THE HONORABLE_____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEA MAR COMMUNITY HEALTH CENTERS, | Case No. 2:24-cv-896 |
| Plaintiff, | **COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION, | |
| Defendant. | |

Plaintiff Sea Mar Community Health Centers ("Sea Mar"), for causes of action against Defendant Accreditation Council for Graduate Medical Education ("ACGME"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      Sea Mar is a nonprofit corporation and a Federally Qualified Health Center ("FQHC") under Section 330 of the Public Health Service Act, Pub. L. 104-299, § 2, 110 Stat. 3626, 3626–42 (1996). Founded in Washington in 1977, Sea Mar provides medical, dental, and social services for the state's medically underserved populations, including migratory and seasonal agricultural workers, the homeless, and residents of public housing. As its website explains, Sea Mar "is a community-based organization committed to providing quality, comprehensive health, human, housing, educational and cultural services to diverse communities, specializing in service

COMPLAINT – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

to Latinos in Washington state. Sea Mar proudly serves all persons without regard to race, ethnicity, immigration status, gender, or sexual orientation, regardless of ability to pay for services." *Welcome to Sea Mar Community Health Centers*, Sea Mar Cmty. Health Ctrs., https://www.seamar.org (last visited June 17, 2024).

2.      Sea Mar's Family Medicine Residency Program, based out of its Marysville clinic, is a cornerstone of its healthcare delivery system. Both the state and federal governments have recognized that rural and underserved communities have inadequate access to basic medical care; the federal Health Resources and Services Administration ("HRSA"), for example, "estimates *a projected shortage of 35,260 primary care physicians*—including family medicine, general internal medicine, geriatrics, and pediatrics—by 2035. These shortages are projected to be particularly acute in rural areas." *Teaching Health Center Graduate Medical Education (THCGME) Program*, HRSA, https://bhw.hrsa.gov/funding/apply-grant/teaching-health-center-graduate-medical-education (July 2023); *see also* S.S.H.B. 1485 § 1, 64th Leg., 2015 Reg. Sess. (Wash.) (recognizing and remediating "family medicine physicians in shortage areas in the state"). To address these shortages, state and federal programs have been created to provide funding and support for community-focused family medicine residency programs—including Sea Mar's.

3.      But there's a catch: Even though state and federal programs provide both direct and indirect funding to residency programs like Sea Mar's, ACGME serves as the gatekeeper for that financial support. ACGME is the accrediting organization for graduate medical education and exercises monopoly control over which graduate medical programs are accredited and which are not. This authority is not merely practical, but legal: State and federal statutes alike condition funding for programs like Sea Mar's Family Medicine Residency Program on ACGME accreditation, deferring completely to ACGME's decisions without meaningful review or oversight.

4.      Because of the express gatekeeping function for funding delegated to ACGME and the deference afforded to it by state and federal governments, ACGME serves as a quasi-public

COMPLAINT – 2

1   entity that exercises significant authority over the fates of the nation's residency programs—
2   including, in particular, those programs that train physicians in the provision of community-based
3   healthcare in rural and medically underserved areas. Given the vital importance of public
4   funding—especially for organizations like Sea Mar that serve underprivileged communities—
5   ACGME is effectively able to exercise "life and death power" over critical residency programs, a
6   level of influence that has led courts to recognize "a 'common law duty on the part of "quasi-
7   public" private professional organizations or accreditation associations to employ fair procedures
8   when making decisions affecting their members.'" *Pro. Massage Training Ctr., Inc. v.*
9   *Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169–70 (4th Cir. 2015) (quoting
10  *McKeesport Hosp. v. ACGME*, 24 F.3d 519, 534–35 (3d Cir. 1994) (Becker, J., concurring in the
11  judgment)).

12      5.      ACGME's actions toward Sea Mar over the past year have been anything but fair.
13  Since receiving its initial accreditation in 2015, the Sea Mar Family Medicine Residency Program
14  had been consistently reaccredited each year and last received a citation in 2018. But this past
15  February, just weeks after ACGME continued Sea Mar's institutional accreditation—with an
16  express commendation for Sea Mar's compliance with ACGME requirements—two ACGME field
17  representatives conducted a perfunctory, remote "site visit" of the Family Medicine Residency
18  Program. Despite being directed to conduct an "in-person" evaluation, the field representatives
19  conducted a video visit, lasting less than a business day, with residents and Sea Mar personnel
20  meeting either in groups for brief discussions or for five-minute individual sessions. At the end of
21  the visit, Sea Mar's administration was granted only a few minutes with the field representatives
22  for discussion, with no opportunity to learn of, respond to, or disabuse them of any inaccuracies
23  of their impressions and findings or otherwise address their concerns.

24      6.      On April 21, 2024, Sea Mar received a notification from ACGME's review
25  committee that the Family Medicine Residency Program's accreditation would be withdrawn in
26  just two months' time—effective June 30, 2024, the end of the 2023–2024 academic year.

COMPLAINT – 3

ACGME did not immediately specify the reasons for the decision, giving itself sixty days to do so. After Sea Mar protested this delay, ACGME provided bare-bones citations several days later but refused to provide the underlying bases for the citations unless and until Sea Mar appealed the withdrawal decision, thereby requiring Sea Mar to appeal without even knowing ACGME's rationale for its precipitous action.

7.     Sea Mar duly appealed, and that rationale was provided thereafter, consisting of a list of forty-seven citations that purportedly chronicled shortcomings in Sea Mar's program but was actually a hodgepodge of vague, manifestly erroneous, trivial or insubstantial claims that were plainly designed to discredit the Family Medicine Residency Program without justifying why the draconian remedy of accreditation withdrawal was chosen rather than one of the less-drastic, progressive remediation options available to ACGME.

8.     Despite the meritless nature of many citations and the unjustified withdrawal decision, Sea Mar has been and continues to be denied a meaningful opportunity to contest ACGME's allegations, citations, and remedy and defend its Family Medicine Residency Program to preserve it and the physicians and community it serves. ACGME informed Sea Mar that an appeal of the accreditation withdrawal was scheduled for July 17, 2024—*after* the withdrawal will have gone into effect—and that that date could not be accelerated. The hearing has since been postponed by ACGME to August 2, and the ACGME board, which has the ultimately authority to rule on the recommendation stemming from the appeal, will not do so until its meeting on September 28. Meanwhile, ACGME has refused all of Sea Mar's requests to either delay the date of accreditation withdrawal or expedite the appeals process to allow it to finish before the withdrawal decision takes effect.

9.     An appeal hearing and decision that takes place *after* the de-accreditation date has already passed—which is to say, exactly what ACGME is allowing here—offers no effective remedy at all. Once accreditation is withdrawn, the Family Medicine Residency Program will, by necessity and ACGME requirement, be dismantled, with existing and incoming residents leaving

COMPLAINT – 4

for other programs, faculty departing for other opportunities, affiliated facilities terminating their relationships with the program, and public grants supporting the program becoming imperiled or terminated. These consequences are not mere conjecture: Sea Mar's residents have already started leaving, institutional relationships are already unraveling, and government funders of the program have taken initial steps to address the public-funding implications.

10. Even if Sea Mar prevails in its appeal and the Family Medicine Residency Program's accreditation is restored by the ACGME board in late September, substantial damage will have already been done, as the program will have effectively and permanently ended on June 30 with no current residents in place, affiliations with facilities needed for the program disrupted and requiring resurrection, and grant applications for financial support denied, deferred or terminated. Given the realities of the situation, the appeal ACGME has offered Sea Mar is illusory; at best, it is too little, too late.

