THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEA MAR COMMUNITY HEALTH
CENTERS,

Plaintiff,

v.

ACCREDITATION COUNCIL FOR
GRADUATE MEDICAL EDUCATION,

Defendant.

Case No. C24-896 JNW

**FIRST AMENDED COMPLAINT**

DEMAND FOR JURY TRIAL

**REDACTED VERSION
PUBLICLY FILED**

Plaintiff Sea Mar Community Health Centers ("Sea Mar"), for causes of action against Defendant Accreditation Council for Graduate Medical Education ("ACGME"), alleges as follows:

**PRELIMINARY STATEMENT**

1.     Sea Mar is a nonprofit corporation and Federally Qualified Health Center ("FQHC") under Section 330 of the Public Health Service Act, Pub. L. 104-299, § 2, 110 Stat. 3626, 3626–42 (1996). For more than four decades, Sea Mar has provided medical, dental, and social services for Washington's medically underserved populations, including migratory and seasonal agricultural workers, the homeless, and residents of public housing. As its website explains, Sea Mar "is a community-based organization committed to providing quality, comprehensive health, human, housing, educational and cultural services to diverse communities,

FIRST AMENDED COMPLAINT – 1
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

specializing in service to Latinos in Washington state. Sea Mar proudly serves all persons without regard to race, ethnicity, immigration status, gender, or sexual orientation, regardless of ability to pay for services." *Welcome to Sea Mar Community Health Centers*, Sea Mar Cmty. Health Ctrs., https://www.seamar.org (last visited August 24, 2024).

2.      Sea Mar's Family Medicine Residency Program (the "Family Medicine Residency Program" or the "Program"), based out of its Marysville clinic, was a cornerstone of its healthcare delivery system. The Program trained residents in family medicine to, among other things, provide services to the underserved and vulnerable in Healthcare Professional Shortage Areas ("HPSAs") throughout their careers.[1] The Program welcomed its first class of residents in 2017 and later expanded to a maximum of twelve residents in each class.

3.      By objective metrics, the Program was a success: During the past five years, every one of its graduating residents passed their board-certification examination on the first try, ACGME recognized its success by twice allowing the Program to permanently increase its resident complement (which is only permitted for programs in compliance with ACGME requirements), and not a single resident transferred out of the Program before graduating.

4.      In training the next generation of community-focused practitioners, the Program addressed a critical shortcoming in the American healthcare system. Both the state and federal governments have recognized that rural and underserved communities have inadequate access to basic medical care; the federal Health Resources and Services Administration ("HRSA"), for example, "estimates *a projected shortage of 35,260 primary care physicians*—including family medicine, general internal medicine, geriatrics, and pediatrics—by 2035. These shortages are projected to be particularly acute in rural areas." *Teaching Health Center Graduate Medical Education (THCGME) Program*, HRSA, https://bhw.hrsa.gov/funding/apply-grant/teaching-

---

[1] As defined by the federal Health Resources and Services Administration, HPSAs "can be geographic areas, populations, or facilities. These areas have a shortage of primary, dental, or mental health care providers." *What Is Shortage Designation?*, HRSA, https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation (June 2023).

FIRST AMENDED COMPLAINT – 2
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

health-center-graduate-medical-education (July 2023); *see also* S.S.H.B. 1485 § 1, 64th Leg., 2015 Reg. Sess. (Wash.) (recognizing and remediating "family medicine physicians in shortage areas in the state"). Sea Mar, for its part, offers medical services in HPSAs as defined by HRSA—including at its Marysville clinic, where the Family Medicine Residency Program was based. *See HPSA Find*, HRSA, https://data.hrsa.gov/tools/shortage-area/hpsa-find (last visited August 24, 2024) (identifying Marysville as "Low Income Population HPSA" and Sea Mar as FQHC for Snohomish County, Washington).

5.      To address this endemic shortage of primary-care providers in underserved areas, government programs provide funding and support for community-focused family medicine residency programs—including Sea Mar's, which received financial support from HRSA and the State of Washington.

6.      But there's a catch: Even though state and federal programs provide both direct and indirect funding to community-based residency programs, ACGME serves as the gatekeeper for that financial support. ACGME is the accrediting organization for all graduate medical education in the United States and thus exercises monopoly control over which graduate medical programs are accredited and which are not. This authority is not merely practical, but legal: State and federal statutes alike condition funding for programs like Sea Mar's Family Medicine Residency Program on ACGME accreditation, deferring to ACGME's decisions without meaningful review or oversight. Moreover, the Washington Medical Commission approves only programs accredited by ACGME (or its Canadian equivalents) for postgraduate clinical training, *see* WAC 246-919-330(2), and only residency programs accredited by ACGME can be used to satisfy physicians' continuing-education requirements, *see* WAC 246-919-430(1).

7.      Because of these express gatekeeping functions and the deference afforded to it by the state and federal governments, ACGME serves as a quasi-public entity that exercises significant authority over the fates of the nation's residency programs—including, in particular, programs that train physicians in the provision of community-based healthcare in rural and

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    medically underserved areas. Given the vital importance of public funding (especially for FQHC-

2    and HPSA-based programs like Sea Mar's), ACGME is effectively able to exercise "life and death

3    power" over critical residency programs, a level of influence that has led courts to recognize "a

4    'common law duty on the part of "quasi-public" private professional organizations or accreditation

5    associations to employ fair procedures when making decisions affecting their members.'" *Pro.*

6    *Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169–70

7    (4th Cir. 2015) (quoting *McKeesport Hosp. v. ACGME*, 24 F.3d 519, 534–35 (3d Cir. 1994)

8    (Becker, J., concurring in the judgment)).

9         8.    ACGME lists the values of integrity, fairness, transparency, excellence, and

10   accountability among its lodestars. *See Mission, Vision, and Values*, ACGME, https://

11   www.acgme.org/about/overview/mission-vision-and-values (last visited August 24, 2024). But its

12   actions toward Sea Mar over the past year have betrayed each of these ostensible values—and, in

13   particular, have been anything but "fair."

14        9.    Since the Program applied to ACGME for and received its initial accreditation in

15   2015, ACGME reviewed and consistently reaccredited both the Program and Sea Mar as its

16   sponsoring institution each year through 2023. ACGME last issued a citation in 2018, which the

17   Program immediately remedied. But six years later—this past February, just weeks after ACGME

18   continued Sea Mar's institutional accreditation with an express commendation for its compliance

19   with ACGME's requirements—two ACGME Field Representatives conducted a perfunctory,

20   remote "visit" of the Program. Despite being directed to undertake an in-person evaluation, the

21   Field Representatives met virtually, for less than a business day, with select residents, faculty, and

22   Sea Mar personnel. At the end of the visit, the Field Representatives reconvened with Sea Mar's

23   administration for mere minutes—far shorter than was scheduled—and gave Sea Mar no

24   opportunity to learn about or respond to any inaccuracies in the Field Representatives' impressions

25   and findings or otherwise address their concerns.

26

FIRST AMENDED COMPLAINT – 4
(No. C24-896 JNW)

10. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████

11.     Nor did ACGME's Review Committee for Family Medicine (the "Review Committee"), which received and considered the Field Representatives' Site Visit Report, ████ ████████████████████████ seek additional information from Sea Mar—even though it could have, and even though Sea Mar had in its possession volumes of data and materials that would have confirmed the Program's substantial compliance with the applicable guidelines.

12. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

FIRST AMENDED COMPLAINT – 5
(No. C24-896 JNW)

1   13. Ultimately, the Site Visit Report that formed the basis of the Review Committee's

2 action ███████████████████████████████████, let alone a

3 complete and accurate summarization of the data and materials that would have demonstrated the

4 Program's compliance with ACGME's guidelines. And the Review Committee only compounded

5 the Field Representatives' missteps: ████████████████████, it assumed the

6 accuracy of the Site Visit Report and then further distorted the record in the notification letter it

7 provided to Sea Mar. Indeed, the Review Committee issued multiple citations on alleged issues

8 where even the Field Representatives concluded that the Program was in substantial compliance.

9   14. On April 21, 2024, Sea Mar received notification from the Review Committee that

10 the Family Medicine Residency Program's accreditation would be withdrawn in just two months'

11 time—effective June 30, 2024, the end of the 2023–2024 academic year. ████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████ Even though

18 progressive remediation was available ██████████—and even though the Site Visit Report

19 was a catalogue of unfounded conclusions and unfinished and inadequate investigative

20 undertakings—the Review Committee chose to precipitously withdraw accreditation just two

21 months later.

22   15. ACGME did not immediately specify the reasons for this decision, giving itself

23 sixty days to do so. After Sea Mar protested this delay, ACGME provided bare-bones citations

24 several days later but refused to provide the Site Visit Report identifying the alleged bases for the

25 citations unless and until Sea Mar appealed the withdrawal decision, thereby requiring Sea Mar to

26 appeal without even knowing ACGME's rationale for its sudden and devastating action.

FIRST AMENDED COMPLAINT – 6
(No. C24-896 JNW)

16.     Sea Mar duly appealed, and ACGME's rationale was provided thereafter: a list of forty-seven citations that purportedly chronicled shortcomings in the Program but was actually a hodgepodge of vague, manifestly erroneous, factually baseless, picayune, and otherwise meritless or insubstantial claims. It was immediately clear to Sea Mar that, given the conspicuous absence of a Review Committee finding of clear or egregious noncompliance with ACGME's guidelines, the citations were designed to "run up the score" and discredit the Program by the sheer number of purported issues. But the citations, even when aggregated, failed to justify the draconian remedy of de-accreditation—especially since less drastic, progressive remediation options were available to ACGME.

17.     Among other deficiencies, many (if not most) of the citations:

• Were based in whole or in part on underlying factual errors;

• Were facially inconsistent with the ACGME guidelines that were purportedly violated;

• Ignored uncontested refuting data that was timely submitted by Sea Mar and within ACGME's possession;

• Addressed issues for which ACGME never sought information or documentation from the Program or Sea Mar—and which, if requested, would have been provided and conclusively refuted the citations' allegations;

• ████████████████████████████████████████ ████████████████████████████████████████ ████████████████

• Addressed minor alleged shortcomings that, even if true, would at most have merited progressive remediation rather than sudden termination of accreditation;

• Were based on anonymous hearsay where the number and identities of the speakers, the subjects and frequency of their alleged statements, and their context were entirely missing, rendering the hearsay inherently unreliable; and

FIRST AMENDED COMPLAINT – 7
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

- ████████████████████████████████████████
████████████████████████████████████████████████
██████████████████

18.     Despite the fundamentally meritless and poorly investigated nature of the citations and the unjustified withdrawal decision, Sea Mar was denied a meaningful opportunity to contest the de-accreditation decision and defend its Family Medicine Residency Program. ACGME informed Sea Mar that its appeal of the accreditation withdrawal, which would be its *first* opportunity to respond, would be scheduled only *after* the withdrawal went into effect—and refused Sea Mar's requests to either accelerate the hearing or delay the accreditation-withdrawal date and allow it to be heard before adverse action was taken. The hearing was ultimately held on August 2, 2024, and the ACGME Board, which has the ultimately authority to rule on the recommendation stemming from the appeal, will not do so until its meeting on September 28, 2024.

