1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8

SEA MAR COMMUNITY HEALTH
CENTERS,

CASE NO. 2:24-cv-00896-JNW

9

Plaintiff,

ORDER GRANTING IN PART
DEFENDANT'S MOTION TO
DISMISS

10

v.

11
12

ACCREDITATION COUNCIL FOR
GRADUATE MEDICAL EDUCATION,

13

Defendant.

14

15

## 1. INTRODUCTION

16

17

18

19

20

This matter comes before the Court on Defendant Accreditation Council for Graduate Medical Education's ("ACGME") motion to dismiss and motion to stay. Dkt. Nos. 55, 56. The Court held oral argument on September 18, 2025. For the reasons explained fully below, ACGME's motion is GRANTED in part and DENIED in part. ACGME's motion to stay is DENIED as moot.

21
22
23

## 2. BACKGROUND

**2.1  The Sea Mar Family Medicine Residency Program.**

Founded in 1978, Plaintiff Sea Mar Community Health Centers ("Sea Mar") is a federally qualified health center that provides community health services to medically underserved populations in Washington state, with a focus on rural and Latino communities. Dkt. No. 63 ¶¶ 44–45. Sea Mar currently operates thirty-three medical clinics, twenty-eight outpatient behavioral health clinics, and four inpatient substance-abuse treatment centers throughout western Washington. *Id.* ¶ 47.

In 2015, Sea Mar established a three-year Family Medical Residency Program ("Program") based in Marysville, Washington, and received initial accreditation from ACGME through June 30, 2024. *Id.* ¶¶ 46, 55. ACGME's Family Medicine Review Committee ("Review Committee") performs an annual review of all accredited programs. Dkt. No. 55 at 6. As part of the review process, ACGME conducts resident and faculty surveys asking them to evaluate their program's patient safety and teamwork, professionalism, and faculty teaching and supervision. *Id.* at 8.

The Program's first class of residents started training in the summer of 2017 and the class expanded to twelve residents in each three-year class, with 100 percent of Program graduates passing the American Board of Family Medicine's family medicine board-certification examinations on their first try. Dkt. No. 63 ¶¶ 58, 60. Between 2018 and 2024, the Program maintained continuous accreditation with no citations during ACGME's annual reviews. *Id.* ¶ 55.

The Program's funding depends on ACGME certification. Federal funding comes through the Teaching Health Center Graduate Medical Education ("THCGME") program, administered by the Health Resources and Services Administration ("HRSA"). *Id.* ¶¶ 77–79. This program requires accreditation by ACGME or the American Osteopathic Association. 42 U.S.C. § 256h(a)(3); 42 U.S.C. § 256h(a)(1)(A)-(C); 42 U.S.C. § 256h(j)(1)(B). The Program received $320,000 from HRSA for two full-time residents in 2023. Dkt. No. 63 ¶ 79. State funding under Washington law similarly requires ACGME certification, providing the Program $531,818 in 2023 and $674,301 in 2024. RCW 70.112.060; RCW 70.112.010(4); Dkt. No. 63 ¶¶ 74, 75.

## 2.2    ACGME's accreditation review and withdrawal.

In 2022, Ricardo Jimenez became the Program's new Director and shifted the Program towards a "Clinic First" model, emphasizing training in community health settings rather than the old model of training physicians in hospital-based settings. *Id.* ¶¶ 61, 64–65. During the ACGME 2023 annual survey, Program residents and faculty expressed dissatisfaction with these changes. *Id.* ¶ 68. Despite these concerns, ACGME found the Program was in substantial compliance with ACGME's Program Requirements and did not issue any citations, but it "encouraged the [P]rogram to review the results from the Resident Survey." *Id.*

In October 2023, ACGME sent Sea Mar a letter stating that "a site visit of the [P]rogram must be conducted before an accreditation decision can be made." *Id.* ¶ 83. Though initial described as an "in person" visit to gather more context about

the 2023 resident and faculty survey, ACGME notified Sea Mar that it scheduled a "remote" visit instead. *Id.* ¶¶ 83, 84. On February 20, 2024, ACGME Field Representatives conducted a videoconference for six hours during which they met with the Program administration, residents, and faculty members. *Id.* ¶¶ 86–87.

