The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEA MAR COMMUNITY HEALTH CENTERS,

Plaintiff,

v.

ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION,

Defendant.

Case No. 2:24-CV-000896-JNW

**DEFENDANT ACGME'S MOTION TO EXCLUDE THE TESTIMONY OF ARIK VAN ZANDT**

NOTE ON MOTION CALENDAR: **OCTOBER 26, 2026**

ORAL ARGUMENT REQUESTED



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
Telephone 206.624.0900

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Van Zandt Fails to Measure Losses Specific to the Termination of the Program. ........ 2

II. Van Zandt's Perpetual Future-Damages Methodology Disregards Sea Mar's Duty to Mitigate. ........ 3

LEGAL STANDARD ........ 4

ARGUMENT ........ 5

I. Van Zandt's Method Does Not Measure Damages Because It Fails to Account for Avoided Costs. ........ 5

A. No Authority Supports Van Zandt's Methodology of Omitting Avoided Costs. ........ 5

B. Van Zandt Admitted That a Damages Award Omitting Avoided Costs Would Be a "Windfall." ........ 6

C. Sea Mar's Non-Profit Status Does Not Justify Omitting Avoided Costs. ........ 8

II. Van Zandt Improperly Included Revenue Losses Unrelated to the Withdrawal of Accreditation. ........ 8

III. Van Zandt Misapplied the Capitalization Method for Future Damages. ........ 10

A. Van Zandt's Future Damages Method Compounds His Failure to Consider Avoided Costs. ........ 10

B. Van Zandt Improperly Ignores Sea Mar's Duty to Mitigate and Assumes Damages in Perpetuity. ........ 11

CONCLUSION ........ 12




STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
Telephone 206.624.0900

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802 (D. Minn. 2011) .....16

*Barrett Bus. Servs. Inc. v. Colmenero*, 2026 WL 313474 (E.D. Wash. Feb. 5, 2026) .....13

*e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637 (7th Cir. 2011) .....9, 10

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) .....8

*Englewood Terrace Ltd. P'ship v. United States*, 479 F. App'x 969 (Fed. Cir. 2012) .....9, 12

*Hegarty v. State Farm Mut. Auto. Ins. Co.*, No. 3:18-cv-05311-BHS, 2019 WL 6825333 (W.D. Wash. Apr. 29, 2019) (Van Zandt Expert Report) .....7, 10

*Johnson v. Travelers Indem. Co.*, No. 3:18-cv-05138-RJB, 2019 WL 1558435 (W.D. Wash. Feb. 14, 2019) (Van Zandt Expert Report) .....10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .....10

*Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150 (9th Cir. 2015) .....13, 14

*Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765 (5th Cir. 2017) .....10

*Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324 (N.D. Ind. Jan. 3, 2018) .....14

**Statutes**

RCW 70.112.060(4) .....11



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
Telephone 206.624.0900

**Other Authorities**

Fed. R. Evid. 702 ....................5, 8, 16

Fed. R. Evid. 702(b)....................14, 15

Fed. R. Evid. 702(c)....................9, 15

Fed. R. Evid. 702(d)....................14, 15

Restatement (Second) of Contracts § 347 (1981)....................9



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
Telephone 206.624.0900

## INTRODUCTION

Sea Mar's damages expert, Arik Van Zandt, plans to tell the jury that the ACGME's decision to withdraw accreditation from Sea Mar's residency program (the "Program") caused Sea Mar tens of millions of dollars of damages: $14,396,000 as of February 23, 2026 (the date of his report) and $40.9 million more in perpetual future damages. These numbers are preposterous and would have no credibility if not presented under the imprimatur of an expert who has been qualified by the Court to opine on damages. Rule 702 forbids that.