11. Notably, these harms will befall Sea Mar despite ACGME's own internal policies that would have permitted a deferral of the Family Medicine Residency Program's accreditation withdrawal for one year, until after the appeals process had concluded and Sea Mar had been allowed the limited opportunity to be heard that ACGME's procedures afford. Delaying the withdrawal of the Family Medicine Residency Program's accreditation by an additional year would have ensured that the appeals process was completed before the program is effectively shuttered and that, should Sea Mar's appeal be unsuccessful, the program's residents would not be required to seek other opportunities in the middle of the academic year. But ACGME both chose to reject this option and refused Sea Mar's request to expedite the appeal, thus ensuring that the Family Residency Program would end before Sea Mar had any opportunity to challenge the decision and denying Sea Mar basic tenets of due process.

12. Put plainly, ACGME has refused to provide Sea Mar the "fair procedures" required by law. The Family Medicine Residency Program is now in jeopardy and ACGME has refused

COMPLAINT – 5

1   even to give Sea Mar a meaningful opportunity to be heard, much less offered fair procedures to

2   seek to vindicate its position—the basic and undeniable requirements of due process.

3       13.    Moreover, the untimely appeals process that ACGME has provided Sea Mar

4   violates Washington's Consumer Protection Act ("CPA") by imposing an unfair and deceptive

5   business practice—specifically, an illusory appeal—that Sea Mar is unable to negotiate or avoid.

6       14.    And, by implementing its internal policies and procedures in a manner that has

7   unnecessarily imposed precipitous adverse action and denied the opportunity for a meaningful

8   appeal, ACGME has further breached its implied duty of good faith and fair dealing.

9       15.    Given ACGME's failure to meet its procedural obligations, the harms that have

10   already occurred, and the imminent risk of additional irreparable injury to Sea Mar, the Family

11   Medicine Residency Program, and the diverse under-resourced communities they serve, Sea Mar

12   seeks intervention and relief from this Court to prevent ACGME from withdrawing the program's

13   accreditation before the end of the next academic year or, at the very least, before providing Sea

14   Mar the opportunity to complete the ACGME appeals process challenging the adverse

15   accreditation decision.

16       16.    Additionally, given the common-law and statutory violations committed by

17   ACGME, Sea Mar further seeks to mitigate the harm and recovery of any damages to which it is

18   entitled.

19   **JURISDICTION AND VENUE**

20       17.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331,

21   as this is a civil action arising under the laws of the United States, including the federal common

22   law; 28 U.S.C. § 1332, as there is complete diversity of citizenship between Sea Mar and ACGME

23   and the amount in controversy exceeds $75,000; and 28 U.S.C. § 1367, which provides the Court

24   with supplemental jurisdiction over Sea Mar's state-law claims.

25

26

COMPLAINT – 6

18.     This Court has personal jurisdiction over ACGME because ACGME transacts business within Washington, including the accreditation of graduate medical education programs in the state. *See* RCW 4.28.185(1)(a); Fed. R. Civ. P. 4(k)(1)(A).

19.     Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

20.     Plaintiff Sea Mar is a Washington nonprofit corporation with its principal place of business in Seattle, Washington.

21.     Defendant ACGME is an Illinois nonprofit corporation with its principal place of business in Chicago, Illinois.

## FACTUAL ALLEGATIONS

### Sea Mar Serves Diverse Communities in Washington

22.     For more than four decades, Sea Mar has been committed to providing quality, comprehensive health, human, housing, educational, and cultural services to diverse communities, specializing in services to Latinos throughout Washington. In that time, it has grown from a single clinic in Seattle to dozens of medical and dental clinics and associated healthcare service providers throughout the state.

23.     In 1978, with approximately $300,000 in funding from the federal government, Sea Mar purchased a clinic in the South Park neighborhood of Seattle from a retiring physician. The clinic offered primary medical care and nutrition services and focused on addressing the healthcare needs of the Spanish-speaking community in western Washington (as well as the retiring physician's patients, many of whom were elderly and in need of long-term care).

24.     Over the course of the next forty years Sea Mar expanded its offerings and clinical sites, including opening its Marysville clinic in 1989, where its Family Medicine Residency Program is based.

COMPLAINT – 7

25.     Today, Sea Mar provides services and programs in thirteen counties throughout Washington: Clallam, Clark, Cowlitz, Franklin, Grays Harbor, Island, King, Pierce, Skagit, Snohomish, Thurston, Whatcom, and Yakima.

26.     Sea Mar operates thirty-three medical clinics and twenty-one dental clinics. In addition to primary medical and dental care, these clinics offer services in obstetrics and gynecology, minor outpatient surgery, occupational healthcare, and pediatric orthodontic care. Sea Mar also operates twenty-eight outpatient behavioral health clinics and four inpatient substance-abuse treatment centers.

27.     In addition to these health services, Sea Mar also offers laboratory, radiology, and pharmacy services; nutrition and health education; maternity support; homeless and migrant outreach and support; home health and home care services; insurance enrollment assistance; and citizenship and English-as-a-second-language classes.

28.     As an FQHC, Sea Mar serves as a "safety net provider[]" and offers comprehensive healthcare services to medically underserved populations, including migratory and seasonal agricultural workers, the homeless, and residents of public housing. *Federally Qualified Health Center*, Ctrs. for Medicare & Medicaid Servs. 4–5 (Jan. 2024), https://www.cms.gov/files/document/mln006397-federally-qualified-health-center.pdf; *see also* 42 U.S.C. § 254b.

29.     In 2023, Sea Mar provided 1,840,337 individual services to 290,556 people across Washington. Of the patient base, 96% had incomes below the federal poverty level, 85% had either public insurance (Medicare or Medicaid) or were uninsured and approximately 41% were Latino. Sea Mar's emphasis on caring for the poor and otherwise underserved has been part of its mission and operations since its creation in 1978.

**Sea Mar's Family Medicine Residency Program Trains the Next Generation of Family Medicine Physicians**

30.     To further support its mission and help address a critical shortage of primary-care doctors, Sea Mar created the Family Medicine Residency Program to train the next generation of

COMPLAINT – 8

family medicine physicians focused on helping the underprivileged. As the program's website explains, its residents are trained to "provid[e] care for families in need, including the uninsured, those without the ability to pay, and undocumented immigrants in Western Washington." *The Sea Mar Marysville Family Medicine Residency Program*, Sea Mar Cmty. Health Ctrs., https://seamarmarysvilleresidency.org (last visited June 17, 2024).

31.     In 2015, after years of preparatory work, Sea Mar first received accreditation from ACGME for the Family Medicine Residency Program—accreditation that has been in place ever since. Since 2018, the program consistently received annually continued accreditation without any citations until this year.

32.     ACGME, according to its website, "sets and monitors voluntary professional educational standards essential in preparing physicians to deliver safe, high-quality medical care to all Americans." *About the ACGME: Overview*, ACGME, https://www.acgme.org/about/overview (last visited June 17, 2024). As a part of these activities, ACGME oversees the accreditation of all medical residency and fellowship programs in the United States—including Sea Mar's Family Medicine Residency Program.

33.     ACGME charges annual accreditation fees to the programs and sponsoring institutions it accredits. The fee is $6,050 for each program with more than five residents and 2.5% of total program fees for sponsoring institutions. Sea Mar has annually paid the sponsoring institution and program fee for the Family Medicine Residency Program since its initial accreditation.

34.     The Family Medicine Residency Program's first class of family medicine residents started training in the summer of 2017, and the program has since expanded to around twelve residents in each three-year class.

35.     Sea Mar's family medicine residents currently see patients in the outpatient setting at three of Sea Mar's clinics, in Marysville, Everett, and Lynnwood. Inpatient training rotations in obstetrics, surgery, family medicine, intensive care, and emergency medicine occur at Providence

Regional Medical Center Everett. Specialized pediatric hospital care is provided at Seattle Children's Hospital.

36.     The Family Medicine Residency Program has a strong track-record of providing high-quality medical education and training. Since the program's inception, *100%* of its graduates have passed the American Board of Family Medicine's board-certification examinations.  By its own policy, the ACGME is supposed to account for the aggregate board pass rates of a program's residents/fellows in its evaluation of program effectiveness, and Sea Mar's program has maintained a perfect score.