19.     An appeal hearing and decision that take place *after* de-accreditation has already occurred—which is to say, exactly what ACGME has allowed here—offers no effective remedy at all. Once accreditation was withdrawn, the Family Medicine Residency Program was, by necessity and ACGME requirement, effectively dismantled, with existing and incoming residents leaving for other programs, faculty departing for other opportunities, affiliated facilities terminating their relationships with the Program, and public grants supporting the Program becoming imperiled or terminated. Even if Sea Mar prevails in its appeal and the Program's accreditation is restored by the ACGME Board in late September, substantial and irreparable damage will have already been done, as the Program ended on June 30. Today, no residents are enrolled in the Program, affiliations with the facilities needed for the Program have been disrupted and require resurrection, and grant applications for the Program's financial support have been denied, deferred, or terminated. Given the realities of the situation, the appeal ACGME offered Sea Mar was illusory; at best, it was too little, too late.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

20.     These harms befell Sea Mar despite ACGME's own policies that would have permitted a deferral of the Family Medicine Residency Program's accreditation withdrawal for one year, until after the appeals process had concluded. That would have permitted Sea Mar its first (albeit limited) opportunity to be heard under ACGME's procedures and allowed Sea Mar to remedy any meritorious concerns the Field Representatives and Review Committee raised. Indeed, this option would have been consistent with ACGME's prior practice: Of the 929 family medicine programs for which full ACGME accreditation histories are available, only *two*—0.2%—were moved from full or continued accreditation to withdrawal of accreditation without first receiving warning or probationary accreditation.

21.     ACGME, however, chose to reject any form of warning or remediation, thus ensuring that the Family Medicine Residency Program would end before Sea Mar had any opportunity to challenge the adverse decision—and denying Sea Mar basic tenets of due process.

22.     Moreover, even though ACGME's own appeals policies entitled Sea Mar to the underlying materials on which the Field Representatives and Review Committee relied, ACGME repeatedly refused the Program's requests for that documentation. It ultimately took litigation and this Court's intervention for Sea Mar to secure these critical materials, ███████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████.

23.     The hearing before the Appeals Panel on August 2 revealed a possible motivation for ACGME's precipitous adverse action: Having seen a discrepancy between Sea Mar's submissions and the interviews reported by the Field Representatives, the Review Committee apparently chose to believe the latter and not the former, thereby crediting subjective, individual opinions over Sea Mar's objective data and refusing to undertake even the most cursory follow-up inquiry to confirm or refute what the interviewees purportedly asserted—even though credible, countervailing evidence was either already in ACGME's possession or would have been provided by Sea Mar had the Review Committee requested it.

FIRST AMENDED COMPLAINT – 9
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

24.     Put plainly, ACGME has refused to provide Sea Mar the "fair procedures" required by law. A perfunctory, one-sided "investigation" yielded a Site Visit Report replete with factual errors and baseless citations, and no one at ACGME—neither the Field Representatives nor Review Committee—bothered to ask basic follow-up questions that would have confirmed Sea Mar's compliance with ACGME's guidelines. The Program, which for years successfully taught and prepared residents to practice family medicine in areas where their care was most needed, was unceremoniously abolished. And ACGME refused to give Sea Mar a meaningful opportunity to be heard.

25.     Notably, "elementary principles of administrative law call for significant, *though not total*, deference to decisionmaking by accreditation agencies." *Pro. Massage*, 781 F.3d at 169 (emphasis added). "[T]he extent to which deference is due to the professional judgment of the association will vary both with the subject matter at issue and with the degree of harm resulting from the association's action"—and "[l]ess deference may be due professional judgment when the question is not one of substantive standards, but rather one concerning the fairness of the procedures by which the challenged determination was reached." *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs., Inc.*, 432 F.2d 650, 655–56 & n.28 (D.C. Cir.) (footnote omitted), *cert. denied*, 400 U.S. 965 (1970).

26.     Here, Sea Mar is not challenging ACGME's programmatic guidelines for accrediting family medicine residency programs, such as the recommended utilization of telemedicine services, the appropriate size of a first-year resident's patient panel, or which educational milestones residents should reach and when. Instead, this case is about the *process* afforded to Sea Mar and the *evidence* of the Program's compliance with those programmatic guidelines, not the substance of the guidelines or other medical issues implicating ACGME's expertise. Put differently, ACGME's due-process violations lie in the "fairness of the procedures" the Field Representatives and Review Committee employed, as designed, written, and implemented—issues of law, not medicine.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

27.     ACGME and its personnel undertook a superficial site visit, ███████████

2     ████████████████████████, exhibited unwarranted bias against Sea Mar, refused to

3     vindicate ACGME's own policies, and denied Sea Mar a meaningful opportunity to be heard

4     before adverse action was taken, all of which resulted in the most significant and irreparable harm

5     possible: the effective dissolution of the Family Medicine Residency Program—and all of which

6     evince ACGME's disregard of fundamental fairness and Sea Mar's common-law due-process

7     rights.

8         28.     Additionally, the insufficient process that ACGME provided Sea Mar violated

9     Washington's Consumer Protection Act ("CPA") by imposing unfair and deceptive business

10    practices—including an unprofessional and deficient investigation and an illusory appeal—that

11    Sea Mar was unable to negotiate or avoid given ACGME's monopoly control over the

12    accreditation of graduate medical education.

13        29.     And, by implementing its internal policies and procedures in a manner that

14    unnecessarily imposed precipitous adverse action and denied the opportunity for a meaningful

15    appeal, ACGME further breached its contractual duty of good faith and fair dealing.

16        30.     Given ACGME's failure to meet its procedural obligations and the harms that have

17    been inflicted on Sea Mar, the Family Medicine Residency Program, and the diverse and under-

18    resourced communities they serve, Sea Mar seeks relief from this Court to restore its accreditation

19    until due process is accorded and recover the damages to which it is entitled.

20                        **JURISDICTION AND VENUE**

21        31.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

22    § 1331, as this is a civil action arising under the laws of the United States, including the federal

23    common law; 28 U.S.C. § 1332, as there is complete diversity of citizenship between Sea Mar and

24    ACGME and the amount in controversy exceeds $75,000; and 28 U.S.C. § 1367, which provides

25    the Court with supplemental jurisdiction over Sea Mar's state-law claims.

26

FIRST AMENDED COMPLAINT – 11
(No. C24-896 JNW)

32.     This Court has personal jurisdiction over ACGME because ACGME transacts business within Washington, including the accreditation of graduate medical education programs in the state. *See* RCW 4.28.185(1)(a); Fed. R. Civ. P. 4(k)(1)(A).

33.     Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

34.     Plaintiff Sea Mar is a Washington nonprofit corporation with its principal place of business in Seattle, Washington.

35.     Defendant ACGME is an Illinois nonprofit corporation with its principal place of business in Chicago, Illinois.

## FACTUAL ALLEGATIONS

### Sea Mar Serves Diverse Communities in Washington

36.     For more than four decades, Sea Mar has provided quality, comprehensive health, human, housing, educational, and cultural services to diverse populations, with a particular focus on Washington's Latino community. Since its founding, it has grown from a single clinic in Seattle to dozens of medical and dental clinics and associated healthcare service providers throughout the state.

37.     In 1978, with approximately $300,000 in funding from the federal government, Sea Mar purchased a clinic in the South Park neighborhood of Seattle from a retiring physician. Sea Mar's clinic offered primary medical care and nutrition services and focused on addressing the healthcare needs of the Spanish-speaking community in western Washington (as well as the retiring physician's patients, many of whom were elderly and in need of long-term care).

38.     Sea Mar expanded its offerings and clinical sites over the next forty years, including opening its Marysville clinic in 1989, where the Family Medicine Residency Program was based.

39.     Today, Sea Mar provides services and programs in thirteen counties throughout Washington: Clallam, Clark, Cowlitz, Franklin, Grays Harbor, Island, King, Pierce, Skagit,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Snohomish, Thurston, Whatcom, and Yakima. It operates thirty-three medical clinics and twenty-one dental clinics, which, in addition to primary medical and dental care, offer services in obstetrics and gynecology, minor outpatient surgery, occupational healthcare, and pediatric orthodontic care. Sea Mar also operates twenty-eight outpatient behavioral health clinics and four inpatient substance-abuse treatment centers.

40.     In addition to these health services, Sea Mar also offers laboratory, radiology, and pharmacy services; nutrition and health education; maternity support; homeless and migrant outreach and support; home-health and home-care services; insurance enrollment assistance; and citizenship and English-as-a-second-language classes.

41.     Additionally, as an FQHC, Sea Mar serves as a "safety net provider[]" and offers comprehensive healthcare services to medically underserved populations, including migratory and seasonal agricultural workers, the homeless, and residents of public housing. *Federally Qualified Health Center*, Ctrs. for Medicare & Medicaid Servs. 4–5 (Jan. 2024), https://www.cms.gov/files/document/mln006397-federally-qualified-health-center.pdf; *see also* 42 U.S.C. § 254b.

42.     In 2023, Sea Mar provided 1,840,337 individual services to 290,556 people across Washington. Of its patients, 96% had incomes below the federal poverty level, 85% had either public insurance (Medicare or Medicaid) or were uninsured, and approximately 41% were Latino. These numbers reflect Sea Mar's ongoing emphasis on offering care to the poor and underserved—its mission since it opened its first clinic in 1978.

**Sea Mar's Family Medicine Residency Program Trained the Next Generation of Family Medicine Physicians**

43.     To further support its mission and help address a critical shortage of primary-care doctors, Sea Mar created the Family Medicine Residency Program to train the next generation of family medicine physicians focused on helping the underprivileged.

44.     In addition to remedying the nationwide shortage of family medicine practitioners in rural and underserved areas, the Program also allowed Sea Mar to address its own, local needs.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

By caring for patients who live in or near HPSAs, Sea Mar shares the difficulty of recruiting community-focused practitioners to serve in its clinics—and so decided to train them itself. The Program provided a pipeline for new doctors to serve Sea Mar's patient base. As the Program's website explained, its residents were trained to "provid[e] care for families in need, including the uninsured, those without the ability to pay, and undocumented immigrants in Western Washington." *The Sea Mar Marysville Family Medicine Residency Program*, Sea Mar Cmty. Health Ctrs., https://seamarmarysvilleresidency.org (last visited August 24, 2024).

45.   In 2015, after years of preparatory work, Sea Mar applied to ACGME pursuant to ACGME's policies and procedures and received accreditation for the Family Medicine Residency Program—accreditation that was in place until June 30, 2024. Since 2018, the Program received annually continued accreditation with no citations until this year.

46.   ACGME, according to its website, "sets and monitors voluntary professional educational standards essential in preparing physicians to deliver safe, high-quality medical care to all Americans." *About the ACGME: Overview*, ACGME, https://www.acgme.org/about/overview (last visited August 24, 2024). As a part of these activities, ACGME oversees the accreditation of all medical residency and fellowship programs in the United States—including Sea Mar's Family Medicine Residency Program.

47.   ACGME charges annual fees to residency programs and sponsoring institutions for the oversight and accreditation services it provides. The fee is $6,050 for each program with more than five residents and 2.5% of total program fees for sponsoring institutions. Sea Mar has annually paid the sponsoring-institution and program fees for the Family Medicine Residency Program; in January 2024, for example, Sea Mar paid ACGME $6,201.25 in annual fees. Since the Program's inception, ACGME has charged Sea Mar, and Sea Mar has directly paid ACGME, tens of thousands of dollars in connection with the Program's accreditation.

FIRST AMENDED COMPLAINT – 14
(No. C24-896 JNW)

48.     The Family Medicine Residency Program's first class of residents started training in the summer of 2017. The Program later expanded to a maximum of twelve residents in each three-year class.

49.     The Program's residents saw patients in the outpatient setting at three of Sea Mar's clinics, in Marysville, Everett, and Lynnwood. Inpatient training rotations in obstetrics, surgery, family medicine, intensive care, and emergency medicine occurred at Providence Regional Medical Center Everett ("Providence"). Specialized pediatric hospital care was provided at Seattle Children's Hospital.

50.     The Family Medicine Residency Program had a strong track-record of providing high-quality medical education and training. Since the Program's inception, *100%* of its graduates passed the American Board of Family Medicine's family medicine board-certification examinations on their first try. Under ACGME's own guidance, board passage rates correlate with a program's "effectiveness," *ACGME Frequently Asked Questions (FAQs)*, ACGME, https://www.acgme.org/about/acgme-frequently-asked-questions (last visited August 24, 2024)—and the Program maintained a perfect score.