The Field Representatives prepared a report of their views on the Program's compliance with ACGME's guidelines. *Id.* ¶ 92. ACGME has shared some of the Field Representatives contemporaneous notes and communications, but Sea Mar alleges other materials like text messages and emails were destroyed. *Id.* ¶ 93.

Two Review Committee members reviewed the Field Representatives' completed report and made divergent recommendations: one reviewer recommended a year of probation while the other recommended probation if Program leadership changed or withdrawal if leadership remained. *Id.* ¶ 95. Despite these recommendations, the Review Committee unanimously voted to *withdraw* accreditation. *Id.*

On April 26, 2024, ACGME sent Sea Mar a letter describing forty-seven citations supporting its withdrawal decision. *Id.* ¶ 100. Sea Mar alleges that some of these citations were factually inaccurate, and thus that the Review Committee based its decision on a record that "lacked substantial evidentiary bases and reflected the unprofessional, inadequate inquiry undertaken by the Field Representatives." *Id.* ¶ 105.

On June 21, 2024, Sea Mar sued ACGME and moved for a temporary restraining order preventing ACGME from withdrawing the Program's accreditation, which this Court denied. Dkt. Nos. 3, 32. ACGME officially withdrew

1   the Program's accreditation on June 30, 2024. Dkt. No. 63 ¶ 155. As a result, the

2   Program lost its residents, most of its faculty, its funding, and affiliation with

3   Providence hospital. *Id.*

4   **2.3   The appeals process and current claims.**

5        Sea Mar appealed the withdrawal decision to ACGME's Appeals Panel. *Id.* ¶

6   124. The panel held a hearing on August 2, 2024, and voted to affirm the

7   withdrawal decision. *Id.* ¶ 130. Sea Mar alleges the appeals process failed to provide

8   meaningful due process, including ACGME's refusal to provide discovery materials

9   until court intervention, exclusion of the Review Committee members' initial

10  recommendations from the appeals record, and the Appeals Panel's refusal to

11  consider countervailing evidence despite ACGME policies permitting such

12  consideration. *Id.* ¶¶ 117–118, 131, 133, 136.

13       Sea Mar Second Amended Complaint asserts four claims against ACGME: (1)

14  denial of federal common-law due process; (2) denial of Washington state common-

15  law due process; (3) violation of the Washington Consumer Protection Act (CPA);

16  and (4) breach of the implied duty of good faith and fair dealing. *Id.* ¶¶ 144–183.

17  ACGME now moves to dismiss all claims under Rule 12(b)(6), arguing that Sea Mar

18  fails to state a claim on which relief can be granted. Dkt. No. 55.

19
20                           **3.   DISCUSSION**

21  **3.1   Legal standard.**

22       The Court will grant a Rule 12(b)(6) motion to dismiss only if the complaint

23  fails to allege "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). The plausibility standard is less than probability, "but it asks for more than a sheer possibility" that a defendant erred. *Id.* When considering a motion to dismiss, the Court accepts factual allegations pled in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). But courts "do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citations modified). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.*

### 3.2    Sea Mar fails to state a federal common law due process claim.

ACGME argues that "[f]ederal law does not support Sea Mar's novel cause of action." Dkt. No. 55 at 16. Sea Mar responds that federal courts have recognized such claims and argues this Court should follow suit. Dkt. No. 65 at 5–12. The Court agrees with ACGME and declines to extend federal common law in this context.

Federal common law creation is limited to extraordinary circumstances. In *Rodriguez v. Federal Deposit Insurance Corp.*, the Supreme Court explained that "the cases in which federal courts may engage in common lawmaking are few and far between," and "before federal judges may claim a new area for common

lawmaking, strict conditions must be satisfied." 589 U.S. 132, 133, 136 (2020). Such lawmaking requires either explicit congressional authorization or those circumstances where it is "'necessary to protect uniquely federal interests.'" *Id.* at 136 (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). The Ninth Circuit has long adhered to these limitations. *Scalia v. Emp. Sols. Staffing Grp., LLC*, 951 F.3d 1097, 1105 (9th Cir. 2020) ("Federal courts have the authority to craft federal common law in limited circumstances. . . . [W]e may undertake this type of lawmaking in those few instances where 'a federal rule of decision is necessary to protect a uniquely federal interest.'" (internal quotation marks omitted)); *In re Consolidated Freightways Corp.*, 443 F.3d 1160, 1162 (9th Cir. 2006) ("[T]he Supreme Court has instructed that the creation of federal common law is disfavored except where explicitly authorized by Congress.").