Van Zandt is able to present such absurdly large numbers because he did not determine the ***net*** effect of Sea Mar's loss of accreditation in June 2024, as valuation textbooks and a chorus of case law direct. He instead looked at the total ***revenue*** at three Sea Mar clinics before the withdrawal of accreditation in FY2024—the highest revenue year in their history—and then subtracted the clinics' ***revenue*** after the withdrawal. That's it. Though he admitted that (1) Sea Mar would have had to incur millions of dollars in costs to generate the revenues he contends Sea Mar "lost," and (2) Sea Mar avoided having to pay those costs as a result of not having a residency program, he did not deduct a penny of those costs from his "damages" figures. Nor did he account for any other cause for the decline of the clinics' various revenue streams—some of which have no connection to the Program at all—instead taking at face value Sea Mar management's self-interested statement that they could not think of any other reason for the decline. The numbers he seeks to present to the jury are no measure of damages at all; they are a pure windfall, as he essentially admitted at his deposition.

Van Zandt compounded these problems in his future damages calculation. There, he took his windfall revenue difference as the input and capitalized it into perpetuity. This calculation also baselessly assumes that Sea Mar will never reapply for accreditation or restore its program, despite its obligation to mitigate damages—and its request that this Court order its reaccreditation.



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
Telephone 206.624.0900

Each of Van Zandt's choices is an independent gatekeeping failure that warrants exclusion. Together, they reveal an opinion untethered from any recognized methodology and unsupported by sufficient facts and data. The Court should exclude Van Zandt's opinions in their entirety.

## BACKGROUND

### I. Van Zandt Fails to Measure Losses Specific to the Termination of the Program.

To calculate Sea Mar's purported economic damages to date, Van Zandt used what he described as a "before-and-after" method (though his cited sources discuss the method solely in the context of lost ***profits***, not lost ***revenues***). *See* Ex. 1 (Van Zandt Report) ¶ 19 & n.2; Ex. 2 (Van Zandt Tr.) at 95:20-96:16, 97:8-18. He compared revenue at the Marysville, Everett, and Lynnwood clinics in FY2024—the highest revenue year in the clinics' history—with revenue at those same clinics in FY2025. Ex. 1 ¶ 19; Ex. 2 at 127:13-18. He then took the annualized revenue decrease across the three clinics—$8,825,000—and extrapolated it across his "past-damages" period, from June 30, 2024 (accreditation withdrawal) through February 23, 2026 (report date) to reach $14,396,000. Ex. 1 ¶¶ 19, 24, 27.

Van Zandt admitted that Sea Mar avoided costs when it stopped operating the Program—millions in salary, benefits, and resident-training chief among them. Ex. 2 at 100:16-23, 103:12-105:16, 110:10-19. He also admitted that millions of dollars in funding that he included as "lost revenue" and "damages" was outside government funding that Sea Mar was ***required*** to spend on the Program. Ex. 2 at 113:17-115:14, 115:17-117:22; *see also* Ex. 5 at 2, Ex. 6 at 2, Ex. 7 at 1. But despite his admissions that losing revenue also caused Sea Mar to avoid a nearly equal amount of expenses, Ex. 2 at 111:15-112:24, Van Zandt did not deduct or offset those avoided expenses from his "damages" amount. In response to a hypothetical, he admitted that failing to offset costs would result in a windfall to a plaintiff: the plaintiff would be awarded unencumbered money that—in the but-for world in which the plaintiff's operations continued uninterrupted—it would have already spent on required expenses. *Id.* at 138:18-144:11. Whereas Sea Mar's net profit


STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

would be zero in the but-for world, it would have a positive gain of $14,396,000 if awarded its "lost revenues" after having already avoided the costs of earning them. *Id.*

Unsurprisingly, despite having given trial testimony as a damages expert in 60-70 cases, Van Zandt could not recall ***ever*** previously opining that damages should be measured by looking solely at lost revenues. Ex. 2 at 11:18-12:8. In fact, he has previously opined that such a method was improper, maintaining that economic damages "are measured by lost profits[,] ***not lost revenue***." *Hegarty v. State Farm Mut. Auto. Ins. Co.*, No. 3:18-cv-05311-BHS, 2019 WL 6825333, ¶ 11 (W.D. Wash. Apr. 29, 2019) (Van Zandt Expert Report) (emphasis added).