37.     Since its creation, the Family Medicine Residency Program has had two permanent program directors and, in between, one interim director was appointed while a search was conducted for the new permanent program director.  Dr. Greg Sanders served in the permanent role at the program's inception until his retirement in 2021. During the search for Dr. Sanders' successor, Dr. Patrick Gemperline—a thirty-year Sea Mar veteran with experience overseeing another of Sea Mar's residency programs—was selected to serve as the interim director. After the search concluded, Dr. Gemperline returned to his position as a clinician at Sea Mar's Seattle clinic and Dr. Ricardo Jimenez, another long-time Sea Mar veteran and the designated institutional officer for Sea Mar's ACGME residency programs, became the permanent program director, effective in April 2022.

**The Family Medicine Residency Program Transitions to the THCGME Model**

38.     Dr. Jimenez had an oversight role since the Family Medicine Residency Program's inception while serving as Sea Mar's Designated Institutional Official, a position which by ACGME Institutional Policy has authority and responsibility for the oversight and administration of each Sponsoring Institution's ACGME-accredited programs, as well as for ensuring compliance with the ACGME institutional and subspecialty-specific program requirements. Once he became the program director, he sought to further align the program with Sea Mar's overall mission by

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   moving it towards the Teaching Health Center Graduate Medical Education ("THCGME") model
2   established by HRSA.

3        39.    THCGME programs are designed to train physicians in community-based settings
4   that focus on rural and underserved communities. Most residency programs emphasize training
5   physicians in hospitals, but THCGME programs emphasize training residents in outpatient settings
6   like Sea Mar's community health centers.

7        40.    In 2022, after months of preparation and several meetings with Sea Mar's faculty
8   and administrative staff and the leadership at Providence Regional Medical Center Everett, the
9   Family Medicine Residency Program updated its inpatient family medicine teaching service,
10  transitioning from a model where residents had more hospital-based and obstetrics rotations (a
11  model more suited to training hospitalists) to a program where community-clinic rotations grew in
12  importance. The program has since welcomed new faculty for the inpatient family medicine
13  teaching service, which remains a key component of the program by allowing residents to follow
14  community patients if they are hospitalized.

15       41.    But even appropriate change can be difficult: Some faculty preferred the older,
16  hospital-based obstetrics care model and a few left as a result. Those departures, combined with
17  unrelated attrition, led to new faculty being recruited and a reconfiguration and reassignment of
18  some of the program's managerial positions.

19       42.    Each year, ACGME conducts surveys of program residents and faculty, and Sea
20  Mar's surveys in 2023 reflect the internal struggle over the Family Medicine Residency Program's
21  modified direction. During the transition to the THCGME model, some residents expressed a
22  desire for fewer obstetrics rotations. But some program faculty members wanted to maintain the
23  frequency and intensity of obstetrics training. Responding to this disagreement and seeking to
24  address the concerns of both faculty and residents, the Family Medicine Residency Program's
25  leadership implemented a workable solution—including structuring the program so that residents
26  can tailor the extent of their obstetrics training to their individual career goals.

COMPLAINT – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

43.     The changes made to residents' obstetrics training is just one instance of Sea Mar's responsiveness to its residents and faculty. Indeed, the program ensures that feedback from residents and faculty is heard and, where feasible, operationalized. The Family Medicine Residency Program has twelve resident leadership positions and uses external and internal surveys (including the annual ACGME surveys) to solicit residents' opinions. Concerns raised are typically incorporated into Sea Mar's action plan.

44.     The quality of the Family Medicine Residency Program has not been affected by the disagreements that accompanied the transition to the THCGME model: For instance, Sea Mar received the Joy in Medicine Recognition Program's silver recognition in 2023 for supporting physician well-being and reducing burnout, and the resident board-certification exam passage rate has remained at 100%.

45.     Moving forward, Sea Mar planned to expand its services for Washington's underprivileged and underserved communities. To this end, it has laid the initial groundwork for a "Rural Pathway" within the Family Medicine Residency Program to help address the particularly acute need for primary care providers in rural areas. Though the Rural Pathway is not yet an official part of the Family Medicine Residency Program, it is set to begin in 2025. The Rural Pathway will have its own curriculum, with participating residents seeing patients at Sea Mar's Mt. Vernon and Concrete clinics in the outpatient setting and inpatient rotations at Providence Regional Medical Center Everett and Skagit Valley Hospital.

**Sea Mar Received State and Federal Funds for the Family Medicine Residency Program**

46.     The Family Medicine Residency Program has received both state and federal funding—all conditioned on ACGME's accreditation of the program.

47.     Washington State provides funding for family medicine residency programs, *see* RCW 70.112.060, as part of a greater effort to "increase the number of family medicine physicians in shortage areas in the state," S.S.H.B. 1485 § 1. Significantly, residency programs are defined as "community-based residency educational programs in family medicine, either in existence or

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

established under this chapter *and that are certified by the accreditation council for graduate medical education* or by the American osteopathic association." RCW 70.112.010(4) (emphasis added). In other words, the Family Medicine Residency Program's eligibility for this state funding is conditioned on ACGME certification.[1]

48.    Sea Mar's Family Medicine Residency Program has consistently received this state funding in recent years. For fiscal-year 2023, these funds totaled $531,181; for 2024, that number increased to $674,301.

49.    Sea Mar relies on this state money to support the Family Medicine Residency Program.

50.    On the federal side, HRSA oversees a THCGME program that, like Washington's family medicine equivalent, aims to assist "qualified teaching health centers" that serve "medically underserved communit[ies]" and "rural area[s]." 42 U.S.C. § 256h(a)(3). First established by the Patient Protection and Affordable Care Act, *see* Pub. L. No. 111-148, §§ 5507–5508, 124 Stat. 119, 668–74 (2010), the THCGME program provides funding for "maintenance of filled positions at existing approved graduate medical residency training programs," "expansion of existing approved graduate medical residency training programs," and "establishment of new approved graduate medical residency training programs." 42 U.S.C. § 256h(a)(1)(A)–(C).

51.    In order to qualify as an "approved graduate medical residency training programs" and thus be eligible for HRSA funding, a program like the Family Medical Residency Program must "meet[] criteria for accreditation []as established by [ACGME], the American Osteopathic Association, or the American Dental Association." *Id.* § 256h(j)(1)(B).

---

[1] Although the American Osteopathic Association ("AOA") previously provided an alternative path to qualifying accreditation, ACGME and AOA announced in 2020 that they had completed a "successful transition to a single accreditation system for graduate medical education [] in the U.S." and that, "[u]nder the single accreditation system, the ACGME serves as the nation's sole accreditor for both osteopathic (DO) and allopathic (MD) residencies and fellowships." *AOA, ACGME and AACOM Usher in New Era of Single Accreditation for Graduate Medical Education*, AOA (June 30, 2020), https://osteopathic.org/2020/06/30/aoa-acgme-and-aacom-usher-in-new-era-of-single-accreditation-for-graduate-medical-education-2.

COMPLAINT – 13

52.     In December 2022, Sea Mar learned that it had been approved for funding through HRSA's THCGME program for two full-time residents beginning July 1, 2023, and four additional full-time residents thereafter. The letter noted, consistent with the statute establishing the THCGME program, *see id.*, that this financial support "is contingent upon programs maintaining accreditation." HRSA subsequently confirmed Sea Mar's award of $320,000 for two full-time residents in the Family Medicine Residency Program.

53.     Sea Mar relies on THCGME program funds for the Family Medical Residency Program, including the money HRSA already allocated for four additional full-time residents.

54.     Because these state and federal programs both condition funding on ACGME accreditation, the withdrawal of the Family Medical Residency Program's accreditation threatens Sea Mar's access to these critical sources of financial support and its ability to train residents and provide associated healthcare services in its target communities.