51.     Since its creation, the Program had two permanent program directors and, in between, one interim director who was appointed while a search was conducted for a new permanent director. Greg Sanders, M.D., served in the permanent role at the Program's inception until his retirement in 2021. During the search for Dr. Sanders's successor, Patrick Gemperline, M.D.—a thirty-year Sea Mar veteran with experience overseeing another of its residency programs—was selected to serve as an interim director. After the search concluded, Dr. Gemperline returned to his position as a clinician at Sea Mar's Seattle clinic and Ricardo Jimenez, M.D., another longtime Sea Mar veteran, became the permanent program director in April 2022. Dr. Jimenez had overseen the Program since its inception in his role as Sea Mar's designated institutional official, an ACGME-approved position that confers the authority and responsibility for overseeing and administering a sponsoring institution's ACGME-accredited

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

programs and ensuring compliance with ACGME's institutional and specialty-specific requirements.

52.     ACGME not only knew about these leadership transitions, but contemporaneously approved them—and, until this year, never questioned whether the Program maintained appropriate continuity of leadership as required by ACGME's programmatic guidelines. ACGME certainly did not cite Sea Mar for perceived instability when it approved the two leadership transitions, including that of Dr. Jimenez as program director, more than two years ago.

53.     To the contrary, ACGME's interactions with the Family Medicine Residency Program confirmed its faith in the quality of Sea Mar's training and education. In addition to issuing no citations from 2018 until this year, ACGME twice approved permanent increases in the Program's resident complement.

**The Family Medicine Residency Program Transitioned to the THCGME Model**

54.     Once Dr. Jimenez became the program director, he sought to further align the Family Medicine Residency Program with Sea Mar's overall mission by moving it towards the Teaching Health Center Graduate Medical Education ("THCGME") model federally established by HRSA.

55.     THCGME programs embrace what is sometimes called the "Clinic First" model and emphasize the training of physicians in community-based settings rather than sophisticated hospital-based services.

56.     In 2022, after months of preparation and several meetings with Sea Mar's faculty and administrative staff and the leadership at Providence, the Family Medicine Residency Program updated its inpatient family medicine teaching service, transitioning from more hospital-based and obstetrics rotations (a model better suited to training hospitalists) to a program where community-clinic rotations grew in importance. The Program welcomed new faculty for the inpatient family medicine teaching service, which became a key component of the Program by allowing residents to follow community patients if they were hospitalized.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

57.     But even appropriate change can be difficult: Some hospital-based faculty preferred the older, hospital-based obstetrics care model and the extensive support the residents offered to them thereby, and a few left as a result. Those departures, combined with unrelated attrition, led to new faculty being recruited and a reconfiguration and reassignment of some of the Program's managerial positions.

58.     Each year, ACGME conducts surveys of program residents and faculty, and Sea Mar's surveys in 2023 reflected the internal struggle over the Program's modified direction. Those surveys, however, did not change the ACGME Review Committee's February 2023 conclusion that the Program was "in substantial compliance with the ACGME's Program Requirements," nor did the Review Committee issue any citations as a result. Instead, it granted the Program continued accreditation and merely "encourage[d] the program to review results from the Resident Survey" moving forward.

59.     Consistent with ACGME's encouragement, Sea Mar studied the survey results and implemented corresponding changes to the Program. This response was consistent with Sea Mar's overarching effort to ensure that feedback from residents and faculty was heard and, to the extent feasible and merited, operationalized.

60.     For example, certain residents cited the burden of obstetrics rotations and sought to reduce it, while some faculty members wanted to maintain the frequency and intensity of obstetrics training. Responding to this disagreement and seeking to address the concerns of both faculty and residents, the Program's leadership found a workable solution—including structuring the Program so that residents could tailor the extent of their obstetrics training to their career goals.

61.     Notably, the quality of the Family Medicine Residency Program was not affected by the disagreements that accompanied the transition to the THCGME model. Sea Mar received the Joy in Medicine Recognition Program's silver recognition in 2023 for supporting physician well-being and reducing burnout, and the resident board-certification exam passage rate remained at 100%.

FIRST AMENDED COMPLAINT – 17
(No. C24-896 JNW)

62.     Moving forward, Sea Mar had planned to expand its services for Washington's underprivileged and underserved communities. To this end, it laid the initial groundwork for a "Rural Pathway" within the Family Medicine Residency Program to help address the particularly acute need for primary-care providers in rural areas. Though the Rural Pathway was not yet an official part of the Program, Sea Mar intended to seek ACGME approval for its initiation beginning, depending on the site, in 2025 or 2026. The Rural Pathway was to have its own curriculum, with assigned residents seeing patients at Sea Mar's Mt. Vernon and Concrete clinics in the outpatient setting and inpatient rotations at Providence and Skagit Valley Hospital. ACGME's decision to withdraw the Program's accreditation—and the inevitable shuttering of the Program that resulted—ended plans for the Rural Pathway.

**Sea Mar Received State and Federal Funds for the Family Medicine Residency Program**

63.     The Family Medicine Residency Program received both state and federal funding— all conditioned on ACGME's accreditation of the Program.

64.     Washington State provides funding for family medicine residency programs, *see* RCW 70.112.060, as part of a greater effort to "increase the number of family medicine physicians in shortage areas in the state," S.S.H.B. 1485 § 1. Significantly, residency programs are defined as "community-based residency educational programs in family medicine, either in existence or established under this chapter *and that are certified by the accreditation council for graduate medical education* or by the American osteopathic association." RCW 70.112.010(4) (emphasis added). In other words, the Program's eligibility for this state funding was conditioned on ACGME certification.[2]

---

[2] Although the American Osteopathic Association ("AOA") previously provided an alternative path to qualifying accreditation, in 2020 (after Chapter 70.112 RCW was last amended), ACGME and AOA announced that they had completed a "successful transition to a single accreditation system for graduate medical education [] in the U.S." and that, "[u]nder the single accreditation system, the ACGME serves as the nation's sole accreditor for both osteopathic (DO) and allopathic (MD) residencies and fellowships." *AOA, ACGME and AACOM Usher in New Era of Single Accreditation for Graduate Medical Education*, AOA (June 30, 2020), https://

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    65.    The Program consistently received this state funding in recent years. For fiscal-year

2    2023, these funds totaled $531,181; for 2024, that number increased to $674,301. Sea Mar relied

3    on this state money to support the Program.

4    66.    Notably, it is not only the receipt of state funds that is contingent on ACGME

5    accreditation under Washington law: The Washington Medical Commission approves only

6    programs accredited by ACGME (or its Canadian equivalents) for postgraduate clinical training,

7    *see* WAC 246-919-330(2), and only residency programs accredited by ACGME can be used to

8    satisfy physicians' continuing-education requirements, *see* WAC 246-919-430(1).

9    67.    On the federal side, HRSA oversees a THCGME program that, like Washington's

10   family medicine equivalent, aims to assist "qualified teaching health centers" that serve "medically

11   underserved communit[ies]" and "rural area[s]." 42 U.S.C. § 256h(a)(3). First established by the

12   Patient Protection and Affordable Care Act, *see* Pub. L. No. 111-148, §§ 5507–5508, 124 Stat.

13   119, 668–74 (2010), the THCGME program provides funding for "maintenance of filled positions

14   at existing approved graduate medical residency training programs," "expansion of existing

15   approved graduate medical residency training programs," and "establishment of new approved

16   graduate medical residency training programs," 42 U.S.C. § 256h(a)(1)(A)–(C).

17   68.    In order to qualify as an "approved graduate medical residency training program[]"

18   and thus be eligible for HRSA funding, a program like Sea Mar's Family Medical Residency

19   Program must "meet[] criteria for accreditation []as established by [ACGME], the American

20   Osteopathic Association, or the American Dental Association." *Id.* § 256h(j)(1)(B).

21   69.    In December 2022, Sea Mar learned that it had been approved for funding through

22   HRSA's THCGME program for two full-time residents beginning July 1, 2023, and four additional

23   full-time residents thereafter. The letter noted, consistent with the statute establishing the

24   THCGME program, that this financial support "is contingent upon programs maintaining

25

26   osteopathic.org/2020/06/30/aoa-acgme-and-aacom-usher-in-new-era-of-single-accreditation-for-graduate-medical-education-2.

FIRST AMENDED COMPLAINT – 19
(No. C24-896 JNW)

1  accreditation." HRSA subsequently confirmed Sea Mar's award of $320,000 for two full-time

2  residents in the Family Medicine Residency Program. Sea Mar relied on these federal funds for

3  the Program's operation.

4       70.    Because these state and federal programs both condition funding on ACGME

5  accreditation, the withdrawal of the Family Medical Residency Program's accreditation has

6  threatened Sea Mar's access to these critical sources of financial support and its ability to train

7  residents and provide associated healthcare services in its target communities. Even if the Program

8  had adequate funding, it could not be approved to conduct postgraduate clinical training by the

9  Washington Medical Commission without ACGME accreditation. *See* WAC 246-919-330(2).

10  **ACGME Awarded Sea Mar Continued Institutional Accreditation with Commendation**

11       71.    On January 23, 2024, ACGME notified Sea Mar that it had received continued

12  accreditation as a sponsoring institution of graduate medical education programs. The ACGME

13  letter further "commended [Sea Mar] for its demonstrated substantial compliance with the

14  ACGME's Institutional Requirements without any [] citations."

15       72.    Many of the "Institutional Requirements" for which Sea Mar's compliance was

16  commended were substantially or fully identical to program requirements with which, just weeks

17  later, the Family Medicine Residency Program was found *non*compliant. In addition, many of the

18  requirements for which the Program was cited were the shared responsibility of Sea Mar as the

19  sponsoring institution—rendering ACGME's near-contemporaneous findings of compliance and

20  noncompliance incompatible and incoherent.

21  **ACGME's Field Representatives Undertook a Perfunctory Site Visit and Did Not Attempt**

22  **to Ensure the Factual Accuracy of Their Findings**

23       73.    In October 2023, following several years of continued accreditation without

24  citation, Sea Mar received a letter from ACGME explaining that "a site visit of the program must

25  be conducted before an accreditation decision can be made." Two months later, on December 5,

26  Sea Mar received a follow-up letter requesting materials and announcing that ACGME had

FIRST AMENDED COMPLAINT – 20
(No. C24-896 JNW)

scheduled a remote site visit for February 20, 2024. The December letter stated that ACGME "ha[d] identified the [] program as due for an accreditation site visit" but provided scant additional information.

74.     According to the October letter, ACGME's Review Committee specifically determined that the Site Visit was necessary because it "want[ed] more context, *in person*, with respect to [the 2023 resident and faculty survey] findings as they impact the overall educational environment of the program." (Emphasis added). The December letter, however, provided for a remote site visit without any "in-person" interaction—a discrepancy that was not explained, even though ACGME's Policies and Procedures expressly differentiated between in-person and remote interviews as means by which to conduct site visits.[3]

75.     In advance of the Site Visit, ACGME sought certain specified documentation and information that Sea Mar uploaded into ACGME's accreditation data system. Sea Mar was prepared to provide any additional documents or materials requested before, during, or after the Site Visit.

76.     On February 20, 2024, two ACGME Field Representatives conducted the remote Site Visit exclusively via videoconference. Neither Field Representative was a board-certified family medicine or community-based health services practitioner: One was a general surgeon whose career was spent in academic medicine relating to surgery and trauma care, while the other was a non-physician with non-medical degrees whose touted expertise was in "strategy alignment and financial projections." *Accreditation Field Representatives*, ACGME, https://www.acgme.org/about/board-and-staff/field-representatives (last visited August 24, 2024).

77.     The remote Site Visit lasted just over six hours. A subset of the Program's residents was briefly interviewed by the two Field Representatives, either in groups or in five-minute individual sessions. Sea Mar had identified for ACGME residents who were not on leave, call, or

---

[3] ACGME's Policies and Procedures are attached as Exhibit 1 and incorporated into this complaint by reference.

an inpatient rotation during the scheduled videoconference time. Consequently, the Field Representatives interviewed only a subgroup of residents, not the full resident roster—and not necessarily a representative subgroup of residents.