The Ninth Circuit has neither recognized nor foreclosed the "validity of common law due process claims challenging decisions relating to accreditation." *Nat'l Univ. of Health Scis. v. Council on Chiropractic Educ., Inc.,* 980 F.3d 679, 681 (9th Cir. 2020). This leaves the Court to determine whether the strict conditions for federal common law creation are satisfied here.

Sea Mar principally relies on decisions from other circuits recognizing federal common law due process rights against accrediting agencies under the Higher Education Act ("HEA") to argue its case. Dkt. No. 65 at 5–7. These courts have held that "quasi-public private professional organizations or accreditation associations" have "a common law duty . . . to employ fair procedures when making decisions affecting their members." *Pro. Massage Training Ctr., Inc. v. Accreditation All. of*

*Career Sch. & Colleges*, 781 F.3d 161, 169 (4th Cir. 2015) (quoting *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 534–35 (3d Cir. 1994)); *Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 711–12 (6th Cir. 2006) ("Many courts, including [the Sixth Circuit], recognize that 'quasi-public' professional organizations and accrediting agencies such as the [American Bar Association] have a common law duty to employ fair procedures when making decisions affecting their members."). These courts ground their authority in the HEA's grant of exclusive federal jurisdiction over "any civil action brought by an institution of higher education . . . involving the denial, withdrawal, or termination of accreditation." 20 U.S.C. § 1099b(f).

As the Fourth Circuit explained in *Professional Massage*—a case Sea Mar relies on heavily—"[t]his grant of exclusive federal jurisdiction necessarily implies that federal law should govern disputes relating to decisions made by [accrediting agencies]." 781 F.3d at 170. The Sixth Circuit similarly emphasized that Congress's jurisdictional grant under the HEA provides the foundation for federal common law governing accreditation disputes: "If a grant of federal jurisdiction sometimes justifies creation of federal common law, a grant of exclusive federal jurisdiction necessarily implies the application of federal law." *Thomas M. Cooley*, 459 F.3d at 712 (internal citation omitted).

Sea Mar acknowledges that most federal common law due process cases in the accreditation context involve the HEA, Dkt. No. 65 at 6, but it argues that the THCGME creates "uniquely federal interests" analogous to those in HEA cases. Dkt. No. 65 at 6–9. Sea Mar attempts to minimize the differences between the HEA

and THCGME through a side-by-side comparison of the programs. But this scorecard approach misses the point, as *Rodriguez* does not endorse counting up federal touchpoints to justify common lawmaking. Dkt. No. 65 at 9. The critical distinction is jurisdictional: Congress explicitly granted exclusive federal jurisdiction for HEA disputes, 20 U.S.C. § 1099b(f), while deliberately omitting any such provision for medical residency accreditation.

When Congress wanted federal law to govern accreditation disputes, it said so explicitly. The absence of similar language in the medical residency context reflects deliberate congressional choice, not oversight or a "formalistic quirk" as Sea Mar suggests. Dkt. No. 65 at 9; *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The Court cannot rewrite the law to create federal common law when clear congressional authorization is lacking. This congressional choice cannot be overcome by showing parallel federal involvement in funding and oversight.

Sea Mar also argues "uniquely federal interests" in the existence of (1) federal funding through HRSA contingent on ACGME accreditation; (2) a nationwide federal program addressing physician shortages in underserved areas; and (3) the need for uniform standards to avoid the "idiosyncrasies and inconsistencies of state law," frustrating Congress's purpose. Dkt. No. 65 at 8–9. While these are no doubt federal components in medical residency funding, these interests do not rise to the level requiring federal common law for several reasons.

First, federal funding alone does not justify federal common law creation. If it could, federal judicial lawmaking would swell beyond the "few and far between" cases the Supreme Court contemplates. *Rodriguez*, 589 U.S. at 133. The federal government routinely relies on private organizations for standard-setting and certification across numerous programs, yet courts have not recognized federal common-law claims in those contexts absent explicit congressional authorization.