Van Zandt also admitted that, because he simply compared total year-over-year revenues at the three clinics, his calculation (*i.e.*, simple subtraction) included revenues that have nothing to do with the Program. Ex. 2 at 29:14-21, 33:2-16. Nonetheless, he ***assumed*** that 100% of the revenue difference (which he calls "damages") was caused by the Program's loss of accreditation, based exclusively on Sea Mar "management" telling him that it was "unaware" of other significant changes affecting the clinics. Ex. 1 ¶ 20; Ex. 2 at 35:23-36:17. Though Van Zandt conceded that this assumption was in Sea Mar management's financial interest, he admitted that he did nothing specific to confirm its accuracy: he did not, for example, run any regression analyses to determine which revenue decreases were actually caused by the withdrawal of accreditation, or consider the effects of Medicaid eligibility redeterminations following the end of the federal COVID emergency. Ex. 2 at 37:23-38:25.

## II. Van Zandt's Perpetual Future-Damages Methodology Disregards Sea Mar's Duty to Mitigate.

To measure future economic loss, Van Zandt applied a 21.6% capitalization rate to his $8,825,000 annualized lost revenue figure to reach a rounded amount of $40.9 million. Ex. 1 ¶ 26 & Sch. 6; Ex. 2 at 144:18-147:13. Because this calculation uses Van Zandt's inflated revenue number as its input, it suffers from and compounds the flaws of his present "damages" calculation. In addition, though Van Zandt conceded that plaintiffs have a duty to mitigate damages, Ex. 2 at



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

163:1-164:8, he admitted that his future damages calculation assumes the Program is "lost indefinitely," Ex. 2 at 147:9-22—*i.e.*, that Sea Mar never regains accreditation or restores its Program and never stops losing every dollar of FY2024 revenue that it did not earn in FY2025.

## LEGAL STANDARD

There is no presumption favoring admission of expert testimony. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Rule 702 liberalized the admission of expert testimony as compared to the [former] *Frye* test, but it did not establish a categorical preference for admitting expert testimony."). Rather, the "proponent of expert testimony must always establish . . . by a preponderance of the evidence" that (1) the expert witness "is qualified . . . by knowledge, skill, experience, training, or education," (2) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (3) "the testimony is based on sufficient facts or data," (4) "the testimony is the product of reliable principles and methods," and (5) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.* at 1049; Fed. R. Evid. 702.

The Court performs an essential gatekeeping function to save the jury from a purported expert whose testimony "go[es] beyond what the expert's basis and methodology may reliably support." *Engilis*, 151 F.4th at 1049-50. "Properly applied, Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence ***only if*** a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Id.* at 1049 (emphasis added). Thus, as the Ninth Circuit recently instructed, a district court must avoid the "error[]" of holding "'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" *Id.* at 1049.



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

## ARGUMENT

**I. Van Zandt's Method Does Not Measure Damages Because It Fails to Account for Avoided Costs.**

Instead of following Washington's jury instructions, the consensus of courts, or his own prior expert reports, Van Zandt measured Sea Mar's "damages" solely by lost revenue, without any consideration of Sea Mar's avoided costs to gain the revenue. This methodology, which Van Zandt conceded excludes millions of dollars in avoided salary, benefits, training, and other costs that Sea Mar avoided paying as a result of not having its Program, is not "the product of reliable principles and methods," and should be excluded. Fed. R. Evid. 702(c).