**ACGME Awards Sea Mar Continued Institutional Accreditation with Commendation**

55.     On January 23, 2024, ACGME notified Sea Mar that, as a sponsoring institution of graduate medical education programs, Sea Mar received continued accreditation. The ACGME letter further "commended [Sea Mar] for its demonstrated substantial compliance with the ACGME's Institutional Requirements without any [] citations."

56.     Many of these "Institutional Requirements" for which Sea Mar was commended are substantially or fully identical to the program requirements with which, just weeks later, the Family Medicine Residency Program was found noncompliant.

**ACGME Unexpectedly Decides to Withdraw the Family Medicine Residency Program's Accreditation**

57.     In October 2023, following several years of continued accreditation without citation or incident, Sea Mar received a letter from ACGME explaining that "a site visit of the [Family Medicine Residency Program] must be conducted before an accreditation decision can be made." Two months later, on December 5, Sea Mar received a follow-up letter requesting materials

COMPLAINT – 14

and announcing that ACGME had scheduled a remote site visit for February 20, 2024. The December letter stated that ACGME "ha[d] identified the [Family Medicine Residency Program] as due for an accreditation site visit" but provided scant additional information.

58.     According to the October letter, ACGME's review committee specifically determined that a site visit was necessary because it "want[ed] more context, *in person*, with respect to those [resident and faculty survey] findings as they impact the overall educational environment of the program." (Emphasis added). The follow-up letter in December, however, provided for a remote site visit without any "in-person" interaction—and with no explanation for this change.

59.     In advance of the site visit, Sea Mar uploaded requested documentation and information into ACGME's accreditation data system and was prepared to seek and provide any available additional documents requested during the site visit.

60.     On February 20, 2024, two "field representatives" from ACGME conducted the remote site visit. These individuals had no apparent background either in family medicine or community-based health services: One is a general surgeon whose career has been spent in academic medicine relating to surgery and trauma care, while the other is a non-physician with advanced non-medical degrees whose touted expertise is in "strategy alignment and financial projections." *Accreditation Field Representatives*, ACGME, https://www.acgme.org/about/board-and-staff/field-representatives (last visited June 17, 2024).

61.     The remote site visit lasted just over six hours. Residents briefly met with the two field representatives, either in groups or for five-minute individual sessions. At the end of the site visit, Sea Mar's administration was allowed only a few minutes with the field representatives for discussion, even though the schedule had allotted thirty minutes for the concluding meeting. The field representatives' findings were not provided to Sea Mar administration, nor was Sea Mar provided an opportunity to address any alleged deficiencies or adverse perceptions. Instead, the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    administrators were left in the dark as to what the field representatives heard (or thought they

2    heard) and what concerns, if any, they had.

3           62.    According to ACGME's policies, field representatives send their findings to the

4    ACGME review committee, which decides what action, if any, to take regarding a program's

5    accreditation. On April 18, 2024, two months after the site visit, the ACGME review committee

6    decided to withdraw the Family Medicine Residency Program's accreditation, which it

7    communicated to Sea Mar in a letter dated April 21.

8           63.    Without apparent ACGME policy authorization or notice to the site under review,

9    upon information and belief it is common ACGME protocol or practice for field representatives

10   to destroy their notes and correspondence regarding site visits immediately after finalizing their

11   site visit reports—which is what ACGME suggested to Sea Mar the field representatives who

12   conducted the Family Medicine Residency Program's site visit did. The field representatives'

13   destruction of their notes and correspondence has significant consequences for Sea Mar and its

14   appeal. The site visit report contains many vagaries and nonspecific information regarding

15   communications the field representatives purportedly had with faculty and residents during their

16   remote visit and unidentified documents they claimed to have reviewed—and omits any

17   contradicting or clarifying communications or information. Many of the forty-seven enumerated

18   citations, in turn, are based solely on these vague communications. The ACGME review

19   committee, which made the ultimate decision to withdraw the Family Medicine Residency

20   Program's accreditation, thus lacked access to the only contemporaneous records of these critical

21   communications, and both Sea Mar and the ACGME appeals panel are now deprived of access to

22   these materials by the spoliation by ACGME's agents—thus preventing Sea Mar, the review

23   committee, and the appeals panel from determining whether the alleged evidence supporting the

24   citations was substantial, credible or relevant, as required under ACGME's policies. *See* ACGME

25   Policies and Procedures § 20.30(b)(12).

26

COMPLAINT – 16

1    **ACGME's Stated Reasons for Withdrawing Accreditation Fall Apart Under Scrutiny**

2    64.    On April 26, 2024, ACGME provided Sea Mar with a notification letter ostensibly

3    reflecting the conclusion reached during an April 18, 2024 review committee meeting at which the

4    review committee decided to withdraw Sea Mar's program's accreditation as of June 30, 2024 and

5    briefly describing forty-seven "citations" that purportedly informed the accreditation decision.

6    Each citation provided a vague, one- or two-sentence explanation that appears to have largely

7    parroted similarly cursory findings in the field representatives' site visit report.

8    65.    Although ACGME's policies and procedures provide that accreditation can be

9    withdrawn due to "egregious non-compliance with accreditation requirements," that was not the

10   offered basis for accreditation withdrawal. Instead, the executive director of the ACGME review

11   committee advised Sea Mar that ACGME's decision was motivated by the sheer number of

12   citations, not by egregious noncompliance. Notably, in cases other than those where egregious

13   noncompliance is found, ACGME's policies provide for progressive remediation, including

14   continued accreditation with warning, probationary accreditation, reduction of resident

15   complement, or other actions as appropriate to the circumstances. None of these remedies was

16   offered or provided here.

17   66.    It is plain from the citations and the underlying documentation that the field

18   representatives' and review committee's goal was to simply run up the score of citations to the

19   forty-seven noted. On their own, many citations are patently meritless, trivial, based upon a

20   nonexistent and spoliated record, or inconsistent with the field representatives' factual findings;

21   collectively, the forty-seven citations neither merit nor support the review committee's decision to

22   effectively destroy Sea Mar's Family Medicine Residency Program rather than offer progressive

23   remedies:

24   a.    **ACGME cited Sea Mar for alleged deficiencies in a planned part of the**

25   **program that does not yet exist (and is not yet part of the residency program that the**

26   **field representatives had authority to review).** Specifically, several citations addressed

COMPLAINT – 17

perceived deficiencies in the planned Rural Pathway program, but the Rural Pathway was to begin in the fall of 2025; at the time of the site visit, it was not yet active, was not yet officially part of the Family Medicine Residency Program, and had no residents enrolled in it. Indeed, initiating the Rural Pathway component of the program would require express ACGME review and approval, which Sea Mar has not yet sought. There is no requirement that an as yet non-existent adjunct to the program have operations and documents in place which are complete and that the failure to do so would be subject to sanction, including withdrawal of accreditation to the existing program.

b.    **Several citations manifestly lacked factual or policy support.** A citation referenced an ACGME guideline that the family medicine practices within residency programs "have [] mission statement[s]" and then notes that "it could not be verified by the program director that [the program] has a mission statement other than the overall institution's mission statement"—without explaining how or why Sea Mar's own mission statement, which is adopted by each of Sea Mar's practices, is insufficient or noncompliant for each of its constituent practices. Another citation faulted the Family Medicine Residency Program for "ha[ving] had three [program directors] over the last three years," even though, as discussed above, this reflects the retirement of the program's first director, an interim director pending a permanent replacement, and the successor permanent director, of course suggesting that the retirement and orderly succession of any program director is perceived by ACGME to be a sanctionable offense. Other citations alleged noncompliance relied on the results of resident and faculty surveys, while other citations inexplicably ignored those very same resident and faculty survey results that confirmed substantial or complete compliance on the cited issues. Indeed, the citation descriptions and site visit report entries routinely ignored or failed to account for virtually all inconsistent or contrary documentary evidence and communications provided to the field representatives and ACGME, without comment or justification.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

c.      **Several citations directly contradicted the express findings of the field representatives, citing Sea Mar for noncompliance on issues where the field representatives confirmed compliance.** For example, the field representatives found that 73% of residents indicated in the resident survey that they experienced four or more days off per twenty-eight-day period, but the citations concluded that the "the recent 2023 Resident Survey reflected, based upon peer judgment, noncompliant responses in this domain." For another citation, while the field representatives confirmed that the program had adequate administrative support and was thus compliant, the corresponding committee citation nonetheless faulted Sea Mar for inadequate support because "it could not be verified" how much time the program coordinator devoted to managing each clinic, without any underlying data or explanation as to what, if any, efforts were made to dispute the program coordinator's affirmative confirmation of working full-time to support the program. Yet another citation faulted the program for not having residents see patients via telehealth, even though the citation itself noted that "the annual data indicates that the residents see patients via telehealth technology", but without attribution said that "it was reported" otherwise.