78.     At the end of the Site Visit, Sea Mar's administration was allowed only a few minutes with the Field Representatives for discussion, even though the schedule had allotted thirty minutes for a concluding meeting. The Field Representatives' findings were not provided to Sea Mar's administration, nor was Sea Mar provided an opportunity to address any alleged deficiencies or adverse perceptions or concerns. Instead, the administrators were left in the dark as to what the Field Representatives heard (or thought they heard) and what concerns, if any, they had.

79.     The Field Representatives prepared the Site Visit Report ███████████. At no point during that process did the Field Representatives seek any additional information or documentation from Sea Mar or ask follow-up questions to confirm, illuminate, clarify, or refute what they had been told during the Site Visit by residents and faculty.

80.     Without apparent ACGME policy authorization or notice to the site under review, upon information and belief, it is common ACGME protocol or practice for field representatives to destroy their notes and correspondence regarding site visits immediately after finalizing their reports—which is what, ACGME previously suggested to Sea Mar, the Field Representatives here did. The Field Representatives' notes and correspondence are significant because the Site Visit Report contained many vagaries and nonspecific information regarding communications the Field Representatives purportedly had with faculty and residents during the Site Visit and unidentified documents they claimed to have reviewed—and omitted any contradicting or clarifying communications or information. Many of the forty-seven enumerated citations, in turn, were based solely on these vague communications. ███████████████████████████ ███████████████████████████, it has repeatedly refused to definitively clarify whether any notes, correspondence, or other materials were destroyed, and it produced no

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

text messages and few of the electronic communications one would expect to see in connection with a collaborative team inspection.[4]

**The Review Committee Unexpectedly Decided to Withdraw the Family Medicine Residency Program's Accreditation for Reasons That Fall Apart Under Scrutiny**

81.     After the Field Representatives completed their Site Visit Report, an initial review was undertaken by two Review Committee members, who drew up and then reconciled individual lists of potential citations. ███████████████████████████████████ ████████████████████████████████, upon information and belief, neither did so—even though Sea Mar had not been asked for clarifying documentation related to the vast majority of purported concerns. ████████████████████████████████████ ██████████████████████████████████████

82.     ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

83.     ███████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████, the Review Committee decided ██████ to withdraw the Program's accreditation, which it communicated to Sea Mar in a letter dated April 21, 2024.

84.     Based on representations made by ACGME during the course of this litigation, no meeting minutes or other record of the Review Committee's decision-making process exists. It is

---

[4] Most recently, in its motion to dismiss, ACGME suggested that Sea Mar has "ma[de] the unfounded and untrue accusation that ACGME may have destroyed documents," but then stated only that "[t]he ACGME has produced those documents to Sea Mar." Def. ACGME's Mot. to Dismiss 16 n.9, Dkt. No. 39. Neither here nor elsewhere has ACGME clearly stated that no Field Representative materials were destroyed, deleted, or withheld.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

therefore unclear why the Review Committee ███████████████████████ ███████████████ chose the precipitous result of de-accreditation rather than progressive remediation. The absence of any record is particularly notable given how rare it is for ACGME to withdraw a program's accreditation when the program previously had full accreditation with no citations and there is no finding of egregious noncompliance.

85.     On April 26, 2024, ACGME sent Sea Mar a notification letter briefly describing each of the forty-seven citations that purportedly informed the adverse accreditation decision. Each citation included a vague, one- or two-sentence explanation that largely parroted similarly cursory findings in the Site Visit Report.

86.     Section 19.100 of ACGME's Policies and Procedures, titled "Withdrawal of Accreditation under Special Circumstances," provided that accreditation can be withdrawn "based on clear evidence of a lack of substantial compliance with accreditation requirements, such as . . . egregious non-compliance with accreditation requirements." Such "special circumstances" were not, however, the determined basis for the withdrawal of the Program's accreditation. Instead, the executive director of the Review Committee advised Sea Mar that ACGME's decision was motivated by the sheer number of citations, not egregious noncompliance. In cases other than those where egregious noncompliance or some other special circumstance (like "a catastrophic loss of resources") is found, ACGME's Policies and Procedures allowed for progressive remediation, including continued accreditation with warning, probationary accreditation, reduction of resident complement, or other actions appropriate to the circumstances. None of these remedies was offered here.

87.     It is plain from the citations and the Site Visit Report that the Field Representatives' and Review Committee's goal was to simply run up the score of citations to the forty-seven noted. On their own, many citations are patently meritless, trivial, based on a nonexistent or spoliated record, or inconsistent with the Field Representatives' factual findings; collectively, the forty-

FIRST AMENDED COMPLAINT – 24
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

seven citations neither merit nor support the Review Committee's decision to effectively destroy Sea Mar's Family Medicine Residency Program rather than offer progressive remedies.

88. Indeed, *every single citation* suffers from multiple notable deficiencies:

| Deficiency Key | |
| --- | --- |
| Minor issue | Ignored evidence in ACGME's possession |
| Factual errors | Based on unrequested information |
| Inconsistent with ACGME policies | ███████████████ |
| Ignored timely submitted data | Based on unreliable, anonymous hearsay |
| Addressed not-yet-existent Rural Pathway | ███████████████ |

| Citations | Minor issue | Factual errors | Inconsistent with ACGME policies | Ignored timely submitted data | Addressed not-yet-existent Rural Pathway | Ignored evidence in ACGME's possession | Based on unrequested information | ███ | Based on unreliable, anonymous hearsay | ███ |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | X | X | X | X | X | X | | | | |
| 2 | X | X | X | X | X | X | | | | |
| 3 | X | X | X | X | | X | X | | X | |
| 4 | X | X | X | X | X | X | | | | |
| 5 | X | X | X | X | | X | | | | |
| 6 | X | X | X | | | X | | | | |
| 7 | | X | X | | | X | X | | X | |
| 8 | X | | X | | | X | | | | |
| 9 | X | X | | | | | X | | X | |
| 10 | | X | | | | X | | | X | |
| 11 | X | X | | | | | | | | |
| 12 | | X | | X | | X | | | X | |
| 13 | | X | | X | | X | | | | |
| 14 | | X | | | | X | | | X | |
| 15 | X | X | | X | | X | | | X | |
| 16 | X | X | | | | | X | | | |
| 17 | | X | X | | | | X | | X | |
| 18 | X | X | | X | | X | X | | X | |
| 19 | X | X | | | | X | | | X | |

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Citations | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | X | X | X |   |   | X |   | ███ |   | ███ |
| 21 | X | X |   | X |   | X |   | ███ |   | ███ |
| 22 | X | X |   | X |   | X |   | ███ |   | ███ |
| 23 | X | X |   |   |   |   | X | ███ |   | ███ |
| 24 | X | X | X |   |   | X |   | ███ |   | ███ |
| 25 | X | X | X |   |   |   |   | ███ | X | ███ |
| 26 | X | X |   |   |   | X |   | ███ | X | ███ |
| 27 | X | X |   |   |   |   | X | ███ | X | ███ |
| 28 | X | X | X |   |   | X |   | ███ | X | ███ |
| 29 | X | X |   | X |   | X |   | ███ |   | ███ |
| 30 | X | X | X |   |   |   |   | ███ |   | ███ |
| 31 | X | X | X |   |   | X |   | ███ |   | ███ |
| 32 | X | X |   | X |   | X |   | ███ |   | ███ |
| 33 | X | X |   |   |   |   | X | ███ |   | ███ |
| 34 |   | X |   | X |   | X |   | ███ | X | ███ |
| 35 | X | X |   | X |   | X | X | ███ |   | ███ |
| 36 |   | X |   |   |   | X |   | ███ |   | ███ |
| 37 | X | X | X |   |   | X |   | ███ |   | ███ |
| 38 | X | X | X | X |   | X |   | ███ |   | ███ |
| 39 | X | X | X |   |   | X |   | ███ | X | ███ |
| 40 |   | X |   | X |   | X |   | ███ | X | ███ |
| 41 |   | X |   | X |   | X |   | ███ | X | ███ |
| 42 |   | X |   |   |   | X |   | ███ | X | ███ |
| 43 |   | X |   |   |   | X |   | ███ | X | ███ |
| 44 | X | X |   | X | X | X |   | ███ |   | ███ |
| 45 | X | X |   |   |   |   | X | ███ | X | ███ |
| 46 |   | X |   |   |   | X |   | ███ | X | ███ |
| 47 | X | X |   |   |   | X |   | ███ | X | ███ |

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

89.     A brief survey of the first twelve citations—a quarter of the total—demonstrates deficiencies that recur throughout the other thirty-five:

a.      **Citation Nos. 1, 2, and 4** addressed perceived deficiencies in the planned Rural Pathway program, but the Rural Pathway was to begin, at earliest, in the fall of 2025; at the time of the Site Visit, it was not yet active, was not yet officially part of the Program, and had no residents enrolled in it. In other words, the Rural Pathway sites at issue in these citations were not participating in the Program and thus not subject to review. Indeed, initiation of the Rural Pathway would have required express ACGME review and approval, which Sea Mar had not yet even sought.

b.      **Citation No. 3** faulted Dr. Jimenez, the program director, for "not provid[ing] active oversight of the program." But the applicable ACGME guideline required that "[t]he *program*"—not the program *director*—"monitor the clinical learning and working environment at all participating sites." (Emphasis added). That guideline was satisfied: Dr. Jimenez directly monitored the clinics where he served as site director and delegated immediate monitoring of the Program's other sites to those locations' site directors. Moreover, the citation credited the subjective impressions of the interviewed residents—"residents report[ed] that they rarely see [Dr. Jimenez] or speak to him"—even though Dr. Jimenez's clinical calendar objectively demonstrated his active participation at multiple program sites. Neither the Field Representatives nor the Review Committee, however, requested his clinical schedule ██████████████████████████████████ ████████████████████████████.

c.      **Citation No. 5** referenced an ACGME guideline requiring that the family medicine practices within residency programs "have [] mission statement[s]" and noted that "it could not be verified by the program director that [the Program] has a mission statement other than the overall institution's mission statement"—without explaining how or why Sea Mar's own mission statement, adopted by each of the Program's sites, was

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

somehow insufficient or noncompliant. In other words, the citation was not only trivial, but inconsistent with the ACGME guideline on which it was ostensibly based.

d.      **Citation No. 6** again saw the Review Committee attempting to find a violation of a guideline with which the Program was facially compliant. The guideline at issue required that each program "have members of the community, in addition to clinical leaders, serve on an advisory committee to assess and address health needs of the community," and the corresponding citation faulted the Program because Sea Mar's own governing board served as the advisory board for each of the Program's components. But the applicable guideline did not require unique boards for every program and every practice, and Sea Mar was therefore in compliance with the plain requirements of the guideline. Moreover, ACGME ignored the fact that, as an FQHC, a majority of Sea Mar's governing board must be (and was throughout the Program's history) comprised of community and clinical leaders—and that this information was provided to ACGME ahead of the Site Visit.

e.      **Citation No. 7** alleged a violation of a requirement related to facilities— namely, that the Program have "clean and private facilities for lactation that have refrigeration capabilities" within reasonable proximity to patient-care facilities. That is the *only* thing the guideline required, and neither the citation nor the Site Visit Report suggested that Sea Mar lacked compliant facilities (which, indeed, it provided). Instead, the citation focused on a *different* issue, unrelated to the referenced guideline: that "residents are not permitted the time to pump and concerns were raised about equitable treatment for requests for accommodations and personal health issues." But, had either the Field Representatives or Review Committee asked, Sea Mar would have provided documentation showing that thirty-minute pump breaks were routinely provided in every eligible resident's schedule. Moreover, this citation illustrated one of the many disconnects between the Review Committee's citations and the Field Representatives' findings. The