Second, the federal interests Sea Mar identifies do not approach the uniquely federal concerns justifying common law in established areas like admiralty, interstate disputes, or foreign relations. *See Rodriguez*, 589 U.S. at 136 ("In contexts like [admiralty disputes and certain controversies between states], federal common law often plays an important role."). Medical residency accreditation involves professional standards, educational quality, and contractual relationships—matters traditionally governed by state law. State courts regularly adjudicate such disputes without frustrating federal objectives. *See Native Vill. of Kivalina*, 696 F.3d at 855; *Rodriguez*, 589 U.S. at 137 (federal common law inappropriate where "state law is up to the task").

Third, Sea Mar's uniformity argument proves too much. The desire for consistent standards across federal programs cannot alone justify federal common law, as *Rodriguez* makes clear: "[W]hat unique interest could the federal government have in determining how a [private dispute], once [federal funds are] paid to a designated agent, is *distributed* among [private parties]?" 589 U.S. at 137 (emphasis in original). The same logic applies here—once federal funds flow based

on accreditation status, the dispute over whether accreditation was properly

withdrawn involves the rights of private parties, not uniquely federal interests.

Sea Mar also attempts to overcome the absence of exclusive federal

jurisdiction by citing older cases that recognized federal common law in

accreditation disputes. Dkt. No. 65 at 9–10 (citing *Found. for Interior Design Educ.*

*Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 528 (6th Cir. 2001) and

*Marlboro Corp. v. Ass'n of Indep. Colls. & Schs., Inc.*, 556 F.2d 78, 79 (1st Cir.

1977)). But these authorities do not support Sea Mar's position. *Marlboro* predated

the HEA's 1992 jurisdictional provision and thus arose before Congress made

deliberate choices about which accreditation disputes warrant federal law. 556 F.2d

at 79. And *Foundation* offers little guidance here: when the Sixth Circuit faced an

accrediting dispute outside the HEA's exclusive jurisdiction, it applied state law

without explicitly analyzing whether federal common law could apply absent HEA's

jurisdictional grant. 244 F.3d at 528–29. These cases cannot justify creating federal

common law given Congress's deliberate choice not to extend the HEA's

jurisdictional provision to medical residency programs. Perhaps more

fundamentally, both *Marlboro* and *Foundation* were decided without the benefit of

the Supreme Court's recent reaffirmation in *Rodriguez* that federal common law

creation is subject to rigorous limitations.

The Court thus declines to extend federal common law to medical residency

accreditation disputes and dismisses Sea Mar's federal due process claim with

prejudice, as amendment would be futile.

1
2

**3.3    Washington case law does not support a common law due process claim in the accreditation context.**

3    ACGME argues that Sea Mar's Washington due process claim "fares no
4    better" than its federal due process claim because Washington courts have not
5    recognized such claims in the accreditation context. Dkt. No. 55 at 16–17. Indeed,
6    Sea Mar itself acknowledges that "the Washington Supreme Court has not
7    confirmed the existence of common-law due-process obligations for accrediting
8    bodies under Washington law," Dkt. No. 63 ¶ 158, and that the Washington Court of
9    Appeals has "expressed doubt as to the viability of a common-law due-process
10    claim," Dkt. No. 3 at 17 n.8.

11    Sea Mar's sole support for its claim rests on *Schroeder v. Meridian Imp. Club*,
12    221 P.2d 544, 545 (Wash. 1950), a 75-year-old case that does not clearly establish a
13    free-floating common law due process claim for voluntary organizations.

14    *Schroeder* involved the by-laws of a neighborhood club incorporated under
15    Washington statute. *Id.* at 549. Former members objected to a provision that
16    provided for expulsion from the club if they failed to pay dues. Ultimately, the
17    Washington Supreme Court held that corporate by-laws "may provide for a loss of
18    membership *ipso facto* for failure to pay dues and, when that is the case, notice is
19    not necessary unless specifically provided for." *Id.* (emphasis in original). In
20    reaching this conclusion, the Court noted in dicta that "[t]here is a distinction
21    between a loss of membership for failure to pay dues, and an expulsion for crime or
22    misconduct inimical to the organization's being. In the latter instance the member
23    must be given a hearing after notice, before he can be expelled." *Id.* Notably,

*Schroeder* never explicitly mentions "common law" or "due process," and the Court actually upheld the organization's right to summarily expel members who failed to pay dues. This passing dictum about notice for expulsion based on misconduct does not support the broad common-law claim Sea Mar asserts here.