**A. No Authority Supports Van Zandt's Methodology of Omitting Avoided Costs.**

Courts uniformly reject damages calculations that rely solely on lost revenue as a measure of damages. "It is well established that where a plaintiff saved certain expenses as the result of the breach of a contract, lost revenue alone is not an appropriate measure of damages." *Englewood Terrace Ltd. P'ship v. United States*, 479 F. App'x 969, 973 (Fed. Cir. 2012). That is because an award of gross revenues "place[s] [the plaintiff] in a ***better*** position than it would have been in had there been no breach." *Id.* at 972-73 (citing Restatement (Second) of Contracts § 347 (1981)) (emphasis added). As the Seventh Circuit put it, "gross revenue is generally not an appropriate measure of damages because revenue is calculated without regard to the costs the plaintiff incurred in the course of making that revenue." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 647 (7th Cir. 2011); see *id.* at 647-48 ("[A] loss of revenue is not the same thing as a loss of profits. . . . [T]he cost savings is a gain that must be offset against the loss of revenues . . . ."). The Fifth Circuit likewise rejected an expert's lost-profits figures that failed to deduct the plaintiff's operating expenses. *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 779-80 (5th Cir. 2017). Washington law is no different: its pattern instruction refers to "net profits," meaning "the difference between the contract price and plaintiff's costs." 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 303.04 & note on use (7th ed. Apr. 2022 update).



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

Van Zandt's own sources, and his past work, foreclose the purported methodology he uses here. Despite testifying as an expert some 60 to 70 times, he could not identify a prior engagement in which he measured damages by lost revenue alone; this case "may be the very first time." Ex. 2 at 7:5-13, 11:18-12:8.[1] To the contrary, he has previously opined that "[e]conomic damages . . . are measured by ***lost profits not lost revenue***," *Hegarty,* 2019 WL 6825333, ¶ 11 (Van Zandt Expert Report) (emphasis added), and faulted an opposing expert for calculating damages "without properly analyzing the actual income ***and expenses*** of the Company both before and after the accident," *Johnson v. Travelers Indem. Co.*, No. 3:18-cv-05138-RJB, 2019 WL 1558435, ¶ 11 (W.D. Wash. Feb. 14, 2019) (Van Zandt Expert Report) (emphasis added).[2] The Federal Judicial Center's Reference Guide on Estimation of Economic Damages, which Van Zandt reviewed for this case, similarly instructs that "[t]he losses are net of any costs avoided because of the harmful act," and warns that "an expert would ***overstate*** damages by not including the avoided costs" in the calculation. Ex. 3 at 754, 778-79 (emphasis added). He conceded that the Guide does not say that its principles are limited to for-profit entities, and that he had not seen any authority for ignoring avoided costs for non-profits. Ex. 2 at 98:2-99:21, 100:24-101:15.

### B. Van Zandt Admitted That a Damages Award Omitting Avoided Costs Would Be a "Windfall."

In ignoring Sea Mar's avoided costs, Van Zandt's model creates the very windfall he acknowledged in his deposition. Asked to consider "Charity B"—a nonprofit that makes $1 million in revenue in Year 1 and spends 100% of it feeding the poor, loses that revenue at the beginning of Year 2 because of a defendant's conduct, and immediately shuts down, such that it no longer has any revenues or expenses—he agreed that Charity B's ***net*** income in both Year 1

[1] A "very significant" factor under Rule 702 is whether an expert has "developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F. 3d 1311, 1317 (9th Cir. 1995).

[2] An expert who abandons his own established methodology for litigation does not "employ[] in the courtroom the same level of intellectual rigor" he applies elsewhere. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

and Year 2 would be zero. Ex. 2 at 138:18-140:6. He further agreed that an award of $1 million in lost revenue would leave Charity B with $1 million in net income that it would not have had if its services had continued. *Id.* at 140:7-141:9, 142:15-143:4. And when asked whether such an award to a charity that never resumes operations is "an economic windfall," he acknowledged the charity "would have $1 million from that award" that it would be "free to spend . . . on whatever it wanted," so long as it was "not encumbered," which a money judgment would not be. *Id.* at 143:25-144:11.