d.      **Several citations alleged noncompliance with policies that are substantially identical to institutional policies with which ACGME expressly commended Sea Mar for complying just weeks before the site visit.** One such citation related to the size of residents' continuity patient panels. The field representatives confirmed that each resident's panel of patients was large enough, but the Family Medicine Residency Program was nonetheless cited because, "based upon peer judgment, the program did not provide a resident panel of sufficient size." The citation is inconsistent not only with the field representatives' express findings, but also with Sea Mar's institutional reaccreditation, which required ACGME to determine that residents' clinical and educational work panels were consistent with the program requirements.  Other citations

COMPLAINT – 19

failed to account for the disparity of treatment between the commended Sponsoring Institution compliance and the substantial noncompliance allegedly detected in the same timeframe during site visit.

e.     **Several citations were simply wrong as a factual matter.** For instance, several citations claimed that the Family Medicine Residency Program did not evaluate its residents or communicate to them their progress based on ACGME's family medicine "Milestones," but Sea Mar's resident-evaluation documents which ACGME possessed before the site visit and could have asked for again during the visit, clearly show that evaluations were done in accordance with ACGME's milestones and protocol and reflected resident review.  Another citation was issued solely because Sea Mar had not included non-mandatory, "recommended language" in two of the three resident evaluations that the field representatives reviewed.  Notably, the citation was issued by the review committee after the site visit report confirmed Sea Mar's compliance with the corresponding ACGME requirement.

f.     **Several citations faulted Sea Mar for activities expressly allowed by ACGME's policies.** For one such citation, the review committee faulted the program because residents periodically performed non-physician tasks like patient scheduling, even though ACGME's family medicine program requirements state that it is acceptable for residents to periodically perform these types of functions and the prohibition is against "excessive reliance" on such tasks. The site visit report is devoid of any reference to an effort to quantify or otherwise objectively evaluate whether such tasks were excessive or interfered with ordinary resident functions.  Another citation faulted Sea Mar because the program director allegedly did not routinely perform evaluations of the residents, even though ACGME's requirement requires the program director "*or their designee*, with input from the Clinical Competency Committee" to perform this function. (Emphasis added). Here, written resident evaluations confirmed that they were conducted by each resident's

COMPLAINT – 20

site advisor (i.e., the program director's designee) and by the Clinical Competency Committee, of which the program director was a participating member.

g.      **Nearly half of the citations were based on summary, non-quoted communications by unidentified residents and faculty purportedly made during the site visit.** No contemporaneous notes or correspondences were provided to the ACGME review committee (or Sea Mar) because they were reportedly destroyed by the field representatives, leaving the committee, Sea Mar and the ACGME Appeal panel with no ability to discern what was actually said, who said it or whether the communications ascribed to "residents" or "faculty" or just "it was reported" reflected actual statements, unanimity among the participants or included inconsistent information.

h.      **Only *one* citation made any reference to the risk of adverse patient outcomes.** Even then, however, the citation does so only suggestively and without any citation to any supporting or objective indicia or record of adverse patient outcomes or associated circumstances presented to the review committee or reflected by the site visit report. In addition, the finding related to allegedly inadequate supervision—which is, in any event, belied by a majority of the resident surveys that confirm compliance and a level of supervision appropriate to the residents' level of experience—was founded on the vague, unattributed and inscrutable statement that "it was suggested by some interviewed that negative outcomes for patients were also a result of concerns about faculty competency."

67.     In sum, ACGME's citations do not hold up under even cursory scrutiny and, when combined with the review committee's decision to forego available progressive remedies, reveal an apparent agenda to remove the Family Medicine Residency Program's accreditation regardless of whether substantial, credible, and relevant information exists to merit that draconian outcome.

COMPLAINT – 21

1    **The Threatened Withdrawal of Accreditation Has Caused—and Will Continue to Cause—**
2    **Irreparable Injury to Sea Mar**

3       68.    Upon receipt of the notification letter, the Family Medicine Residency Program
4    was prevented from appointing any new residents or fellows and was required to notify all
5    individuals currently enrolled in the program, as well as those who had applied, of the change in
6    accreditation status—thereby prompting their exit from the program and the application process.

7       69.    Since receiving the notification letter, most residents have already arranged to leave
8    the Family Medicine Residency Program to finish their residencies elsewhere. From the
9    announcement of the accreditation withdrawal through the date of this filing, 20 of the program's
10   22 current first- and second-year residents and 10 of its 12 incoming first-year residents have
11   signed contracts to begin or continue their residencies at other institutions. For all practical
12   purposes, the accreditation withdrawal has prevented residents from enrolling in the program or
13   continuing their residencies there.

14      70.    Sea Mar has also experienced threatened and actual attrition of its program faculty
15   and non-Sea Mar facilities that are or were planned to be part of the Family Medicine Residency
16   Program.

17      71.    Meanwhile, Providence Regional Medical Center Everett has threatened to
18   terminate its affiliation with the Family Medicine Residency Program solely because of the
19   impending loss of accreditation, leaving the program at imminent risk of losing its site for
20   inpatient-training rotations in obstetrics, surgery, family medicine, intensive care, and emergency
21   medicine. In addition, the adverse accreditation decision has needlessly and recklessly sullied Sea
22   Mar's reputation in the medical and patient communities

23      72.    Finally, because the Family Medicine Residency Program was firmly integrated
24   into its clinical services, Sea Mar has had to contract with other providers to ensure that it has the
25   resources necessary to address the needs of its otherwise medically underserved patient base.

26

COMPLAINT – 22

**ACGME's Appeals Process and Procedures Are Inadequate**

73.     On May 10, 2024, Sea Mar notified ACGME of its intent to appeal the review committee's withdrawal of the Family Medicine Residency Program's accreditation.

74.     After receiving Sea Mar's notice of appeal, ACGME told Sea Mar that the appeal hearing was scheduled for July 17, 2024—nearly three weeks *after* the withdrawal of accreditation is scheduled to go into effect. ACGME later postponed the hearing to August 2 to accommodate the appeals panelists' schedules. Sea Mar's written request to have the appeal heard and decided before the withdrawal goes into effect was rejected by ACGME without explanation.

75.     After the hearing, the appeals panel will have to file a report and recommendation for the ACGME board to take final action, which, ACGME informed Sea Mar, will not occur until the board's September 28, 2024, meeting—three months after the Family Medicine Residency Program's accreditation withdrawal will take effect.

76.     Although ACGME's policies and procedures provide for a right to appeal adverse accreditation decisions, the appeals process in this case effectively prohibits Sea Mar from challenging the revocation of the program's accreditation. ACGME requires that Sea Mar identify itself as having had its program accreditation withdrawn as of June 30, 2024 (although "under appeal"), and that Sea Mar so notify all residents and applicants. More to the point, ACGME will treat the Family Medicine Residency Program as unaccredited as of July 1, 2024. As a result, the appeals process provides no real recourse because by the time it is complete, the Family Medicine Residency Program will have lost its accreditation—and, consequently, ceased to exist.