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

citation suggested that *multiple residents* raised "concerns" about personal accommodations. The corresponding finding in the Site Visit Report, by contrast, referred to a *single* resident who "reported concerns" about a personal accommodation. Had anyone at ACGME followed up with Sea Mar about these reported concerns, Sea Mar's leadership could have explained, for instance, about an inadvertent omission of a scheduled lactation break on a single day for a resident's first day back from parental leave, and about that resident's accommodated request to double her allocated time to pump. ████████

████████████████████████████████████████████████████████████████

████████████████████—concerns that were, in turn, magnified and misconstrued by the Review Committee.

      f.    **Citation No. 8** was the *only* citation without some underlying factual error—and might also have been the most patently absurd of the forty-seven. Specifically, ACGME cited the Program for failing to maintain continuity of leadership because it had three program directors during the three years preceding the Site Visit. But the Review Committee already knew about these leadership changes—and, indeed, had approved them years ago. Moreover, after the Review Committee approved the leadership changes, it continued the Program's accreditation (including in February 2023) without *any* citations relating to continuity of leadership. On the merits, the belated citation is no more compelling. The Program's leadership changes reflected an orderly transition process to replace the founding director upon his retirement after six years of service to the Program: first, to an interim director who had served as faculty for the Program since its inception and otherwise had thirty years' experience at Sea Mar; and then, to a newly appointed permanent director who also served as Sea Mar's designated institution official for the Program and had also been on the Program's faculty from the beginning. Not only was this a quintessentially orderly succession contemporaneously approved by ACGME, but the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

transition to highly experienced individuals who were more than familiar with the Program is clear evidence of *stability*, not instability, in its leadership.

g.    **Citation No. 9** exemplified the disconnect between the Field Representatives' findings and the Review Committee's conclusions and the amplification of minority anecdotal opinions to majority conclusions. The citation suggested that Dr. Jimenez failed to maintain "ongoing clinical activity," an ACGME requirement for program directors, based solely on comments made by some interviewees during the Site Visit. Prior to the visit, Sea Mar had confirmed in writing that Dr. Jimenez spent an average of four hours per week in clinic, a fact that the citation ignored. The Site Visit Report, for its part, noted that a "majority" of interviewed residents "indicated" that they had never seen Dr. Jimenez in a clinical situation—effectively confirming that the minority of residents interviewed *had* seen him in clinical situations. But by the time this issue reached the Review Committee, the reported facts had changed: The citation suggested that "it was reported that [Dr. Jimenez] had *never* been seen in a clinical situation" (emphasis added)—now implying that *no* Program residents had seen him in clinical situations, even though the Site Visit Report confirmed that even some who were interviewed had. Similarly unfounded hyperbole was used throughout the forty-seven citations, all to the Program's detriment. Again, had ACGME asked about this issue or sought corroboration, Sea Mar would have provided Dr. Jimenez's clinical calendar, which objectively confirmed that he worked four hours per week in multiple Program clinics—thus plainly satisfying the guideline's requirement of "ongoing clinical activity."

h.    **Citation No. 10** is the first in a series of citations criticizing Dr. Jimenez's leadership and suggesting a climate of fear and threatened retribution that impeded the Program's educational environment—but that, like other citations, was based on rumor and innuendo rather than a meaningful investigation into the underlying facts. ■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████████████████████████████████████████ Had such an inquiry

13 been undertaken, Sea Mar would have clarified the issues and, in so doing, addressed any

14 concerns about perceived retribution that appears to have arisen due to rumor and innuendo

15 and not fact.

16         i.        **Citation No. 11** accused Sea Mar of reporting an "incorrect number of

17 residents located at each" of the Program's sites and failing to make correct data available

18 when it "was requested during the site visit." This citation was erroneous twice over:

19 Incorrect data was inadvertently provided for a *single* site (for which the previous year's

20 data had been accidentally uploaded), and this information *was corrected* during the Site

21 Visit. Moreover, the data-entry error was raised by the Field Representatives during the

22 Site Visit, reflecting that they knew the correct number based on other Program

23 submissions and that there was no prejudice to their inquiry. A nonprejudicial data-error

24 entry is a plainly trivial basis for a citation and provides no justification for adverse action

25 whatsoever.

26

FIRST AMENDED COMPLAINT – 31
(No. C24-896 JNW)

1         j.      **Citation No. 12** is one of several citations that questioned the competence

2  of the Program's faculty—a baseless concern that would have been readily discounted had

3  ACGME attempted to corroborate subjective reports with objective metrics. Most

4  significantly, the Field Representatives and Review Committee apparently ignored that the

5  Program's faculty were fully credentialed and privileged by some of the region's most

6  sophisticated hospitals to perform the family medicine services in question at their

7  respective institutions. Nor did ACGME address the complete absence of reported quality-

8  assurance issues relating to faculty supervision of the Program's residents or substandard

9  treatment of patients in either the inpatient or outpatient setting. Once again, ACGME

10  simply took the word of unknown, anonymous interviewees as gospel without any

11  corresponding documentation or information—and stopped there.

12      90.     The myriad deficiencies illustrated above were pervasive in the Site Visit Report

13  and across the forty-seven citations. The record confirmed that the citations uniformly lacked

14  substantial evidentiary bases and reflected the unprofessional, inadequate inquiry on which they

15  were based. ██████████████████████████████████████

16  ████████████████████████, ACGME ultimately based its adverse decision on meritless and

17  trivial issues that could not possibly justify the precipitous result of de-accreditation without a

18  timely opportunity for response or remediation.

19      91.     Moreover, in its initial follow-up conversations with ACGME following receipt of

20  the notification letter, Sea Mar was informed that the decision to suddenly withdraw the Program's

21  accreditation was motivated less by any one citation than by the sheer number of citations. But

22  once the meritless citations are removed and that sheer number plummets, it quickly becomes clear

23  that no evidence, let alone substantial evidence, justified the Review Committee's decision.

24      92.     Perhaps most significantly, the citations did not demonstrate that the Program was

25  falling short in the two areas most important to Sea Mar and its mission: resident education and

26  patient safety. As to the former, the subjective concerns of a subset of residents and faculty could

FIRST AMENDED COMPLAINT – 32
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    not overcome the objective metric of success provided by the residents' 100% board passage rate,

2    a metric recognized by ACME itself as indicative of high-quality residency programs. And only

3    *one* of the forty-seven citations addressed patient safety—and, like the others, it collapses under

4    scrutiny.

5           93.    Specifically, Citation No. 47 suggested that "residents and faculty reported that

6    inpatient supervision is not adequate resulting in adverse patient outcomes due to incompetent

7    faculty." ███████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ████████████████████████████████████ Moreover, neither the Site Visit Report nor the

11   citations themselves pointed to any sentinel events or quality issues reported at Sea Mar or the

12   Program's other participating institutions. Simply put, if patients were in danger, this would have

13   been reflected at the institutional level. No such evidence was found or even existed—which would

14   have been clear to the Field Representatives and Review Committee had they bothered checking.

15          94.    In sum, ACGME's citations do not hold up under even cursory scrutiny and, when

16   combined with the Review Committee's decision to forego available progressive remedies, reveal

17   an apparent agenda to remove the Family Medicine Residency Program's accreditation regardless

18   of whether substantial, credible, and relevant evidence existed to merit that outcome.

19          **The Family Medicine Residency Program Effectively Ended on June 30, 2024**

20          95.    Upon receipt of the withdrawal notification, the Family Medicine Residency

21   Program was prevented from appointing any new residents or fellows and required to notify all

22   individuals currently enrolled in the Program, as well as those who had applied, of the change in

23   accreditation status—thereby prompting their exit from the Program and the application process.

24          96.    Soon after receiving the notification letter, most residents arranged to leave the

25   Program to finish their residencies elsewhere. Between the announcement of the accreditation

26   withdrawal and June 30, 2024, twenty of the Program's twenty-two first- and second-year residents

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

and ten of its twelve incoming first-year residents signed contracts to begin or continue their residencies at other institutions. The Program also experienced threatened and actual attrition of its faculty and non-Sea Mar facilities that were planned to be part of the Family Medicine Residency Program.

97.     Meanwhile, Providence threatened to terminate its affiliation with the Family Medicine Residency Program solely because of the loss of accreditation, which would leave the Program without its main site for inpatient-training rotations in obstetrics, surgery, inpatient family medicine, adult and neonatal intensive care, adult emergency medicine, significant portions of the geriatric and pediatric emergency medicine rotations, and electives including infectious diseases. A terminated affiliation would have also affected the Program's Providence-based outpatient training, including outpatient pediatrics, community medicine, and subspecialty (otolaryngology-specific) rotations.

98.     Finally, because the Family Medicine Residency Program was firmly integrated into its clinical services, Sea Mar has had to contract with other providers to ensure that it has the resources necessary to address its patients' needs. Sea Mar has also lost a critical pipeline of new doctors to practice in its clinics and treat its vulnerable, medically underserved patient base. And Sea Mar has suffered the Review Committee's needless and reckless sullying of its reputation in the medical and patient communities because of the accreditation decision.

### ACGME's Appeals Process and Procedures Were Inadequate

99.     On May 10, 2024, Sea Mar notified ACGME of its intent to appeal the Review Committee's withdrawal of the Family Medicine Residency Program's accreditation.

100.     After receiving Sea Mar's notice of appeal, ACGME told Sea Mar that the appeal hearing was scheduled for July 17, 2024—nearly three weeks *after* the withdrawal of accreditation was scheduled to go into effect. ACGME later postponed the hearing to August 2 to accommodate its panelists' schedules. Sea Mar's written request to have the appeal heard and decided before the withdrawal went into effect was rejected by ACGME without explanation. So too was Sea Mar's

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    request to have the effective date of accreditation withdrawal pushed back one year to allow for

2    an orderly appeal and to avoid destruction of the Program during that process.

3        101.    Although ACGME's Policies and Procedures purported to provide a right to appeal

4    adverse accreditation decisions, the appeals process in this case effectively prohibited Sea Mar

5    from meaningfully challenging the withdrawal of the Program's accreditation. ACGME required

6    that Sea Mar itself publicize that the Program's accreditation had been withdrawn (although "under

7    appeal") as of June 30, 2024, and so notify all residents and applicants. More to the point, ACGME

8    has treated the Program as unaccredited since July 1, 2024. As a result, the appeals process

9    provides no real recourse because by the time it is completed following the ACGME Board's

10   decision in late September, the Program will have already lost its accreditation—and,

11   consequently, ceased to exist.

12       102.    Timing aside, the ACGME appeals process as implemented did not provide Sea

13   Mar with a meaningful opportunity to be heard on the adverse accreditation decision:

14           a.    ACGME's Policies and Procedures stated that the appeal was not "of an

15   adversarial nature" but merely "provide[d] an administrative mechanism for peer review

16   of [the] accreditation decision."

17           b.    ACGME prohibited Sea Mar from interviewing or even speaking to the

18   Field Representatives or Review Committee members about their findings and thought

19   processes before the appeal hearing, and ACGME's Policies and Procedures prohibited Sea

20   Mar from having any contact with the Appeals Panel outside of the hearing—while

21   simultaneously permitting apparently unlimited ex parte contact among the Appeals Panel,

22   the Review Committee and its representatives at the hearing, and other ACGME personnel.

23           c.    The scope of Sea Mar's presentation was limited only to "clarifications of

24   the record" and did not encompass any remedial action that could have demonstrated that

25   any purported noncompliance was insubstantial and easily addressed without withdrawal

26   of accreditation.