More importantly, the Washington Court of Appeals has already interpreted *Schroeder* narrowly and declined to extend it beyond the membership expulsion context. In *Mayer v. Pierce Cnty. Med. Bureau, Inc.*, 909 P.2d 1323, 1324 (Wash. Ct. App. 1995), an internal medicine doctor alleged he was entitled to but denied due process before a non-profit health care provider cancelled his status as a Preferred Provider. The court found the doctor's common law due process claim "creative" but "not persuasive" given it relied only on "marginal support for [the notice before expulsion] proposition" offered by *Schroder*. *Id.* at 1328. The court explicitly held that *Schroeder* was inapplicable because the doctor's "membership in the Bureau is not at issue; the Preferred Participant Agreement expressly states that it does not supplant the Participation Agreement between the Participant and the Bureau." *Id.* The court also examined cases from other jurisdictions but found that they "all deal with the due process rights afforded to a member who is being expelled from an organization, which is not the case here. Thus, they do not support [plaintiff's] theories that the common law recognizes such rights." *Id.*

Federal courts "ordinarily accept the decision of an intermediate appellate court as the controlling interpretation of state law, unless they find convincing evidence that the state's supreme court likely would not follow it." *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021) (citation modified).

Sea Mar offers no such convincing evidence. Instead, it relies on out-of-state cases from Pennsylvania, Michigan, New Jersey, Georgia, Florida, and Arizona, which are irrelevant to determining Washington law. As ACGME correctly notes, this Court must "apply the law as it believes the Washington Supreme Court would apply it." *Indian Harbor Ins. Co. v. City of Tacoma, Wash. Dep't of Pub. Utilities*, 354 F. Supp. 3d 1204, 1212 (W.D. Wash. 2018) (citing *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003)).

This case resembles *Mayer* more than *Schroeder*. Like the physician in *Mayer* who retained his participation agreement despite losing preferred provider status, Sea Mar retains the ability to reapply for accreditation at any time. *See* Dkt. No. 63-1 at 90 (ACGME Policies, 18.11). This represents a status change, not the type of permanent organizational expulsion that triggered due process in *Schroeder*'s dicta. Thus, the Court finds that *Schroeder* does not support Sea Mar's position, and that *Mayer* forecloses a common law due process claim in this context.

Rather than accepting this conclusion, Sea Mar asks the Court to certify the question to the Washington Supreme Court. Under RCW 2.60.020, "[w]hen in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of [Washington] in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the [Washington] supreme court for answer the question of local law involved and the supreme court shall render its opinion in answer thereto." Certification serves the important judicial interests of efficiency and comity, and it saves "time, energy and resources and helps build a cooperative judicial federalism." *Lehman Bros. v.*

*Schein*, 416 U.S. 386, 391 (1974). But "[t]he decision to certify a question to a state supreme court rests in the sound discretion of the district court," *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1087 (9th Cir. 2003), and "[e]ven where state law is unclear, resort to the certification process is not obligatory," *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009).

The Court declines to exercise its discretion to certify this question. *Mayer* provides a clear determination from the Court of Appeals that has stood for nearly 30 years without being questioned by Washington courts. Sea Mar's reliance on out-of-state precedent and a 75-year-old dictum from *Schroeder* does not render Washington law unclear. Moreover, certification would significantly delay these proceedings for a claim that lacks support in existing Washington law. Accordingly, the Court denies Sea Mar's request for certification.

Because this claim fails as a matter of law and amendment would be futile, the Court dismisses Sea Mar's Washington common law due process claim with prejudice.

## 3.4    Sea Mar's CPA claim satisfies the liberal pleading standard applied at the motion to dismiss stage.

Sea Mar's Consumer Protection Act claim presents a close question that ultimately should proceed beyond the pleading stage.

The Washington CPA serves as a critical check on monopolistic and unfair business practices, requiring liberal construction to achieve its protective purposes. RCW 19.86.920. "[T]o prevail in a private CPA action . . . , a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade

or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). ACGME challenges only elements one and three, effectively conceding that Sea Mar adequately alleges the remaining elements.