That same reasoning applies here. Sea Mar has not operated its Program since mid-2024, and Van Zandt's own perpetual-damages opinion assumes it never will. Ex. 1 ¶ 26; Ex. 2. at 147:9-22. As a result, it has not had to pay the expenses the Program necessitated—expenses that he admitted would have ***equaled*** the revenues Sea Mar lost. Ex. 2 at 104:2-16, 111:15-112:24. The windfall is especially clear in the case of the many "revenues" Sea Mar was ***obligated by law*** to spend on Program expenses: Van Zandt admitted that the Medicare graduate medical education funds Sea Mar received through its hospital rotation site, Providence, were "specific for the resident program." *Id.* at 116:12-117:15; *see also* Dkt. 174-9, Ex. 17 at 1. He acknowledged that the state funding Sea Mar received was likewise restricted to use for the Program,[3] as was the grant funding from the Health Resources and Services Administration[4]—yet nevertheless included both sources of restricted funding in his damages calculation. Sea Mar loses nothing on a net financial basis when it stops receiving money it was required to spend operating a residency program that no longer exists. Yet Van Zandt counted every dollar of these restricted funds as damages, without separating them from the clinics' other revenue. Ex. 1 at ¶¶ 12, 21; Ex. 2 at 117:16-22. Awarding Sea Mar the gross revenue of a program it no longer runs, without deducting the costs of running it, would put Sea Mar in a better financial position than if the Program had never closed. *See*

---

[3] Ex. 2 at 114:7-115:14; Ex. 5 at 2; Ex. 6. at 2; *see also* RCW 70.112.060(4) ("No funds for the purpose of this chapter shall be used to subsidize the cost of care incurred by patients.").

[4] Ex. 1 ¶ 7 & Sch. 2; Ex. 4 at 3 (grant "may be used to support the *training of resident* FTEs. . . ." (emphasis added)).

*Englewood*, 479 F. App'x at 972-73. That is not compensation; it is the windfall Van Zandt described.

**C. Sea Mar's Non-Profit Status Does Not Justify Omitting Avoided Costs.**

Van Zandt's only justification for ignoring avoided costs is that Sea Mar is a nonprofit whose "expenditures to service operations [are] equal to the net fees it can generate," and that "the elimination of the revenue source from the Program directly impacts the community services provided." Ex. 1 ¶ 24; Ex. 2 at 111:15-112:12; 120:4-22. He repeated the community rationale throughout his deposition, explaining that he did not offset Sea Mar's $3.25 million in saved salaries and benefits because lost revenue "is the value of the services provided to its community members," and, nonsensically, that Sea Mar's costs are themselves "part of the economic benefit that it generates . . . for the individuals that it serves in the underserved community." Ex. 2 at 110:20–111:2, 102:6–9; *see also id.* at 119:9-23; 120:23-121:12. That methodology has no support. *Supra* Part I.A.

Moreover, Van Zandt's appeal to harm to "the community" is a red herring and would confuse the jury. The plaintiff is Sea Mar, not "the community," and "harm to the community" is not a measure of ***Sea Mar's*** loss. In any event, Van Zandt would not be qualified to conduct that kind of epidemiological and public health analysis, nor did he even attempt to do so. Indeed, he did not even determine whether there ***was*** any such harm; for all Van Zandt knows, the small decline in patient visits at the Sea Mar clinics following the Program's termination could be explained by changes in the number of patients needing care or by patients receiving superior healthcare at lower costs elsewhere. *Id.* at 121:5-25, 122:6-9. Van Zandt should not be permitted to make up facts and legal principles and present them to the jury as expert testimony.

**II. Van Zandt Improperly Included Revenue Losses Unrelated to the Withdrawal of Accreditation.**

Despite his purported assessment, Van Zandt did not actually measure Sea Mar's loss in revenue that was caused by the withdrawal of accreditation. Rather, he measured the change in



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

***all*** revenue and ***assumed*** the difference was attributable to loss of residents. Ex. 1 ¶ 20; Ex. 2 at 35:23-36:17. Courts have rejected such approaches that fail to isolate damages to the harm allegedly caused by the defendant. *See, e.g.*, *Barrett Bus. Servs. Inc. v. Colmenero*, 2026 WL 313474, at *7 (E.D. Wash. Feb. 5, 2026) (damages calculation "based on an assumption that all [plaintiff's] loss in revenue across all three branches . . . was attributed to Defendants' misappropriation . . . is not calculated with reasonable certainty").