77.     Moreover, the appeals process itself is unlikely to provide Sea Mar with a meaningful opportunity to be heard on the adverse accreditation decision. Notably, ACGME has refused to provide Sea Mar with any documents other than those comprising the ACGME curated "program file" on which the review committee ostensibly relied when making its decision, but ACGME claimed that the file does not include the relevant review committee meeting minutes or other documents that constitute "the record of the review committee's action" beyond the citation

COMPLAINT – 23

1   notice. Among other shortcomings, the program file does not include the communications gathered

2   during the site visit, documentation explaining omissions of exculpatory or contradictory

3   communications or materials, or the review committee's bases for its decision (including why it

4   declined to adopt less draconian remedies).[2]

5       78.     No other documents have been provided to Sea Mar to understand ACGME's

6   action or relevant to the appeal. Indeed, on multiple occasions, Sea Mar has requested in writing

7   additional documents that bear on the decision to withdraw the Family Medicine Residency

8   Program's accreditation, including all survey or inspection workpapers, communications and

9   documents that led to the withdrawal decision, and the review committee's records corresponding

10  to its deliberations and decision. ACGME has refused those requests and others, leaving Sea Mar

11  to rely exclusively on the small set of materials comprising the program file. ACGME has also

12  refused to explain its field representatives' destruction of their workpapers and correspondence or

13  even confirm in writing that the documents were destroyed or provide ACGME authority for doing

14  so.

15      79.     Additionally, as communicated to Sea Mar, the details of the appeals process are

16  inadequate to protect it in the face of ACGME's arbitrary and capricious (or worse) decision-

17  making:

18  _____

19      [2] The inexplicably deficient citations and precipitous accreditation withdrawal action,
20  along with the inadequate process afforded in connection with the appeal, leave Sea Mar to guess
    why it has been so mistreated by ACGME. The information to which Sea Mar currently has access,
21  though, suggests motivations that might be iniquitous. For example, Sea Mar, a relatively small
    healthcare provider operating one residency program, pays far less to ACGME in annual fees than
22  say, academic medical institutions that have many residency programs that maintain accreditation
    despite multiple citations. So, ACGME has an ample financial incentive to give short shrift to Sea
23  Mar's accreditation while establishing or maintaining its image of rigorous oversight at low cost
    to it. Moreover, in the ACGME site visit report, the field representatives made the puzzling,
24  seemingly irrelevant mention that Sea Mar "was founded by Hispanics," suggesting possible
    discriminatory animus. Sea Mar is unable to confirm these explanations because ACGME and its
25  agents have either destroyed or refused to produce materials and documentation that might shed
    light on these issues (notwithstanding ACGME's policy that the appeals process determine if the
26  de-accreditation decision was based on substantial, credible, and relevant evidence).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

a.      ACGME's policies and procedures state that the appeal is not "of an adversarial nature" but instead "provide[s] an administrative mechanism for peer review of an accreditation decision for an educational Sponsoring institution or program."

b.      The scope of Sea Mar's presentation is limited only to "clarifications of the record," and does not encompass any remedial action that could demonstrate that any purported noncompliance was insubstantial and easily addressed without withdrawal of accreditation.

c.      Sea Mar has been denied the opportunity it requested to do any discovery on the decision-making process, including interviewing or deposing the field representatives or review committee members, or obtaining a history of ACGME's disposition of similar findings.

d.      ACGME has also refused Sea Mar's requests for information regarding (1) how the members of the appeals panel are selected (including who makes the selection, what criteria are used, and whether and how the members are screened for potential conflicts of interest); (2) how the members of the appeals panel have ruled in prior appeals; (3) what other duties (if any) the appeals panel has; (4) whether the attorney(s) advising the appeals panel also advises the review committee and/or the ACGME board; or (5) the applicable burden of proof or standard of review.

e.      Among other things, Sea Mar has been denied (1) records it requested regarding ACGME's decision to continue Sea Mar's institutional accreditation with commendation; (2) documents underlying ACGME's decision to authorize a remote site visit rather than an in-person visit; (3) official confirmation that the field representatives who conducted the remote site visit destroyed their notes and correspondence; (4) any policy pertaining to the destruction of notes prepared by field representatives; (5) the minutes of the review committee meeting concerning the site visit; (6) materials that might be shared between the review committee and the appeals panel; (7) the identities of anyone

COMPLAINT – 25

from ACGME who will attend the appeal hearing; and (8) records and information pertaining to previous ACGME appeals.

      f.     Before the hearing, Sea Mar is prohibited from communicating with the members of the appeals panel, the field representatives, the members and executive director of the ACGME review committee, and the ACGME board; the same prohibitions do not apply to ACGME which apparently may engage *in ex parte* communication.

80.     Moreover, ACGME has refused to consider as part of the appeal any evidence of remedial actions taken by Sea Mar and the Family Medicine Residency Program in response to the review committee's forty-seven citations. Even though progressive remediation or probationary accreditation are available to ACGME when a program "has failed to demonstrate substantial compliance," which in turn allow for a program to demonstrate that the issues are insufficiently substantial that they can be remedied during continued accreditation without withdrawal of accreditation, ACGME refuses to permit the introduction of such evidence.

81.     In short, this appeals process might well fall short of the "meaningful" opportunity to be heard that Sea Mar is owed.

82.     Even if Sea Mar overcomes these hurdles and prevails in the appeal, and the ACGME board chooses to reverse the review committee's decision and restore the Family Medicine Residency Program's accreditation at its meeting on September 28, the program will have been effectively shuttered for a full academic year, as the program will be devoid of existing and incoming residents. Under these circumstances, a restoration of the program's accreditation will be too little, too late—the loss of reputational capital alone would make it difficult (if not impossible) to revive the program. The consequent harm to Sea Mar's residents and the communities they serve will be profound.

83.     In sum, the ACGME appeals process and procedures do not provide adequate due process because the adverse decision will have been effectuated before Sea Mar has a meaningful opportunity to be heard.

COMPLAINT – 26

84.     ACGME has the authority in its policies and procedures to permit a program to complete an additional academic year following an adverse accreditation decision. ACGME chose not to exercise that authority here despite Sea Mar's request that it do so.

## CAUSES OF ACTION

### COUNT I

### Denial of Federal Common-Law Due Process

85.     Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

86.     "[A]ccreditation agencies are [not] wholly free of judicial oversight"; instead, courts have recognized that "there exists a 'common law duty on the part of "quasi-public" private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members.'" *Pro. Massage*, 781 F.3d at 169 (quoting *McKeesport Hosp.*, 24 F.3d at 534–35 (Becker, J., concurring)); *see also, e.g.*, *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1314 (8th Cir. 1987) ("Although not governed by constitutional guidelines, [accrediting bodies] nevertheless must conform [their] actions to fundamental principles of fairness.").

87.     "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). This opportunity "is required before an individual is finally deprived of a property interest." *Id.*; *see also, e.g.*, *Mountain State Univ., Inc. v. Higher Learning Comm'n*, No. 5:14-16682, 2017 WL 963043, at *10 (S.D. W. Va. Mar. 10, 2017) ("'[N]otice and opportunity for hearing appropriate to the nature of the case' are indispensable ingredients of due process and thus of common-law due process claims." (alteration in original) (citation omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950))).

COMPLAINT – 27

88.     Here, ACGME has informed Sea Mar that it intends to withdraw the Family Medicine Residency Program's accreditation effective June 30, 2024—before Sea Mar will have an opportunity to be heard on the de-accreditation decision at the appeal hearing scheduled for August 2. ACGME has further denied Sea Mar's requests to expedite the hearing or extend the effective date of the accreditation withdrawal to allow the appeal to be completed beforehand.

89.     Sea Mar has therefore been denied the opportunity to be heard at a meaningful time and in a meaningful manner because no opportunity will be afforded until after adverse action is taken.