FIRST AMENDED COMPLAINT – 35
(No. C24-896 JNW)

d.      The "record" as provided to Sea Mar (and the Appeals Panel) was self-curated by the Review Committee—whose decision was appealed and under review. Acting in its apparent self-interest, the Review Committee excluded the Field Representatives' contemporaneous notes of interviews, any record of its deliberations, communications among and between the Field Representatives and Review Committee, and other information and data that might have allowed Sea Mar to meaningfully challenge the adverse accreditation decision. The Review Committee's selection of a limited and slanted record likewise frustrated the Appeals Panel's ability to objectively review the de-accreditation decision. The Review Committee's obfuscation manifested in a related way: It apparently failed to keep any minutes or other record of its deliberations and decision-making with respect to the withdrawal of the Program's accreditation, even though that action was significant and nearly unprecedented.

e.      Not only did ACGME deny Sea Mar's request to undertake discovery on the de-accreditation process, including by interviewing or deposing the Field Representatives and Review Committee members, it denied Sea Mar's request for information pertaining to ACGME's disposition of findings and citations from similarly situated programs.

f.      ACGME also refused Sea Mar's requests for information regarding (1) how the members of the Appeals Panel were selected (including who made the selection, what criteria were used, and whether and how the members were screened for potential conflicts of interest); (2) how the members of the Appeals Panel ruled in prior appeals; (3) what other duties (if any) the Appeals Panel had; and (4) the applicable burden of proof or standard of review.

g.      ACGME also denied Sea Mar (1) records it requested regarding ACGME's January 2024 decision to continue Sea Mar's institutional accreditation with commendation; (2) documents leading up to the Site Visit and the decision to undertake a

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

remote visit rather than an in-person visit; (3) official confirmation that the Field Representatives who conducted the remote Site Visit destroyed notes or correspondence; (4) any policy pertaining to the destruction of notes prepared by Field Representatives; (5) the minutes of the Review Committee meeting; (6) materials that might have been shared between the Review Committee and the Appeals Panel; (7) the identities of anyone from ACGME who planned to attend the appeal hearing; and (8) records and information pertaining to previous ACGME appeals. While ACGME claimed that its policies required only that it provide the "appeal file" that it itself curated, it failed to cite any policy that forbade providing additional documents, data, or information that would have helped Sea Mar prepare for the appeal hearing—and ACGME continued its stonewalling even after Sea Mar pointed out that ACGME's Policies and Procedures provided a floor, not a ceiling, for cooperation.

h.     Sea Mar was required to provide the contents of its oral and written presentations to the Appeals Panel at least ten days before the hearing—which ACGME then shared with the Review Committee's representative, who reviewed and incorporated Sea Mar's materials into her presentation to the Appeals Panel. By contrast, ACGME was *not* required to provide Sea Mar with the Review Committee's presentation in advance of the hearing, and it was not provided.

i.     Finally, even though the Appeals Panel is charged with recommending to the ACGME Board whether the Program's accreditation should be restored and whether there was substantial, relevant, and credible evidence supporting the de-accreditation decision, ACGME advised Sea Mar that it would not be provided a copy of the Appeals Panel's recommendation and its associated findings. ACGME has interpreted its policies, which are silent on this point, to ensure that the Appeals Panel's conclusion will remain a mystery to Sea Mar.

FIRST AMENDED COMPLAINT – 37
(No. C24-896 JNW)

1      103.    By refusing to provide materials requested by Sea Mar, ACGME defied its own

2    policies. Section 20.30 of ACGME's Policies and Procedures, which governed the internal appeals

3    process, provided that "[a] Sponsoring Institution or program shall be given the documents

4    comprising the Sponsoring Institution or program file *and the record of the Review Committee's*

5    *action*" and that "[t]he documents comprising the Sponsoring Institution or program file *and the*

6    *record of the Review Committee's action*, together with oral and written presentations to the

7    Appeals Panel, shall be the basis for the final recommendations of the Appeals Panel." (Emphases

8    added). Section 20.30 also allowed Sea Mar's oral and written appeals presentations to clarify the

9    record with respect to its compliance with applicable program requirements and the review

10   undertaken by ACGME.

11     104.    Notably, however, ACGME refused to provide Sea Mar with any documents other

12   than those comprising the self-curated "program file" on which the Review Committee ostensibly

13   relied when making its decision—which did *not* include various relevant materials, including a

14   record of the Review Committee's deliberations and ultimate vote, the Field Representatives'

15   contemporaneous notes, the preliminary list of potential citations drawn up by members of the

16   Review Committee, or any explanation from the Review Committee as to why it rejected

17   progressive remediation. Despite Sea Mar's repeated requests, ACGME refused to provide these

18   critical components of the Field Representatives' investigation and the Review Committee's

19   record. No explanation was given other than that, somehow, ACGME believed it was not required

20   to provide these materials to Sea Mar—even though there was nothing in ACGME's policies that

21   prohibited providing this critical information, and even though the policies otherwise obliged Sea

22   Mar (and, for that matter, the Appeals Panel) to review the merits of the Review Committee's

23   decision.

24     105.    Repeatedly frustrated by ACGME's intransigence, Sea Mar was left with no other

25   option than to seek judicial intervention to secure documents it needed to mount a meaningful

26

FIRST AMENDED COMPLAINT – 38
(No. C24-896 JNW)

1    defense of the Program—materials to which it was entitled under the letter and spirit of ACGME's

2    own policies.

3         106.    Following several weeks of litigation during which ACGME repeatedly claimed

4    that it "ha[d] *already provided* Sea Mar with . . . materials considered by the Review Committee

5    at the time it made its decision to withdraw accreditation from Sea Mar's family medicine

6    residency program," Local Rules W.D. Wash. LCR 37 Joint Submission on Pl.'s Mot. for

7    Expedited Disc. 13, Dkt. No. 33, this Court concluded that "Sea Mar should be afforded an

8    opportunity to mitigate its injuries by gaining access to the information it needs to challenge

9    [ACGME's] decision" and ordered the production of key documents that informed the actions

10   taken by the Field Representatives and Review Committee, Order 3, Dkt. No. 36. ██████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ██████████████████████ Whether intentionally or merely carelessly, ACGME repeatedly

16   misled Sea Mar about the scope of the materials that were provided—and then did the same to the

17   Court.

18        107.    The documents produced by ACGME in this litigation ████████████

19   ████████████████████████████████████

20        ██     ████████████████████████████████████

21        ████████████████████████████████████████

22        ████████████████████████████████████████

23        ████████████████████████████████████████

24        ████████

25        ██     ████████████████████████████████████

26   ████████████████████████████████████████████████████

FIRST AMENDED COMPLAINT – 39
(No. C24-896 JNW)



108.

FIRST AMENDED COMPLAINT – 40
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**The Appeal Hearing Confirmed That the Withdrawal of the Program's Accreditation Was Wholly Unjustified**

109.    Sea Mar presented these and other arguments at the hearing before the ACGME Appeals Panel on August 2, 2024. The Review Committee was in turn given the opportunity to defend its precipitous decision to withdraw the Family Medicine Residency Program's accreditation.

110.    The presentation of Louito Edje, M.D., the Review Committee chair, confirmed that the record lacked substantial, credible, and relevant evidence to justify the de-accreditation decision. Indeed, Dr. Edje ignored and failed to reply to almost all of the materials presented to the Appeals Panel by Sea Mar, except to quibble with Sea Mar's characterization of certain citations (such as those based on the Program having an orderly succession of directors and the yet-to-be-operative Rural Pathway) as "minor."

111.    Additionally, at the hearing, a possible motive for the Review Committee's perplexing decision came to light. Dr. Edje suggested that the Review Committee, having perceived differences between objective data reported by Sea Mar and subjective opinions attributed by the Field Representatives to interviewed residents and faculty, chose to disregard the former and consistently credit the latter. In other words, according to Dr. Edje, the Review Committee simply chose not to believe Sea Mar or its administration. Setting aside the fundamental impropriety of this bias—especially given that the Review Committee took no steps to reconcile the differences it saw between Sea Mar's data and the resident and faculty interviews—the Review Committee's skepticism was based on a fundamentally infirm foundation.

112.    Specifically, Dr. Edje pointed to one issue in particular as a source for the Review Committee's bias: the Program's use of telemedicine. Although Sea Mar's objective submissions confirmed that the Program employed telemedicine and that the residents used the technology (at least to the extent feasible, given the technological disadvantages common to Sea Mar's vulnerable patient base), the Review Committee believed that the interviewed residents said the opposite: that

FIRST AMENDED COMPLAINT – 41
(No. C24-896 JNW)

they did *not* use telemedicine. Dr. Edje suggested at the hearing that this issue took on outsized importance, as the purported discrepancy caused her and her Review Committee colleagues to question the validity of not only Sea Mar's telemedicine data, but *all* of the evidence and data submitted in support of the Program. But the Review Committee was wrong: There was no actual inconsistency to resolve. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████ the Site Visit Report, which found that "[r]esidents"—*plural*—"indicated that they do not use telemedicine." By the time the Review Committee was finished, the facts had morphed even further: Citation No. 18 read that "it was reported that residents"—not only plural, but seemingly universal—"do not use telemedicine and residents do not receive any access or training to telehealth services."

113.   In short, this citation (and, as discussed above, many others) was premised on a factual misunderstanding caused by a manifest failure to investigate the underlying issues, and the Review Committee's apparent skeptical bias against Sea Mar—which motivated it to disregard Sea Mar's data and materials and run up the score against the Program—was wholly unmerited. And while some of the Review Committee's apparent (or willful) confusion might be attributed to the inadequacy of the Field Representatives' investigation, something more profoundly wrong is suggested by its exaggeration and misstatement of the materials provided to it and its studious avoidance of the facts presented to it by Sea Mar at the appeal hearing. In short, the Review Committee appears to have sought this draconian result *despite* the facts rather than because of them.[5]

─────────────────

[5] The inexplicably deficient citations and precipitous de-accreditation decision, along with the inadequate process afforded throughout the Site Visit and appeals process, has left Sea Mar to guess why it was so mistreated by ACGME. The reason suggested by Dr. Edje at the appeal hearing—that the Field Representatives and Review Committee simply chose not to believe anything Sea Mar said—is one possible explanation, but the information to which Sea Mar currently has access suggests other, equally iniquitous motivations. For example, Sea Mar, a relatively small healthcare provider operating one residency program, pays far less to ACGME in annual fees than, say, academic medical institutions that have many residency programs and

FIRST AMENDED COMPLAINT – 42
(No. C24-896 JNW)

**CAUSES OF ACTION**

**COUNT I**

**Denial of Federal Common-Law Due Process**

114.    Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

115.    "[A]ccreditation agencies are [not] wholly free of judicial oversight"; instead, courts have recognized that "there exists a 'common law duty on the part of "quasi-public" private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members.'" *Pro. Massage*, 781 F.3d at 169 (quoting *McKeesport Hosp.*, 24 F.3d at 534–35 (Becker, J., concurring in the judgment)); *see also, e.g.*, *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1314 (8th Cir. 1987) ("Although not governed by constitutional guidelines, [accrediting bodies] nevertheless must conform [their] actions to fundamental principles of fairness.").

116.    "The fundamental components of due process are 'notice and an opportunity to respond.'" *Bennett Coll. v. S. Ass'n of Colls. & Schs. Comm'n on Colls., Inc.*, 474 F.Supp.3d 1297, 1307 (N.D. Ga. 2020) (quoting *Auburn Univ. v. S. Ass'n of Colls. & Schs., Inc.*, 489 F.Supp.2d 1362, 1374 (N.D. Ga. 2002)); *see also, e.g.*, *Mountain State Univ., Inc. v. Higher Learning Comm'n*, No. 5:14-16682, 2017 WL 963043, at *10 (S.D. W. Va. Mar. 10, 2017) ("'[N]otice and opportunity for hearing appropriate to the nature of the case' are indispensable ingredients of due process and thus of common-law due process claims." (alteration in original) (citation omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950))). This opportunity

---

maintain accreditation notwithstanding the issuance of citations. ACGME therefore has ample financial incentive to give short shrift to Sea Mar's accreditation while simultaneously touting the de-accreditation decision as low-cost evidence of its rigorous oversight. Moreover, in the Site Visit Report, the Field Representatives puzzlingly and seemingly irrelevantly mentioned that Sea Mar "was founded by Hispanics," suggesting possible discriminatory animus.