Turning first to whether Sea Mar alleges an unfair act or practice, the Washington Supreme Court recently reiterated that this determination presents a mixed question of law and fact. *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 649 (Wash. 2024). Sea Mar advances multiple theories of unfair practices: conducting only a six-hour site visit while denying Sea Mar's administration any opportunity to address the Field Representatives' concerns (Dkt. No. 63 ¶¶ 87–91); crediting hearsay over verifiable data and issuing citations inconsistent with both facts and ACGME's own policies (*id.* ¶¶ 103–09); disregarding the primary reviewer's recommendation for probation (*id.* ¶¶ 94–96); scheduling the appeal only after withdrawing accreditation (*id.* ¶¶ 114–16); refusing to provide materials Sea Mar was entitled to for its appeal (*id.* ¶¶ 118-19); and refusing to consider countervailing evidence confirming the Program's compliance (*id.* ¶¶ 131–36).

Beyond these procedural violations, Sea Mar alleges deception in that ACGME promised accreditation services with "integrity, fairness, transparency, excellence, and accountability," *id.* ¶ 7, while actually providing what a reasonable consumer would not expect: an unprofessional investigation and an illusory appeals process that denied meaningful review, *id.* ¶ 166. These allegations, taken as true at this stage, plausibly state that ACGME's conduct was both unfair in deviating

from reasonable procedures and deceptive in its failure to deliver the promised fair process.

The public interest element presents the closer question but likewise survives dismissal. Under RCW 19.86.093(3), Sea Mar may establish public interest impact by showing ACGME's conduct "has either injured or has the capacity to injure other persons." While the potential for repetition must be "real and substantial, as opposed to a hypothetical possibility," *Behnke v. Ahrens*, 294 P.3d 729, 737 (Wash. Ct. App. 2012), Sea Mar meets this standard through its monopoly theory. Dkt. No. 63 ¶¶ 4, 35, 73, 165, 168. ACGME maintains exclusive control over residency accreditation, with 198 other Washington programs subject to the identical policies and procedures challenged here. Although ACGME emphasizes the rarity of withdrawing accreditation without prior citations, rarity does not negate capacity for future harm when the alleged unfairness stems from ACGME's written policies and standard procedures which ACGME claims it followed in this case. Dkt. No. 55 at 21.

Even if the likelihood of identical injury remains speculative, Sea Mar satisfies all four factors of the Hangman Ridge alternative test for establishing public interest in private disputes: the acts occurred in ACGME's business of accreditation; ACGME advertises its services to residency programs; ACGME solicited Sea Mar's participation in its accreditation system; and the parties occupy unequal bargaining positions given ACGME's monopolistic control. *Hangman Ridge*, 719 P.2d at 538. While ACGME points to a voluntarily dismissed Pennsylvania case as evidence that similar claims lack merit, Dkt. No. 66 at 10

1
2
3
4
5

(citing *Prospect Med. Holdings, Inc. v. ACGME*, No. CV-2024-001003 (Pa. Ct. Com. Pl. Jan. 31, 2024)), the Court must accept Sea Mar's allegations as true and draw reasonable inferences in its favor on this procedural posture. That another program sued ACGME over accreditation withdrawal, regardless of the lawsuit's outcome, could support rather than defeat an inference of systemic concerns.

6
7
8
9
10
11
12

At this early stage, Sea Mar need only plausibly allege each CPA element, not prove its case. The combination of ACGME's monopolistic position, the 198 programs subject to identical policies, and the mixed factual questions regarding the fairness of ACGME's conduct counsel against dismissal. As another court in this district recognized, when a plaintiff alleges the possibility of repeated injury, they "should have the opportunity to develop evidence to support this claim." *Birkholm v. Wash. Mut. Bank*, 447 F. Supp. 2d 1158, 66 (W.D. Wash. 2006).

13

Accordingly, ACGME's motion to dismiss Sea Mar's CPA claim is denied.

14
15

### 3.5    Sea Mar states a claim against ACGME for breach of the implied duty of good faith and fair dealing.

16
17
18
19
20
21
22
23

The is an implied duty of good faith and fair dealing in "every contract," and it "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356, 359 (Wash. Ct. App. 1991). This duty applies "'where the contract gives a party discretion or leeway in determining how to act and that party exercises its discretion in a manner inconsistent with the reasonable expectations of the parties or in some other objectionable manner.'" *Hesketh v. Total Renal Care, Inc.*, No. C20-1733-JLR, 2021 WL 5761610, at *7 (W.D. Wash. Dec. 3, 2021) (quoting *Microsoft Corp. v.*

1    *Motorola, Inc.*, 963 F. Supp. 2d 1176, 1190 (W.D. Wash. 2013)), *aff'd*, No. 22-35001,

2    2022 WL 16832818 (9th Cir. Nov. 9, 2022).