Van Zandt's miscalculations go even farther afield: Van Zandt includes revenue lines that he could not explain at his deposition, Ex. 2 at 66:12-68:14, and items with no conceivable connection to the Program, like bad debt, contractual allowances, and uncompensated care. *Id.*; Ex. 1 Schs. 2-4. Those three categories account for approximately $1.5 million of the $6.5 million decline he attributes to accreditation withdrawal. Ex. 2 at 55:20-57:9; Ex. 1 Schs. 2–4. At Lynnwood clinic, the deterioration in those categories—approximately $1.02 million—exceeded the clinic's entire net revenue decline, meaning every other revenue category *increased* after the withdrawal of accreditation. *Id.* Nor did Van Zandt consider that the loss in residents is not equivalent to the loss of the same number of full-time employees; residents spent time on educational activities and did not see patients full-time, Dkt. 143, Ex. 19 at 23–24, so Sea Mar's replacement of residents with equal FTEs would generate ***more*** revenue, not less. Van Zandt's calculation is ***not*** a measurement of loss of revenue due to the accreditation withdrawal; it is simply an observation of the total change in revenue, misleadingly packaged as "damages." *See Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (rejecting damages calculation that failed to "segregate the losses" allegedly caused by the defendant's actions).

Van Zandt's only stated basis for assuming that 100% of the 2024-2025 revenue decline was caused by the withdrawal of accreditation was that Sea Mar management told him so. *Supra* Background. The Ninth Circuit has affirmed exclusion of exactly this kind of untested, pass-through opinion. In *Magnetar Technologies Corporation. v. Intamin, Ltd.*, the court upheld exclusion where the expert "took as a 'base assumption'" the plaintiff's projections and "assumed



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

they were accurate" because there was "no 'independent assessment of the[ir] validity.'" 801 F.3d at 1159.

Here, Van Zandt did the same. He did no regression analysis to test management's causation assumption, Ex. 2 at 38:6-10, 59:23-60:5; he did no analysis of changes in patient mix, *id.* at 69:14-70:18; and he did not specifically consider Medicaid eligibility redeterminations following the end of the COVID-19 pandemic, despite their potential effect on payer mix and revenue, *id.* at 38:1-5. Nor could he explain, for example, why not having residents-in-training at a clinic would cause more patients or insurance carriers not to pay for treatment they received, *id.* at 57:10-58:8. In fact, he "do[es]n't have an opinion on that one way or another," *id.* at 59:7-12, despite including this increase in unpaid services as "damages." An expert who cannot explain the causal link at the center of his damages figure has no reliable methodology to offer. *See Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324, at *3-4 (N.D. Ind. Jan. 3, 2018) ("[A]ny opinion that purports to measure damages without making a judgment as to which effects stem from the breach and which do not is useless." (internal quotations omitted)). Rule 702(b) and (d) do not permit a litigant's assertion to be repackaged as expert analysis.

## III. Van Zandt Misapplied the Capitalization Method for Future Damages.

Van Zandt's $40.9 million perpetual-future-damages opinion compounds the errors in his past-damages analysis. It capitalizes a revenue figure rather than a net economic benefit, assumes Sea Mar will never regain accreditation or otherwise mitigate its losses, and rests on untested assumptions about future funding from Sea Mar's hospital rotation site, Providence. Each defect independently warrants exclusion under Rule 702(b), (c), and (d).

### A. Van Zandt's Future Damages Method Compounds His Failure to Consider Avoided Costs.

Van Zandt's $40.9 million future damages opinion compounds the defect in his past-damages analysis by capitalizing the same unsupported revenue figure into perpetuity. He testified that his future damages approach is "largely the same" as a cash-flow valuation. Ex. 2 at 146:15-



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

147:2. But a cash-flow valuation capitalizes ***income*** after costs, whereas Van Zandt capitalized ***revenue***, deducted nothing, and projected it forward forever. Ex. 2 at 147:9-148:6, 155:2-6. His $40.9 million figure is not a reliable valuation; it is the product of applying a capitalization formula to an improper input that fails to account for the millions of dollars Sea Mar has avoided paying—and will continue to avoid paying—as a result of not having a Program.