90.     Sea Mar has suffered and will continue to suffer significant, irreparable injury if the Family Medicine Residency Program's accreditation is withdrawn on June 30, 2024. Even if Sea Mar prevails in ACGME's appeals process, the loss of residents and faculty, institutional support, and public funding caused by the accreditation withdrawal will effectively lead to the program's permanent and irreversible dissolution. Nor, given the reputational harm caused by accreditation withdrawal, would reaccreditation appear to be a viable option to revive the Family Medicine Residency Program.

91.     Intervention from this Court is therefore needed to vindicate Sea Mar's federal due-process rights and ensure that ACGME's adverse accreditation decision is not effectuated until at least after Sea Mar has received a meaningful opportunity to be heard appealing the decision.

## COUNT II

### Denial of State Common-Law Due Process

92.     Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

93.     States have also recognized that "certain private organizations owe a limited common law duty of due process to those subject to disciplinary action," which, like federal common-law due process, requires "fundamental fairness," "notice," and "an opportunity to be

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

heard." *Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F.Supp.3d 531, 542–43 (E.D. Pa. 2019) (quoting *Psi Upsilon of Phila. v. Univ. of Pa.*, Pa.Super. 604, 610–11 (1991)).

94.     Although the Washington Supreme Court has not confirmed the existence of common-law due-process obligations for accrediting bodies under Washington law, it long ago noted—in a more specific but legally analogous context—that "expulsion for crime or misconduct inimical to [an] organization's being" must be preceded by "a hearing after notice" *Schroeder v. Meridian Improvement Club*, 36 Wn.2d 925, 933 (1950).

95.     Because due-process protections are especially appropriate where membership in or recognition from a given organization is "an economic necessity" and the organization is one "with which the public is highly concerned and which engages in activities vitally affecting the health and welfare of the people," *Falcone v. Middlesex Cnty. Med. Soc'y*, 34 N.J. 582, 591, 596–97 (1961) (cleaned up), states have extended common-law due process rights to accreditation decisions, *see, e.g.*, *Auburn Univ. v. S. Ass'n of Colls. & Schs., Inc.*, 489 F.Supp.2d 1362, 1367–75 (N.D. Ga. 2002) (charting history of higher-education accreditation and observing that "the notion of common law due process evolved from the . . . line of [state] cases holding that where membership in private associations is a virtual prerequisite to the practice of a given profession, courts must scrutinize the procedures used by the association to assure that they are reasonable, while giving deference to the specialized competence of the association" (cleaned up)).

96.     Here, again, ACGME has decided that Sea Mar will not have a meaningful opportunity to be heard until *after* the adverse accreditation decision is effectuated, which will effectively end the Family Medicine Residency Program, causing irreparable harm for Sea Mar, its staff and residents, and its patients who rely on the program for family medicine services.

97.     Intervention from this Court is therefore needed to vindicate Sea Mar's state due-process rights and ensure that ACGME's adverse accreditation decision is not effectuated until after Sea Mar has received a meaningful opportunity to be heard.

COMPLAINT – 29

**COUNT III**

**Violation of the Washington Consumer Protection Act**

98.     Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

99.     Washington's CPA, RCW 19.86.010–.920, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020. The CPA "shall be liberally construed that its beneficial purposes may be served." RCW 19.86.920.

100.     To prevail on a CPA claim, private litigants must establish five elements: "(1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest"; (4) "injury to plaintiff in his or her business or property"; and (5) "a causal link be established between the unfair or deceptive act complained of and the injury suffered." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784–85 (1986).

101.     Here, each of these elements is satisfied based on ACGME's hollow and illusory commitment to a meaningful appeal process for adverse accreditation decisions.

102.     First, ACGME's appeal process—which has denied Sea Mar its due-process rights and given Sea Mar a hollow, illusory opportunity to contest the adverse accreditation decision— is both an unfair and a deceptive practice and is designed to prevent meaningful and successful appeals of its decision-making. Even if Sea Mar prevails in the appeal, the process offered by ACGME will nonetheless cause irreparable harm to Sea Mar and the Family Medicine Residency Program. This is inherently unfair, as Sea Mar has no alternative to the process. *See Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787–88 (2013) (suggesting that "a practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits" (cleaned up)).

103.     ACGME's appeals process is also deceptive, as a reasonable consumer would believe that an appeal would permit meaningful redress of an erroneous decision. *See Panag v.*

COMPLAINT – 30

1  *Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 49–50 (2009). This deception is not unique to the

2  relationship between Sea Mar and ACGME; instead, it is designed to deceive, and has the effect

3  of deceiving, a substantial portion of the residency programs accredited by ACGME, who believe

4  that they have access to a fair appeals process should they be subject to an adverse accreditation

5  decision. *See Behnke v. Ahrens*, 172 Wn. App. 281, 292–93 (2012).

6      104.    Second, the ACGME accreditation process is "in trade or commerce," as ACGME

7  charges annual fees to Sea Mar and the other entities it accredits. *In re Breast Cancer Prevention*

8  *Fund*, 574 B.R. 193, 223 (Bankr. W.D. Wash. 2017).

9      105.    Third, ensuring a fair accreditation process for residency programs is not only in

10  the public interest generally, but also in the narrower sense of the CPA: The practice occurred in

11  the course of ACGME's business of accrediting residency programs, which it advertises to the

12  relevant public and solicited Sea Mar to undertake. *See Hangman Ridge*, 105 Wn.2d at 790–91.

13  Furthermore, given that it exercises monopolistic control over the accreditation of graduate

14  medical education, ACGME holds an unequal bargaining position in the relationship, setting forth

15  terms and procedures that Sea Mar is unable to negotiate. *See id.* at 794 (factors under CPA's

16  public-interest inquiry "include (1) whether defendant was acting in the course of his or her

17  business, (2) whether defendant advertised to the general public, (3) whether defendant actively

18  solicited this plaintiff, and (4) whether the parties were unequal bargainers"). Moreover,

19  ACGME's deceptive practice has the effect of undermining Washington's articulated state policy

20  of promoting and increasing family medicine residency programs in medically underserved areas.

21  *See* RCW 70.112.

22      106.    Finally, Sea Mar has been and will be injured both financially and reputationally

23  because ACGME's appeal process has not provided the opportunity to meaningfully challenge the

24  withdrawal of the Family Medicine Residency Program's accreditation before adverse action is

25  taken.

26

COMPLAINT – 31

**COUNT IV**

**Breach of the Implied Duty of Good Faith and Fair Dealing**

107.     Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

108.     "Under Washington law, '[t]here is in every contract an implied duty of good faith and fair dealing' that 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'" *Melwani v. Amazon.com, Inc.*, No. 21-1329RSM, 2022 WL 3683807, at *4 (W.D. Wash. Aug. 25, 20220) (alteration in original) (quoting *Rekhter v. State*, 180 Wn.2d 102, 112 (2014)); *see also Rekhter*, 180 Wn. at 115 ("[W]hen a party has discretion over a future contract term, it has an implied duty of good faith and fair dealing in setting and performing that contractual term."). This "duty arises [] in connection with terms agreed to by the parties." *Melwani*, 2022 WL 3683807, at *4 (quoting *Rekhter*, 180 Wn.2d at 113).

109.     By inviting accreditation applications, ACGME extends offers to applicants that it will offer accreditation and make accreditation decisions in accordance with its policies and procedures in exchange for payment of annual accreditation fees and substantial compliance with ACGME policies and procedures. Program applicants like Sea Mar accept that offer when they submit applications and provide monetary consideration in the form of annual accreditation fees. *See, e.g.*, *St. Agnes Hosp. of City of Balt., Inc. v. Riddick*, 748 F.Supp. 319, 342 (D. Md. 1990). The relationship between ACGME and Sea Mar is contractual in nature.

110.     Here, ACGME has violated the implied duty of good faith and fair dealing that adheres to all contracts under Washington law with respect to its internal policies and procedures in at least two ways.