FIRST AMENDED COMPLAINT – 43
(No. C24-896 JNW)

1    "is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*,

2    424 U.S. 319, 333 (1976).

3        117.    Common-law due process further requires that accrediting bodies, among other

4    things:

5        •    Employ fair procedures when making decisions affecting their members, *Thomas*

6    *M. Cooley L. Sch. v. ABA*, 459 F.3d 705, 711 (6th Cir. 2006), such that any "process and decision

7    [are] fundamentally fair," *Paine Coll. v. S. Ass'n of Colls. & Schs. Comm'n on Colls., Inc.*, 810

8    F.App'x 852, 857 (11th Cir. 2020) (per curiam);

9        •    Ensure that decisions are neither arbitrary nor unreasonable, are based on

10   substantial evidence, are reached with sufficient reasoning, and are made by impartial

11   decisionmakers, *Cooley L. Sch.*, 459 F.3d at 712, 715; *Pro. Massage*, 781 F.3d at 177;

12       •    Afford open, fair, and deliberative processes that "protect all interests and [] assure

13   some measure of confidence in the outcome of the inquiry," *Bennett Coll.*, 474 F.Supp.3d at 1307

14   (quoting *Auburn Univ.*, 489 F.Supp.2d at 1374);

15       •    Have fair and impartial procedures and adhere to their own rules when making

16   decisions, *Pro. Massage*, 781 F.3d at 172; and

17       •    Avoid conflicts of interest, *Paine Coll.*, 810 F.App'x at 858.

18       118.    Here, ACGME has denied Sea Mar these fundamental tenets of due process.

19       119.    ACGME informed Sea Mar that it intended to withdraw the Family Medicine

20   Residency Program's accreditation effective June 30, 2024—before Sea Mar had an opportunity

21   to be heard on the de-accreditation decision at the August 2 appeal hearing. ACGME further denied

22   Sea Mar's requests to expedite the hearing or extend the effective date of the accreditation

23   withdrawal to allow the appeal to be completed beforehand. Sea Mar was therefore denied the

24   opportunity to be heard at a meaningful time and in a meaningful manner because no opportunity

25   was afforded until after adverse action was taken.

26

FIRST AMENDED COMPLAINT – 44
(No. C24-896 JNW)

1       120.    The process and deliberations leading to the accreditation-withdrawal decision—

2 and the appeals process that followed—were fundamentally unfair. The Field Representatives

3 conducted a short, remote site visit ████████████████████████████████████████████

4 ████████████████████████████████████████. Their Site Visit Report ██████████

5 ████████████████████████████████████████████—errors repeated by

6 the Review Committee, who credited subjective opinion over objective data ████████████

7 ████████████████████████████████████████████████████.

8 Adverse action was taken before Sea Mar had an opportunity (let alone a meaningful one) to

9 respond to the forty-seven citations, and progressive remediation was rejected in favor of

10 unwarranted, precipitous de-accreditation. And, at every step of the process, ACGME construed

11 its internal policies and procedures to Sea Mar's detriment, including by failing to record its

12 deliberations, refusing to provide critical documentation to Sea Mar, and conducting the appeal

13 hearing in a manner that prevented the Appeals Panel from assessing the substantiality and

14 credibility of the evidence that purportedly justified the withdrawal of the Program's accreditation.

15 In short, rudimentary fairness was repeatedly denied, replaced instead by a shoddy, unprofessional

16 investigative process and "star chamber"-like proceedings.

17       121.    Given the meritless nature of the Review Committee's forty-seven citations and the

18 manifestly deficient investigation that preceded their issuance, the decision to withdraw the Family

19 Medicine Residency Program's accreditation was arbitrary and unreasonable and lacked both a

20 substantial evidentiary basis and sufficient underlying reasoning. As detailed above, each of the

21 forty-seven citations suffered from multiple deficiencies, ranging from clear factual errors to a

22 failure to account for the terms of the policies allegedly violated to ready contradiction by materials

23 in ACGME's possession at the time the Review Committee made its decision. Even aggregated,

24 the citations ████████████████████████ cannot possibly justify the withdrawal of the

25 Program's accreditation.

26

FIRST AMENDED COMPLAINT – 45
(No. C24-896 JNW)

1    122.    Rather than provide an open, fair, and deliberative process, both the Field

2    Representatives and Review Committee ███████████████████████████, and they

3    did not seek additional documentation or input from Sea Mar that would have readily refuted most

4    or all of the forty-seven citations. And, as detailed above, the internal ACGME appeals process

5    denied Sea Mar a meaningful opportunity to contest the de-accreditation decision.

6    123.    Lastly, ACGME's appeals procedures are neither fair nor impartial. The

7    imprecision and silences in ACGME's Policies and Procedures allowed the Review Committee to,

8    among other things, fail to record essential information, curate a selective record that denied both

9    Sea Mar and the Appeals Panel critical materials and documentation, affirmatively refuse Sea

10   Mar's requests for relevant data, and deprive Sea Mar and the Appeals Panel of the ability to assess

11   the evidentiary basis for the de-accreditation decision. The information imbalance was

12   compounded by a process that permitted ACGME personnel to engage in ex parte communication

13   and coordination with the Appeals Panel while denying the same right to Sea Mar. ACGME tilted

14   the playing field even further by providing the Review Committee with Sea Mar's presentation

15   well before the appeal hearing, allowing the Review Committee to incorporate Sea Mar's materials

16   into its own presentation—while simultaneously allowing the Review Committee to keep its

17   presentation secret from Sea Mar until its unveiling at the hearing.

18   124.    Sea Mar suffered significant and irreparable injury when the Family Medicine

19   Residency Program's accreditation was withdrawn on June 30, 2024. Even if Sea Mar prevails in

20   ACGME's appeals process, the loss of residents, faculty, and institutional support has effectively

21   led to the Program's dissolution. Additionally, the sudden adverse decision has threatened Sea

22   Mar's receipt of critical federal funding that is statutorily conditioned on ACGME accreditation.

23   These injuries—and the monetary and reputational harm that have resulted—could have been

24   avoided had ACGME afforded Sea Mar the due-process rights to which it was entitled, including

25   the opportunity to be heard and respond to the allegations before adverse action was taken.

26

FIRST AMENDED COMPLAINT – 46
(No. C24-896 JNW)

**COUNT II**

**Denial of State Common-Law Due Process**

125.    Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

126.    State courts have also recognized that "certain private organizations owe a limited common law duty of due process to those subject to disciplinary action," which, like federal common-law due process, requires "fundamental fairness," "notice," and "an opportunity to be heard." *Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F.Supp.3d 531, 542–43 (E.D. Pa. 2019) (quoting *Psi Upsilon of Phila. v. Univ. of Pa.*, Pa.Super. 604, 610–11 (1991)).

127.    Although the Washington Supreme Court has not confirmed the existence of common-law due-process obligations for accrediting bodies under Washington law, it long ago noted—in a more specific but legally analogous context—that "expulsion for crime or misconduct inimical to [an] organization's being" must be preceded by "a hearing after notice" *Schroeder v. Meridian Improvement Club*, 36 Wn.2d 925, 933 (1950); *see also Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 527 (6th Cir. 2001) (explaining that "body of jurisprudence concerning academic accreditation . . . derives from early common law relating to private, voluntary organizations").

128.    Because due-process protections are especially appropriate where membership in or recognition from a given organization is "an economic necessity" and the organization is one "with which the public is highly concerned and which engages in activities vitally affecting the health and welfare of the people," *Falcone v. Middlesex Cnty. Med. Soc'y*, 34 N.J. 582, 591, 596–97 (1961) (cleaned up), states have extended common-law due process rights to accreditation decisions, *see, e.g.*, *Auburn Univ.*, 489 F.Supp.2d at 1367–75 (charting history of higher-education accreditation and observing that "the notion of common law due process evolved from the . . . line of [state] cases holding that where membership in private associations is a virtual prerequisite to the practice of a given profession, courts must scrutinize the procedures used by the association to

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

assure that they are reasonable, while giving deference to the specialized competence of the association" (cleaned up)).

129.   Here, as described above, *see supra* ¶¶ 118–23, ACGME denied Sea Mar basic tenets of common-law due process, including by undertaking a perfunctory investigation of the Program's compliance with applicable guidelines, withdrawing the Program's accreditation without a substantial evidentiary basis, and refusing to provide Sea Mar an opportunity to be heard until *after* adverse action was taken—all of which served to effectively end the Family Medicine Residency Program and inflict irreparable harm on Sea Mar, its staff and residents, and its patients who rely on the Program for family medicine services. Additionally, the sudden adverse decision has threatened Sea Mar's receipt of critical state funding that is statutorily conditioned on ACGME accreditation and foreclosed approval for postgraduate clinical training from the Washington Medical Commission.

## COUNT III

### Violation of the Washington Consumer Protection Act

130.   Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

131.   Washington's CPA, RCW 19.86.010–.920, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020. The CPA "shall be liberally construed that its beneficial purposes may be served." RCW 19.86.920.

132.   To prevail on a CPA claim, private litigants must establish five elements: "(1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest"; (4) "injury to plaintiff in his or her business or property"; and (5) "a causal link . . . between the unfair or deceptive act complained of and the injury suffered." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784–85 (1986).

FIRST AMENDED COMPLAINT – 48
(No. C24-896 JNW)

133.    Here, each of these elements is satisfied based on ACGME's hollow commitment to a meaningful review and appeals process for adverse accreditation decisions.

134.    First, ACGME's accreditation-withdrawal and appeals processes—which denied Sea Mar its due-process rights and provided only an illusory opportunity to contest the adverse accreditation decision—is both an unfair and a deceptive practice and is designed to prevent meaningful and successful appeals of ACGME's decision-making. ACGME undertook a perfunctory site visit ███████████████████████████████████, resulting in the issuance of meritless citations that could not possibly justify the withdrawal of the Family Medicine Residency Program's accreditation. ACGME then interpreted and applied its appeals procedures in a manner that denied Sea Mar a meaningful opportunity to contest the de-accreditation decision. Even if Sea Mar prevails in the appeal, the process offered by ACGME will nonetheless cause irreparable harm to Sea Mar and the Program, given that adverse action was taken before the appeals process was completed, effectively shuttering the Program for at least one year and likely more. ACGME's treatment of the Program was inherently unfair, as Sea Mar has no alternative to the process given ACGME's monopoly control over the accreditation of graduate medical education programs. *See Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787–88 (2013) (suggesting that "a practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits" (cleaned up)).

135.    ACGME's appeals process is also deceptive, as a reasonable consumer would believe that the accreditation and appeals processes would provide a meaningful investigation of a program's compliance with applicable guidelines and permit effective redress of an erroneous decision. *See Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 49–50 (2009). This deception is not unique to the relationship between Sea Mar and ACGME; instead, it is designed to deceive, and has the effect of deceiving, a substantial portion of the residency programs accredited by

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   ACGME, who believe they have access to a fair appeals process should they be subject to an

2   adverse accreditation decision. *See Behnke v. Ahrens*, 172 Wn.App. 281, 292–93 (2012).

3       136.   Second, the ACGME accreditation process is "in trade or commerce," as ACGME

4   charges annual fees to Sea Mar and the other entities it accredits. *In re Breast Cancer Prevention*

5   *Fund*, 574 B.R. 193, 223 (Bankr. W.D. Wash. 2017). Sea Mar has paid ACGME tens of thousands

6   of dollars in annual fees since the Family Medicine Residency Program was first accredited.