3         ACGME argues that Sea Mar's claim fails because no contract can exist

4    between an accreditor and accredited program, citing federal cases that purportedly

5    establish a categorical rule against such claims. Dkt. No. 55 at 23–24. But "contract

6    formation is a question of state law," requiring courts to "first look to the

7    appropriate state law." *Kseniya Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th

8    Cir. 2025). Closer inspection of ACGME's authorities reveals that they either

9    applied different states' laws reaching different conclusions or made sweeping

10   pronouncements without analyzing state-specific requirements—neither of which

11   controls here.

12        *Professional Massage*, for instance, applied Pennsylvania law's specific

13   requirement that contracts must bind both parties in finding the accreditation

14   standards at issue did not constitute a binding contract between the parties. 781

15   F.3d 161, 181 (3d Cir. 2015) (holding accreditor "can alter the alleged contract at

16   will and, thus, is not bound by its terms" under Pennsylvania law). But Sea Mar

17   alleges ACGME's policies allow it to make changes only prospectively, and that it is

18   bound to those policy terms as they existed at the time of the alleged breach,

19   distinguishing *Professional Massage*'s rationale. Dkt. No. 63 ¶ 175. *Chicago School*

20   *of Automatic Transmissions, Inc. v. Accreditation All. of Career School & Colleges*

21   made the policy-driven assertion that "accrediting bodies are not engaged in

22   commercial transactions for which state-law contract principles are natural

23   matches," but this categorical pronouncement came without analyzing Illinois's

contract formation requirements. 44 F.3d 447, 449 (7th Cir. 1995). *Tsamota Certification Ltd. v. ANSI ASQ National Accreditation Board, LLC*, simply adopted *Chicago School*'s categorical approach without independent analysis of Wisconsin law. No. 17-CV-839-JPS, 2018 WL 1936840, at *7 (E.D. Wis. Apr. 24, 2018).

At least one district court has warned against reading these cases "too broadly," explaining that *Professional Massage* was "specifically applied to the terms of different accreditation standards set by a different accrediting agency . . . under a different State's common law," and "does not say that any [contract-based] claim brought by an institution . . . against an accrediting agency on the basis of the accreditation relationship fails as a matter of law." *Sojourner-Douglass Coll. v. Middle States Ass'n of Colleges & Sch.*, No. CIV.A. ELH-15-01926, 2015 WL 5091994, at *43 (D. Md. Aug. 27, 2015).

Under Washington law, contracts require "subject matter, parties, promise, terms and conditions, and price or consideration." *Becker v. Washington State Univ.*, 266 P.3d 893, 899 (Wash. App. Ct. 2011). Sea Mar alleges: (1) accreditation services as subject matter; (2) Sea Mar and ACGME as parties; (3) ACGME's promise to provide accreditation per its policies; (4) terms in ACGME's Policies and Procedures; and (5) Sea Mar's payment of thousands in annual fees as consideration. Dkt. No. 63 ¶¶ 56–57, 173–75. This is enough to plausibly allege a contractual relationship.[1]

---

[1] Washington recognizes contracts in analogous voluntary professional relationships. *See, e.g.*, *Marcus & Millichap Real Est. Inv. Servs. of Seattle, Inc. v. Yates, Wood & MacDonald, Inc.,* 369 P.3d 503, 507–08 (Wash. Ct. App. 2016) (voluntary membership in professional organization creates binding obligations);

1    Even assuming a contractual relationship exists, ACGME contends it could

2   not have breached the implied duty because it merely "appl[ied] its Policies as

3   written." Dkt. No. 55 at 25. However, Sea Mar doesn't claim ACGME violated its

4   policies, but rather that it weaponized its discretion to ensure Sea Mar could never

5   meaningfully contest the adverse decision. *See Rekhter v. State, Dep't of Soc. &*

6   *Health Servs.*, 323 P.3d 1036, 1042 (Wash. 2014) (the implied duty prohibits

7   exercising discretion in bad faith to deprive the other party of contractual benefits).