Van Zandt also had no reliable basis to assume—as his future "damages" figure does—that in the but-for world, Sea Mar's Program would continue in perpetuity to receive the direct and indirect government funding that constitutes the bulk of Sea Mar's "lost revenues." His only stated basis for assuming that Sea Mar would forever continue to receive the millions in Medicare graduate medical education payments received indirectly through its contract with Providence—which was based on the presence of residents and faculty at Providence—was that he did not "have any reason to assume [they] wouldn't." Ex. 2 at 159:16-160:4. He reviewed none of Providence's Medicare cost reports, even though Sea Mar's contract payments depend on them. *Id.* at 160:10-161:13. Nor did he review Providence's termination notice or have the ability to identify any specific facts supporting his assumption that the termination was based solely on Sea Mar's loss of accreditation. *Id.* at 162:7-163:15. Van Zandt's assumption of perpetual, unmitigated loss, rests not on facts or data, but on the absence of any meaningful inquiry into them and, thus, fails to satisfy Rule 702(b) and (d).

### B. Van Zandt Improperly Ignores Sea Mar's Duty to Mitigate and Assumes Damages in Perpetuity.

Van Zandt's perpetuity assumption is equally unsupported. Despite agreeing that a plaintiff has a duty to mitigate, Ex. 2 at 163:16-19, he performed *no* mitigation analysis, *id.* at 164:1-165:18, 167:1-23. And despite acknowledging that Sea Mar could have reapplied for accreditation, *id.* at 165:23-166:2, he instead "assume[d] that the program is lost indefinitely," *id.* at 147:9-22. He did not consider any facts to support that assumption: he does not know why Sea Mar has not reapplied, and could not answer whether it would be "impossible for Sea Mar to regain



STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3400, Seattle, WA 98101
*Telephone 206.624.0900*

accreditation" or be "futile for Sea Mar to attempt to regain accreditation." Ex. 2 at 165:23-167:23. Yet those questions determine whether the assumed loss period could last forever. Sea Mar is one of Washington's largest providers of health services, operating more than 100 sites across 19 counties with nearly 3,400 employees. Dkt. 165 ¶ 5; Dkt. 145-1, Ex. 81 at 1. Nothing in Van Zandt's analysis explains why Sea Mar could not have reestablished a residency program at any of its sites to mitigate damages. Rule 702 does not permit an expert to disclaim the questions upon which his damages calculation depends and then simply assume the answer most favorable to his client. *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 832 (D. Minn. 2011) (damages opinion inadmissible because expert did not consider "many other factors . . . that might impact sales growth rates").

## **CONCLUSION**

The ACGME respectfully requests that this Court preclude Van Zandt from testifying at trial.

*I certify that this memorandum contains 4,198 words, in compliance with the Local Civil Rules.*

DATED: October 5, 2026

STOEL RIVES LLP

*s/ Vanessa Soriano Power*
Vanessa Soriano Power, WSBA No. 30777
vanessa.power@stoel.com
Jenna M. Poligo, WSBA No. 54466
jenna.poligo@stoel.com
600 University Street, Suite 3400
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

COVINGTON & BURLING LLP

s/ Nathan E. Shafroth
Nathan E. Shafroth (*pro hac vice*)
nshafroth@cov.com
W. Douglas Sprague (*pro hac vice*)
dsprague@cov.com
Majid Waheed (*pro hac vice*)
mwaheed@cov.com
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: 415.591.6000

Patrick Nutter (*pro hac vice*)
pnutter@cov.com
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94303-2112
Telephone: 650.632.4700

*Attorneys for Defendant ACGME*