111.     First, section 19.70 of ACGME's policies and procedures allows its review committee to "confer a status of Probationary Accreditation if it has determined that a Sponsoring Institution or program has failed to demonstrate substantial compliance with the applicable

COMPLAINT – 32

1   Requirements confirmed by the findings of an accreditation site visit."[3] Whether to take adverse

2   action against an institution and program, and what adverse action to take, are at the discretion of

3   ACGME.

4       112.    In response to the site visit of the Family Medicine Residency Program, ACGME

5   chose the precipitous response of immediate accreditation withdrawal. Under ACGME's own

6   policies, probationary accreditation and progressive remediation would have been appropriate

7   given the circumstances, and yet ACGME has not only declined to offer these options to Sea Mar,

8   but also refused to seek or consider Sea Mar's responses to the site visit findings and review

9   committee's citations—even though many citations were baseless, meritless, premised on vague,

10  non-quoted communications and manifestly inaccurate—before imposing a sanction that will

11  inevitably lead to the program's dissolution based upon the sheer volume of these citations.

12      113.    ACGME thus breached the implied duty by imposing the severest possible penalty

13  on the Family Medicine Residency Program without providing Sea Mar the opportunity to remedy

14  the alleged deficiencies or even meaningfully contest the review committee's conclusions.

15      114.    Second, section 20.00 of ACGME's policies and procedures outlines an appeal

16  process by which an appeals panel can "make recommendation to the ACGME Board as to whether

17  substantial, credible, and relevant evidence exists to support the" adverse action taken by the

18  review committee.

19      115.    ACGME, however, has exercised its discretion to control the timing—of the initial

20  notification to Sea Mar, the withdrawal of accreditation, and the appeals process—to completely

21  deprive Sea Mar of any meaningful opportunity to be heard prior to de-accreditation. Indeed, since

22  withdrawing the Family Medicine Residency Program's accreditation, ACGME has refused Sea

23  Mar's repeated requests and entreaties to provide a meaningful appeals process. Among other

24  procedural and substantive shortcomings, ACGME has chosen an effective withdrawal date that

25

26      [3] ACGME's policies and procedures are attached as Exhibit 1 and incorporated into this complaint by reference.

COMPLAINT – 33

1    precedes the opportunity for appeal; refused to extend the withdrawal date or otherwise provide

2    progressive remediation; denied Sea Mar's repeated requests for information and materials,

3    including the field representatives' notes and correspondence related to the site visit and the

4    minutes of the review committee's deliberations; and refuses to seek or consider any additional

5    evidence in the appeal that contradicts the review committee's conclusions, whether

6    communicated during the site visit or presented before the hearing. Consequently, Sea Mar has

7    been denied the opportunity to demonstrate to the ACGME appeals panel and board that the review

8    committee's decision is not supported by "substantial, credible, and relevant evidence."

9        116.    ACGME thus breached the implied duty by exercising unilateral discretion to

10   implement its internal policies and procedures in a way that has denied Sea Mar the opportunity

11   for a meaningful appeal.

12                               **PRAYER FOR RELIEF**

13       WHEREFORE, Sea Mar prays for judgment against ACGME as follows:

14       A.      A declaration that ACGME's imposition of precipitous adverse action and failure

15   to provide a meaningful opportunity for Sea Mar to be heard before the withdrawal of the Family

16   Medicine Residency Program's accreditation constitutes a violation of Sea Mar's federal and state

17   common-law due-process rights; a violation of the CPA, RCW 19.86.010–19.86.920; and a

18   violation of the implied duty of good faith and fair dealing.

19       B.      An injunction prohibiting ACGME from withdrawing the Family Medicine

20   Residency Program's accreditation until, at earliest, the conclusion of the 2024–2025 academic

21   year or, alternatively, until the appeals process has been completed.

22       C.      An order requiring ACGME to provide Sea Mar with all documents requested by

23   Sea Mar that are relevant to the inspection and review committee deliberation that led to

24   accreditation withdrawal.

25       D.      An award of damages, as well as attorney' fees and costs, in an amount to be proven

26   at trial, but in excess of $75,000; and

COMPLAINT – 34

1    E.      Any and such other relief that the Court deems appropriate.

2                              **<u>DEMAND FOR JURY TRIAL</u>**

3         Pursuant to Federal Rule of Civil Procedure 38(b), Sea Mar demands a trial by jury of all

4    damages claims asserted in this complaint so triable.

COMPLAINT – 35

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2  Dated: June 21, 2024          By: *s/ Matthew P. Gordon*

3

4                                By: *s/ David B. Robbins*

5

6                                By: *s/ Cara V. Wallace*

7

8                                By: *s/ Jonathan P. Hawley*

9                                By: *s/ Juliana L. Bennington*

10

11       David B. Robbins, WSBA No. 13628
         Matthew P. Gordon, WSBA No. 41128
12       Cara V. Wallace, WSBA No. 50111
         Jonathan P. Hawley, WSBA No. 56297
13       Juliana L. Bennington, WSBA No. 60357
         **PERKINS COIE LLP**
14       1201 Third Avenue, Suite 4900
         Seattle, Washington 98101-3099
15       Telephone: +1.206.359.8000
         Facsimile: +1.206.359.9000
16       DRobbins@perkinscoie.com
         MGordon@perkinscoie.com
17       CWallace@perkinscoie.com
         JHawley@perkinscoie.com
18       JBennington@perkinscoie.com

19

20       By:   *s/ Adrianna M. Simonelli*

21       Adrianna M. Simonelli, WSBA No. 58472
         **PERKINS COIE LLP**
22       1120 N.W. Couch Street, Tenth Floor
         Portland, Oregon 97209-4128
23       Telephone: +1.503.727.2000
         Facsimile: +1.503.727.2222
24       ASimonelli@perkinscoie.com

25

26       *Attorneys for Plaintiff*
         *Sea Mar Community Health Centers*

COMPLAINT – 36

1

**CERTIFICATE OF SERVICE**

2

I certify under penalty of perjury that on June 21, 2024, I caused the following to be

3

served the foregoing COMPLAINT by the method(s) indicated:

4

| | |
|---|---|
| Douglas Carlson<br>**DOUGLAS CARLSON LLC**<br>c/o Accreditation Council for Graduate<br>Medical Education<br>401 North Michigan Avenue, Suite 2000<br>Chicago, IL  60611<br>Tel.: (312) 241-1166<br>Email:  carlson@dougcarlsonlaw.com<br><br>*Attorney for Accreditation Council for*<br>*Graduate Medical Education* | \_\_\_   Via hand delivery<br>\_\_\_   Via U.S. Mail, 1st Class, Postage Prepaid<br>\_\_\_   Via Overnight Delivery<br>\_\_\_   Via Facsimile<br>_X_   Via Email<br>\_\_\_   Other:  _____ |
| Vanessa Soriano Power<br>STOEL RIVES LLP<br> 600 University Street, Suite 3600<br>Seattle, WA 98101<br>vanessa.power@stoel.com | www.stoel.com<br><br>Nathan Shafroth-nshafroth@cov.com<br>Covington & Burling LLP<br>415 Mission St., Ste. 5400<br>San Francisco, CA 94105<br><br>Doug Sprague - dsprague@cov.com<br>Covington & Burling LLP<br>415 Mission St Suite 5400<br> San Francisco, CA 94105<br>Attorneys for defendant ACGME | \_\_\_   Via hand delivery<br>\_\_\_   Via U.S. Mail, 1st Class, Postage Prepaid<br>\_\_\_   Via Overnight Delivery<br>\_\_\_   Via Facsimile<br>_X_   Via Email<br>\_\_\_   Other:  _____ |

22

DATED this 21st day of June, 2024.

23

24

*s/ Matthew P. Gordon*
Matthew P. Gordon

25

26

CERTIFICATE OF SERVICE

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

167858405.1