7       137.   Third, ensuring fair and adequate accreditation and regulatory processes for

8   residency programs is not only in the public interest generally, but also in the narrower sense of

9   the CPA: The practice occurred in the course of ACGME's business of accrediting and regulating

10   residency programs, which it advertises to the relevant public (including its actual and would-be

11   residency programs) and solicited Sea Mar to undertake in a manner consistent with ACGME's

12   stated values of integrity, fairness, transparency, excellence, and accountability. *See Hangman*

13   *Ridge*, 105 Wn.2d at 790–91. Furthermore, given that it wields monopoly control over the

14   accreditation of graduate medical education, ACGME holds an unequal bargaining position in the

15   relationship, setting forth terms and procedures that Sea Mar was unable to negotiate irrespective

16   of how unfair, deceptive, nontransparent, deficient, and unaccountable they might be. *See id.* at

17   794 (factors under CPA's public-interest inquiry "include (1) whether defendant was acting in the

18   course of his or her business, (2) whether defendant advertised to the general public, (3) whether

19   defendant actively solicited this plaintiff, and (4) whether the parties were unequal bargainers").

20       138.   Moreover, ACGME's unfair and deceptive practices have the effect of undermining

21   Washington's articulated policy of promoting and increasing family medicine residency programs

22   in medically underserved areas, directly frustrating the State's public-policy aims. *See* RCW

23   70.112; Sally C. Pipes, *Free Tuition Won't Fix America's Shortage of Doctors*, Seattle Times

24   (Aug. 19, 2024), https://www.seattletimes.com/opinion/free-tuition-wont-fix-americas-shortage-

25   of-doctors (opinion piece attributing primary-care shortage in HPSAs to lack of residency slots

26   nationwide, with "more than 44,800 doctors applying for just over 41,500 residency positions

across the country" in 2024). Indeed, State Senator June Robinson of Everett told the *Everett Herald* that "[l]osing family residency slots in Marysville is painful," while James Lewis, M.D., health officer for Snohomish County, noted that the withdrawal of the Family Medicine Residency Program's accreditation "will impact a key federally qualified health center partner's patient care capacity" and "curtail a meaningful pipeline of primary care providers to our region." Sydney Jackson, *After 47 Citations, Sea Mar Sues to Save Marysville Residency Program*, Everett Herald (Aug. 17, 2024), https://www.heraldnet.com/news/after-47-citations-sea-mar-sues-to-save-marysville-residency-program. Dr. Lewis further explained that ending the Program might limit primary-care providers for refugee and immigrant referrals. *Id.* As he suggested, the loss of the Program will have a particularly detrimental effect on some of Washington's most vulnerable communities—especially since only *three* family medicine residency programs in the entire state are sponsored by FQHCs like Sea Mar.

139.    Additionally, ACGME's inherently unfair and deceptive practices are not limited to its treatment of Sea Mar's Family Medicine Residency Program: Its articulated appeals procedures deny all accredited programs and institutions a meaningful process to contest adverse action, including by depriving them of critical documentation (and instead permitting only a limited, ACGME-curated file). Given that every accredited program and institution—including at least 197 other ACGME-accredited programs in Washington State, *see Advanced Program Search*, ACGME, https://apps.acgme.org/ads/Public/Programs/Search (last visited Aug. 23, 2024)—is required to seek annual reaccreditation under ACGME's policies, the risk of repeated unfair and deceptive practices is real and substantial. Upon information and belief, Sea Mar regularly engages in similarly unfair and deceptive practices with other programs and institutions, denying them fair accreditation decisions and appeals processes.[6]

---

[6] Indeed, this is not the first time ACGME's accreditation procedures have been subject to judicial scrutiny. *See generally* Complaint, *Prospect Med. Holdings, Inc. v. ACGME*, No. CV-2024-001003 (Pa. Ct. Com. Pl. Jan. 31, 2024) (alleging that ACGME "suddenly announced that [surgical residency program's] accreditation would be withdrawn" without "any substantive basis

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

140.     Finally, Sea Mar has been and will be injured both financially and reputationally because the Program was effectively terminated without justification for the withdrawal of accreditation and without a meaningful opportunity to contest the adverse decision.

## COUNT IV

### Breach of the Implied Duty of Good Faith and Fair Dealing

141.     Sea Mar realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

142.     "Under Washington law, '[t]here is in every contract an implied duty of good faith and fair dealing' that 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'" *Melwani v. Amazon.com, Inc.*, No. 21-1329RSM, 2022 WL 3683807, at *4 (W.D. Wash. Aug. 25, 20220) (alteration in original) (quoting *Rekhter v. State*, 180 Wn.2d 102, 112 (2014)); *see also Rekhter*, 180 Wn.2d at 115 ("[W]hen a party has discretion over a future contract term, it has an implied duty of good faith and fair dealing in setting and performing that contractual term."). This "duty arises [] in connection with terms agreed to by the parties." *Melwani*, 2022 WL 3683807, at *4 (quoting *Rekhter*, 180 Wn.2d at 113).

143.     By inviting accreditation applications, ACGME extends offers to applicants that it will provide accreditation and make accreditation decisions in accordance with its Policies and Procedures in exchange for payment of annual accreditation fees—which, in Sea Mar's case, totaled tens of thousands of dollars. Program applicants like Sea Mar accept that offer when they submit applications, provide monetary consideration in the form of annual accreditation fees, and extend resources and effort to comply with the programmatic terms contractually required by ACGME through its policies, procedures, and guidelines.

144.     The relationship between ACGME and Sea Mar was therefore contractual in nature. *See, e.g.*, *St. Agnes Hosp. of City of Balt., Inc. v. Riddick*, 748 F.Supp. 319, 342 (D. Md. 1990).

---

for the withdrawal of accreditation" or "any meaningful means to appeal that determination" and asserting common-law due-process and tortious-inference claims).

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

This conclusion was consistent with ACGME's actions: for example, requiring payment for its promised and delivered services and its acknowledged practice of not applying its policies and procedures retroactively and instead applying them prospectively (and thus binding itself to the terms as they existed at the time action was taken).

145.    Here, ACGME has violated the implied duty of good faith and fair dealing that adheres to all contracts under Washington law with respect to its internal Policies and Procedures in several ways.

146.    First, section 18.20 of ACGME's Policies and Procedures provided that "[t]he accreditation process for . . . programs includes site visits to *address compliance* with the . . . Program Requirements." (Emphasis added).

147.    Here, however, the Site Visit undertaken by the Field Representatives did not meaningfully address the Program's compliance with the applicable guidelines. Among other shortcomings, the Site Visit lasted less than a business day, the Field Representatives interviewed only a subset of residents and faculty and yet drew sweeping conclusions from those limited interactions, and the Field Representatives failed to undertake necessary follow-up actions to assess the Program's compliance.

148.    Second, section 19.70 of ACGME's Policies and Procedures allowed its Review Committee to "confer a status of Probationary Accreditation if it has determined that a Sponsoring Institution or program has failed to demonstrate substantial compliance with the applicable Requirements confirmed by the findings of an accreditation site visit." Whether to take adverse action against an institution and program, and what adverse action to take, were at the discretion of ACGME.

149.    In response to the Site Visit, ACGME chose the precipitous response of imminent accreditation withdrawal. Under ACGME's own policies, probationary accreditation and progressive remediation would have been appropriate given the circumstances, and yet ACGME not only declined to offer these options to Sea Mar, but also refused to seek or consider Sea Mar's

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

responses to the Site Visit findings and Review Committee's citations—even though many citations were baseless, inaccurate, or premised on anonymous communications—before imposing, based on the sheer number of citations, a sanction that inevitably led to the Program's dissolution. ACGME thus breached the implied duty by choosing the severest possible penalty on the Family Medicine Residency Program without providing Sea Mar the opportunity to remedy the alleged deficiencies or even meaningfully contest the Review Committee's conclusions.

150. Third, section 20.00 of ACGME's Policies and Procedures outlined an appeals process through which the Appeals Panel "make[s] recommendation to the ACGME Board as to whether substantial, credible, and relevant evidence exists to support the" adverse action taken by the Review Committee.

151. ACGME, however, exercised its discretion to control the timing—of the initial notification to Sea Mar, the withdrawal of accreditation, and the appeals process—to completely and unfairly deprive Sea Mar of any meaningful opportunity to be heard prior to de-accreditation. Indeed, after notifying Sea Mar of the withdrawal of the Program's accreditation, ACGME refused Sea Mar's repeated requests and entreaties to provide a meaningful appeals process. Among other procedural and substantive shortcomings, ACGME unfairly and in bad faith: chose an effective withdrawal date that preceded the opportunity for appeal; refused to extend the withdrawal date or otherwise provide progressive remediation; denied Sea Mar's repeated requests for information and materials, including the Field Representatives' notes and the minutes of the Review Committee's deliberations; refused to seek or consider any additional evidence in the appeal that contradicted the Review Committee's conclusions, whether communicated during the Site Visit or presented before the hearing; and, during the hearing, maintained its position and did not even attempt to reply to or controvert the objective facts presented by Sea Mar that conclusively refuted most or all of the citations. Consequently, in violation of its implied contractual duties, ACGME denied Sea Mar a meaningful opportunity to demonstrate to the ACGME Appeals Panel and Board

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   that the Review Committee's decision was not supported by "substantial, credible, and relevant

2   evidence."

3          152.    ACGME thus breached the implied duty by exercising discretion to impose baseless

4   citations, withdraw the Program's accreditation, and deny Sea Mar the opportunity for a

5   meaningful appeal.

6                                    **PRAYER FOR RELIEF**

7          WHEREFORE, Sea Mar prays for judgment against ACGME as follows:

8          A.      A declaration that ACGME's insufficient investigatory process, issuance of

9   insubstantial and meritless citations, imposition of precipitous adverse action rather than

10  progressive remediation, and failure to provide a meaningful opportunity for Sea Mar to be heard

11  before the withdrawal of the Family Medicine Residency Program's accreditation constitute a

12  violation of Sea Mar's federal and state common-law due-process rights; a violation of the CPA,

13  RCW 19.86.010–19.86.920; and a violation of the implied duty of good faith and fair dealing.

14         B.      An injunction restoring the Family Medicine Residency Program's accreditation

15  until such time as ACGME fulfills its legal obligations under federal and state common-law due

16  process, the CPA, and the implied duty of good faith and fair dealing;

17         C.      An award of damages, as well as attorney' fees and costs, in an amount to be proven

18  at trial but in excess of $75,000; and

19         D.      Any and such other relief that the Court deems appropriate.

20                                  **DEMAND FOR JURY TRIAL**

21         Pursuant to Federal Rule of Civil Procedure 38(b), Sea Mar demands a trial by jury of all

22  damages claims asserted in this complaint so triable.

23

24

25

26

FIRST AMENDED COMPLAINT – 55
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2 Dated: August 26, 2024  By: *s/ David B. Robbins*

3

4            By: *s/ Matthew P. Gordon*

5

6            By: *s/ Cara V. Wallace*

7            By: *s/ Jonathan P. Hawley*

8            By: *s/ Juliana L. Bennington*

9

10         David B. Robbins, WSBA No. 13628
Matthew P. Gordon, WSBA No. 41128

11 Cara V. Wallace, WSBA No. 50111
Jonathan P. Hawley, WSBA No. 56297

12 Juliana L. Bennington, WSBA No. 60357
**PERKINS COIE LLP**

13 1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

14 Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

15 DRobbins@perkinscoie.com
MGordon@perkinscoie.com

16 CWallace@perkinscoie.com
JHawley@perkinscoie.com

17 JBennington@perkinscoie.com

18            By: *s/ Adrianna M. Simonelli*

19

20         Adrianna M. Simonelli, WSBA No. 58472
**PERKINS COIE LLP**

21 1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128

22 Telephone: +1.503.727.2000
Facsimile: +1.503.727.2222

23 ASimonelli@perkinscoie.com

24 *Attorneys for Plaintiff*

25 *Sea Mar Community Health Centers*

26

FIRST AMENDED COMPLAINT – 56
(No. C24-896 JNW)

1

## <u>CERTIFICATE OF SERVICE</u>

2

I certify under penalty of perjury that, on August 26, 2024, I caused to be electronically

3

filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will

4

send a notification of the filing to the email addresses indicated on the Court's Electronic Mail

5

Notice List.

6

Dated: August 26, 2024

7

*s/ David B. Robbins*
David B. Robbins

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. C24-896 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000