8          Sea Mar alleges ACGME exercised its discretion to Sea Mar's detriment in at

9   least three ways: First, ACGME chose immediate withdrawal over probation

10   despite no recent citations or egregious violations—a decision the Appeals Panel

11   later found inappropriate. Dkt. No. 63 ¶¶ 142, 180, 182. Second, ACGME set the

12   withdrawal date before the appeal hearing, denied Sea Mar's requests for

13   extensions and discovery materials, and refused to consider exculpatory evidence,

14   effectively mooting any meaningful review. *Id.* ¶ 182. Third, ACGME's Board

15   upheld withdrawal even after its own Appeals Panel recommended probation

16   instead, suggesting predetermined outcome. *Id.* ¶¶ 142, 182.

17          ACGME doesn't address these specific bad faith allegations. Whether

18   ACGME followed its policies and whether it exercised discretion in good faith

19   presents factual questions requiring discovery into ACGME's decision-making,

20

21   *Armed Citizens' Legal Def. Network v. Washington State Ins. Comm'r*, 534 P.3d 439,
22   446 (2023) (find contractual relationship between voluntary membership
     organization and its members because members "submit[ ] the membership
23   application . . . and pay[ ] the membership fees" which "serve[s] as acceptance and
     consideration").

1    choice of harshest penalty, refusal of Sea Mar's requests, and disregard of the

2    Appeals Panel's recommendation.

3        Thus, Sea Mar has alleged facts showing that ACGME exercised discretion

4    "inconsistent with the reasonable expectations of the parties or in some other

5    objectionable manner." *Hesketh*, 2021 WL 5761610, at *7. These allegations,

6    accepted as true at this stage, preclude dismissal.

7    **3.6    Sea Mar may seek damages for its losses.**

8        ACGME argues that Sea Mar cannot recover money damages because its loss

9    of government funding resulted from federal and state regulator's decisions, not

10   because of the accreditation withdrawal. ACGME bases this argument on

11   *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 482 (6th Cir. 2023). But ACGME's

12   reliance on this case is misplaced. *Geomatrix* is an anti-trust case applying the

13   *Noerr-Pennington* immunity doctrine—a doctrine specific to antitrust law that

14   shields defendants from liability when the plaintiff's harms flow from government

15   action rather than private anticompetitive conduct. This antitrust-specific

16   immunity does not apply to Sea Mar's claims.

17       Sea Mar contends that under Washington law, ACGME's allegedly wrongful

18   conduct proximately caused its damages and that such damages were reasonably

19   foreseeable. More specifically, Sea Mar alleges that: (1) ACGME knew or should

20   have known that government funding was conditioned on maintaining

21   accreditation; (2) ACGME's allegedly improper withdrawal of accreditation directly

22   triggered the loss of this funding; and (3) this harm was a reasonably foreseeable

23

consequence of ACGME's actions. *See* Dkt. No. 63 ¶¶ 20, 80. At the motion to dismiss stage, these allegations are enough to proceed on the damages claim. *See Travis v. Bohannon,* 115 P.3d 342, 348 (Wash. Ct. App. 2005) ("If the defendant's original negligence continues and contributes to the injury, the intervening negligence of another is an additional cause. It is not a superseding cause and does not relieve the defendant of liability.").

Thus, ACGME's motion to dismiss Sea Mar's claim for money damages is denied. This ruling does not preclude ACGME from challenging causation or the extent of damages at summary judgment or trial with a properly developed factual record.

## 4. CONCLUSION

In sum, the Court GRANTS in part ACGME's motion to dismiss, Dkt. No. 55, as follows:

- Sea Mar's federal common law due process claim (Claim 1) is DISMISSED with prejudice.

- Sea Mar's Washington state common law due process claim (Claim 2) is DISMISSED with prejudice.

- ACGME's motion to dismiss is DENIED in all other respects.

- ACGME must file its answer to Sea Mar's surviving claims within 14 days of this order, *see* Fed. R. Civ. P. 12(a)(4)(A), unless ACGME moves for an extension before that deadline expires.

- ACGME's motion to stay discovery, Dkt. No. 56, is DENIED as moot. The parties may proceed with discovery on the remaining claims.

IT IS SO ORDERED.

Dated this 26th day of September, 2025.

Jamal N. Whitehead
United States District Judge